IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARK G. ABBEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 07-272C |
| | ) | Chief Judge Smith |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS

Pursuant to Rule 56(h)(1) of the Rules of this Court, defendant respectfully submits the following proposed findings of uncontroverted facts setting forth all of the material facts upon which we base our partial motion for summary judgment.

A. The FAA's Personnel Management System

1. On November 15, 1995, Congress authorized the Administrator of the FAA to develop and implement (no later than January 1, 1996), a personnel management system ("PMS") for the FAA. Def. App. 1[1]. *See also* Department of Transportation and Related Agencies Appropriations Act of 1996, Pub. L. No. 104-50, § 347(a) (November 17, 1995). The Administrator was to develop the FAA PMS "[i]n consultation with the employees of the FAA and such non-governmental experts in personnel management systems as he may employ, and notwithstanding the provisions of Title 5, United States Code, and other Federal personnel laws." Id., quoting *Department of Transportation and Related Agencies*

[1] "Def. App. ___" is a citation to the appendix filed with defendant's partial motion to dismiss and partial motion for summary judgment.

*Appropriations Act of 1996,* P.L. 104-50, Section 347(a).

2. The FAA PMS is comprised of a document specifically outlining (1) staffing; (2) compensation; (3) performance management; (4) training; (5) labor relations; and (6) executive systems. The PMS is also comprised of Personnel Reform Information Bulletins ("PRIB"); the Human Resource Policy Manual ("HRPM"); Human Resource Operating Instructions (HROI's); and FAA Orders. Def. App. 1. The PMS identifies the aspects of title 5, United State Code, from which the FAA is expressly exempt, as well as the aspects of title 5 that continue to apply to the FAA. Def. App. 25. The FAA Administrator or his/her designees have the authority to amend the PMS as necessary. The PMS is amended through PRIBs, HROIs and FAA orders. Def. App. 1.

B. Credit Hours Are Not Overtime.

3. According to FAA policy, credit hours are not considered overtime payment. Def. App. 3, 13-23 . Instead, credit hours are hours that an employee elects to work with supervisory approval in excess of the employee's basic work requirement under a flexible work schedule. Id. Credit hours are not used at the FAA to compensate employees for overtime. Id.

4. The FAA negotiated the definition of credit hours in 1998 and again in 2006 with the National Air Traffic Controllers Association ("NATCA"). Def. App. 3, 13-16. The parties agreed upon the following language in Article 34, Section 7:

> "credit" hours are *non-overtime* hours worked under an FWS [Flexible Work Schedule] which are in excess of an employee's basic work requirement which are worked at the election of the employee after approval by the Agency.

(Emphasis added). Id.

C. The Cru-X/ART Computer System

5. FAA facilities use the Cru-X/ART software to track employee hours and to prevent non-exempt employees from working before or after their scheduled shift without compensation. Def. App. 6-7. The FAA has operated the Cru-X/ART system for ATCS personnel, including plaintiffs, since as early as November 2004, although implementation was not completed at all facilities until August 2005. Id.

6. The ART software runs on a personal computer. Employees in operational positions, such as ATCS and TMC, are required to sign-in and sign-out of their shifts using the software.[2] They are also required to use the software to sign in and sign out each time they work an operational position, such as a radar scope. Id.

7. The design of Cru-X/ART software precludes an

[2] Plaintiffs are comprised of ATCSs, TMC's, and Staff Support Specialists. Most Staff Support Specialists are exempt, do not hold operational positions, and are not required to sign-in and sign-out at the beginning and end of their scheduled shifts using the ART software. Some specialists maintain currency to control air traffic for certain periods of time. Those specialists must sign into the ART system before controlling air traffic or "working on position." Def. App. 6-7.

operational employee from performing work before or after his scheduled shift without compensation. Id. The following examples will demonstrate why this is true. The first example assumes that an operational employee, such as an ATCS, is scheduled to work from 7:00 a.m. to 3:00 p.m.[3] The employee's schedule shift time is already stored in the ART software. When an employee signs in on the Cru-X/ART software at the beginning of her shift, the software prompts her to enter her start time. If the employee enters a time other than the scheduled start time, the software asks whether the employee is changing his shift time or is working "time outside shift" ("TOS"), such as overtime. The employee must affirmatively make an entry into the software in order to sign in, either by entering her scheduled shift time, indicating that she is changing her shift time, or that she is working TOS. Id.

8. If the employee attempts to sign in at 6:45 a.m. for a 7:00 a.m. shift, for example, and she does not enter 7:00 a.m. for her start time, she must indicate that she is changing her shift times to 6:45 a.m. to 2:45 p.m. or that she is working TOS from 6:45 a.m. to 7:00 a.m. Thus, any time she worked between 6:45 a.m. (her actual start time) and 7:00 a.m. (her scheduled

---

[3] Operational employees work an eight-hour shift, including a paid thirty minute meal break, because they are always subject to recall. Non-operational employees, such as Staff Support Specialists, work an eight and a half hour (8.5) shift, which includes an unpaid thirty minute meal break.

start time) would be compensated. The same would hold true at the end of the shift. Assuming that the employee signed in for her shift at the scheduled start time (7:00 a.m.), if she attempted to sign out at 3:15 p.m., the software would ask her if she had worked TOS from 3:00 p.m. to 3:15 p.m. Id.

9. Additionally, operational employees are required to sign in and sign out of specific operational positions, such as a radar scope, using the ART software. The software will not allow an employee to sign in to an operational position before or after her scheduled shift start or stop time. Thus, if an employee signed in for her 7:00 a.m. shift at 6:45 a.m. without changing her shift or indicating that she was working TOS, and then attempted to sign in to an operational position at 6:50 a.m. using the ART software, the software would not allow her to sign in to the position prior to the official start of her shift at 7:00 a.m. Id.

10. The only way an employee could work and not receive compensation for the time before or after her shift would be if she was not following agency procedures. An employee could sign in for her 7:00 a.m. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 a.m. If that were the case, the employee is supposed to use the ART

software to amend her time record to reflect that she worked prior to 7:00 a.m., either by adjusting her shift times or by indicating that she was working TOS. Either way, the employee would be compensated for the time. Id.

11. Prior to the implementation of the Cru-X/ART software, time and attendance for employees, including ATCSs, TMCs, and Staff Support Specialists, was collected manually. Def. App. 11. The employee or her supervisor would record the time worked on a personnel log which was used for compilation of time and attendance data. Id. The FAA compensated employees for all time worked before or after an employee's scheduled shift that was in addition to their scheduled shift. Id.

12. Finally, employees receive Leave and Earnings ("L&E") statements on a biweekly basis that reflect their time worked for the relevant pay period. Id. If an employee believes she is not paid correctly, she can bring the issue to FAA management's attention for resolution. Id. If the employee is not satisfied by management's response, she can grieve the issue under the grievance procedure contained in the applicable agreement. Id. Plaintiffs do not contend that they have complained previously concerning incorrect payments in one or more pay periods.

D. Bidding For Work and Vacation Leave Schedules Off Duty

13. The FAA operates over 300 air traffic facilities to which the bulk of plaintiffs are assigned.[4] Def. App. 9. Each air traffic facility has the discretion to develop its own policies regarding the establishment of work and leave schedules, including procedures for employees bidding on the schedules.[5] Those policies and procedures are usually developed in conjunction with NATCA and the procedure may vary from facility to facility. Id. At many facilities, by agreement, FAA management allowed the union to conduct the bidding process for work and vacation leave schedules. Id.

14. Plaintiffs who are Staff Support Specialists do not bid on work and leave schedules. Def. App. 10-11. They normally work an administrative workweek and request vacation leave from their supervisors. Id. Plaintiffs who are ATCSs and TMCs do bid on work and vacation leave schedules. Def. App. 9. However, the FAA does not require that ATCSs and TMCs bid for work and vacation

[4] Plaintiffs who are ATCSs and TMC's work exclusively at air traffic facilities. Plaintiffs who are Staff Support Specialists work at either air traffic facilities or one of the FAA's nine regional offices.

[5] Many of the approximately 300 air traffic facilities operate continuously, i.e. twenty-four hours a day, seven days a week. Those that do not operate continuously usually operate seven days a week and more than eight hours a day. Therefore, plaintiffs who are ATCSs and TMC's do not customarily work a traditional administrative workweek, i.e. "business hours" Monday through Friday.

leave schedules. Def. App. 10. Bidding is completely voluntary. Id.

15. Because bidding is conducted by seniority pursuant to the collective bargaining agreement with NATCA, employees bid in a strict order and an employee's turn to bid may arise when she is off-duty. Id. Most facilities utilize a "proxy" system to avoid employees having to bid while off-duty, but use of the proxy is optional with the employee. Id.

16. Bidding occurs once annually at each facility. Id. The total time that any individual spends bidding on the work and vacation leave schedules during the course of year is between five and ten minutes, regardless of whether the bidding occurs off-duty. Id. In no circumstances, should any employee spend more than one hour per year engaged in bidding the work and vacation leave schedules. Id.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE M. DAVIDSON
Director

s/Hillary A. Stern
HILLARY A. STERN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0177
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

EDEN BROWN GAINES
ELIZABETH HEAD
MICHAEL DOHERTY
Federal Aviation Administration
600 Independence Ave., S.W.
Suite 1E-100
Washington, D.C. 20591
Tele: (202) 385-8254
Facsimile: (202) 493-5085

October 4, 2007

CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of October, 2007, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Hillary A. Stern