IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARK G. ABBEY, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 07-272C |
| | ) | Judge Emily C. Hewitt |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _ | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of this Court, plaintiffs respectfully submit the following response to defendant's proposed findings of uncontroverted facts.

A. The FAA' s Personnel Management System

1. On November 15, 1995, Congress authorized the Administrator of the FAA to develop and implement (no later than January 1, 1996), a personnel management system ("PMS") for the FAA. Def. App. 1[1]. *See also* Department of Transportation and Related Agencies Appropriations Act of 1996, Pub. L. No. 104-50, § 347(a) (November 17, 1995). The Administrator was to develop the FAA PMS [i]n consultation with the employees of the FAA and such non-governmental experts in personnel management systems as he may employ, and notwithstanding the provisions of Title 5, United States Code, and other Federal personnel laws." Id., quoting *Department of Transportation and Related Agencies Appropriations Act of 1996,* P.L. 104-50, Section 347(a).

[1] Plaintiff's Appendix, submitted in opposition to Defendants' Partial Motion to Dismiss and Partial Motion for Summary Judgment and in support of Plaintiffs' Cross-Motion for Partial Summary Judgment shall hereinafter be referred to as, "Plf. App. ___" References to Plaintiffs' Proposed Findings of Uncontroverted Facts shall be cited as "Plf. Fact ¶ __."

RESPONSE: Disputed. Entire statement sets forth conclusion of law, not fact. Statement is not supported by citation to admissible evidence. Evidence cited is a declaration which asserts conclusions of law and is not based on personal knowledge of the legislative history summarized therein.

2. The FAA PMS is comprised of a document specifically outlining (1) staffing; (2) compensation; (3) performance management; (4) training; (5) labor relations: and (6) executive systems. The PMS is also comprised of Personnel Reform Information Bulletins ("PRIB"); the Human Resource Policy Manual ("HRPM"); Human Resource Operating Instructions (HROI's); and FAA Orders. Def. App. 1. The PMS identifies the aspects of title 5, United State Code, from which the FAA is expressly exempt, as well as the aspects of title 5 that continue to apply to the FAA. Def. App. 25. The FAA Administrator or hi s/her designees have the authority to amend the PMS as necessary. The PMS is amended through PRIBs, HROIs and FAA orders. Def. App. 1.

RESPONSE: Disputed. Entire statement sets forth conclusion of law, not fact. Statement is not supported by citation to admissible evidence. Evidence cited is a declaration which asserts conclusions of law and is not based on personal knowledge of the legislative history summarized therein. Statement is further disputed by the fact that FAA's own personnel handbook acknowledges that "[w]henever legislative, regulatory, or other authoritative changes invalidate any portion of this handbook, that portion is voided automatically." Plf. Fact ¶1.

B. Credit Hours Are Not Overtime.

3. According to FAA policy, credit hours are not considered overtime payment. Def. App. 3, 13-23. . Instead, credit hours are hours that an employee elects to work with supervisory approval in excess of the employee's basic work requirement under a flexible work schedule. Id. Credit hours are not used at the FAA to compensate employees for overtime. Id.

RESPONSE: Disputed. Statement that "[a]ccording to FAA policy, credit hours are not considered overtime payment" is undisputed. Statement that "credit hours are hours that an employee elects to work" is disputed and contradicted by the fact that plaintiffs were assigned "credit hours" for work they were permitted to perform. Plf. Fact ¶¶ 4-5. Statement that "credit hours" are worked by employees "with supervisory approval" and that "credit hours" are worked "in excess of the employee's basic work requirement under a flexible work schedule" is undisputed. Statement that "[c]redit hours are not used at the FAA to compensate employees for overtime" is contradicted by the prior statement that "credit hours" are worked "in excess of the employee's basic work requirement," and as such is disputed.

4. The FAA negotiated the definition of credit hours in 1998 and again in 2006 with the National Air Traffic Controllers Association ("NATCA"). Def. App. 3, 13-16. The parties agreed upon the following language in Article 34, Section 7:

> "credit" hours are *non-overtime* hours worked under an FWS [Flexible Work Schedule] which are in excess of an employee's basic work requirement which are worked at the election of the employee after approval by the Agency.

(Emphasis added). Id.

RESPONSE: Disputed. Statement that "[t]he FAA negotiated the definition of credit hours in 1998 and again in 2006 with the National Air Traffic Controllers Association" is not

supported by the evidence cited. The evidence cited includes declaration statements from a witness who established no personal knowledge concerning the relevant issues.[2] The remaining evidence cited is similarly inadmissible.[3] The cited evidence reveals nothing about a negotiation of the definition of "credit hours." The statement is further contradicted by the fact that the FAA and the National Air Traffic Controllers Association ("NATCA") did not negotiate the definition of "credit hours" in 2006. Plf. Fact ¶37. Statement that the FAA and NATCA "agreed upon the following language in Article 34, Section 7 . . ." is disputed and not supported by the evidence cited. The cited evidence is not an agreement or even part of an agreement between FAA and NATCA. The statement is contradicted by the fact that FAA and NATCA failed to reach any agreement in 2006. Plf. Fact ¶37. Statement is not disputed as it relates to the 1998 collective bargaining agreement between FAA and NATCA.

---

[2] The cited evidence in support of Def. Fact ¶4 includes a declaration statement by an individual who has no established personal knowledge of contract negotiations between the NATCA and FAA, nor any established knowledge of the substance of "Article 34, Section 7 of the 2003 and 2006 NATCA CBAs." The declarant merely stated that "for two years" she has held a position where it is her duty to "manage a team of employees who provide policy implementation, advice and guidance in the areas of staffing, classification, compensation and pay-setting" and that "[p]rior to that time, [she] was a Classification/Pay/Compensation Specialist in the Policy Management Division." Cook Decl. ¶ 1 (Def. App. 1). These positions and duties in no way establish personal knowledge regarding the status of NATCA and FAA's contract negotiations or whether any agreement between NATCA and FAA had been reached.

[3] The documents cited at Def. App. 13-16 are unauthenticated documents entitled "Article 34 Working Hours" and "Article 34 Working Hours." Not only do these items have the *same title*, they are submitted as what appears to be incomplete portions of a larger written document that was not submitted. Further, the documents contain no indicia of self-authentication, such as a cover page, letterhead or signature. Moreover, if these items are, as defendant asserts, excerpts from a larger document, defendant has submitted no explanation as to why the entirety of the document was excluded or why defendant failed to submit any documentation regarding the authenticity of the document. It is plaintiffs' position that FAA cannot establish the existence of a ratified 2006 collective bargaining agreement – the existence of which FAA has repeatedly represented to the Court in this action. Although plaintiffs do not seek sanctions, pursuant to Fed. R. Civ. P. 11, against defendant for submitting false statements to the Court, plaintiffs request that this Court ignore defendant's representations regarding an alleged 2006 collective bargaining agreement until such time as defendant can provide this Court with evidence that such an agreement has been ratified.

C. The Cru-X/ART Computer System

5. FAA facilities use the Cru-X/ART software to track employee hours and to prevent non-exempt employees from working before or after their scheduled shift without compensation. Def. App. 6-7. The FAA has operated the Cru-X/ART system for ATCS personnel, including plaintiffs, since as early as November 2004, although implementation was not completed at all facilities until August 2005. Id.

RESPONSE: Disputed. Statement that "FAA facilities use the Cru-X/ART software to track employee hours" is contradicted by fact FAA is aware that plaintiffs regularly change the Cru-X/ART software to reflect their scheduled shift start time even though plaintiffs commence work prior to their scheduled shift start time. Plf. Fact ¶ 23; Plans & Programs Bulletin (Plf. App. 40)("[p]ersonnel must sign on at their scheduled shift time, or up to 15 minutes before their regular shift time"); FAA Order 7210.3U, § 2-2 (Plf. App. 76-88)("[s]ign in, using the assigned shift start time, may occur up to 15 minutes before an employee's assigned shift. . . . [overtime] time at the beginning of an assigned shift must receive approval . . . prior to . . . recording it into Cru-X/ART"); Robicheau decl. ¶¶ 11-12 (Plf. App. 27) (supervisors see plaintiffs' names appear on Cru-X/ART screen prior to designated shift start time). Statement that "FAA facilities use the Cru-S/ART software to . . . prevent non-exempt employees from working before or after their scheduled shift without compensation" is contradicted by fact that plaintiffs perform work before and after their scheduled shifts without compensation. Plf. Fact ¶¶ 15-20, 23-27; see also FAA Order No. 7210.3 (Plf. App. 76-88) (requiring plaintiffs to review "facility/area/position status boards, weather status boards, 'hot item' binders, clip board information sheets, and designated areas for written notes" and engage in extensive position briefing before relinquishing or taking on a position) . Statement that "[t]he FAA has operated the Cru-X/ART system for ATCS

personnel, including plaintiffs, since as early as November 2004, although implementation was not completed at all facilities until August 2005" is undisputed.

6. The ART software runs on a personal computer. Employees in operational positions, such as ATCS and TMC, are required to sign-in and sign-out of their shifts using the software.[4] They are also required to use the software to sign in and sign out each time they work an operational position, such as a radar scope. Id.

RESPONSE: Disputed. Statement that "[t]he ART software runs on a personal computer" is disputed as it is contradicted by the fact that the Cru-X/ART software connects several computers via a Local Area Network connection. Robicheau decl. ¶ 11-12 (Plf. App. 27). Statement that "[e]mployees in operational positions, such as ATCS and TMC, are required to sign-in and sign-out of their shifts using the software" is disputed as it is contradicted by the fact that plaintiffs' key strokes on the Cru-X/ART software reflect plaintiffs' actual time signing in and out for their shifts, and that the sign-in and sign-out times reflected on the Cru-X/ART software merely show the scheduled start and end of plaintiffs' shifts. Robicheau decl. ¶ 14-15 (Plf. App. 28). Statement that plaintiffs "are also required to use the software to sign in and sign out each time they work an operational position, such as radar scope" is disputed as it is contradicted by fact that plaintiffs may work an operational position, such as radar scope, prior to signing-into the Cru-X/ART system by key stroking into the Cru-X/ART system prior to the scheduled start time of the shift. Plf. Fact ¶27(g); Bukovsky dec. ¶ 33 (Plf. App. 11-12); Robicheau decl. ¶ 13 (Plf. App. 27-28). Statement that "[p]laintiffs are comprised of ATCs,

[4] Plaintiffs are comprised of ATCSs, TMC's, and Staff Support Specialists. Most Staff Support Specialists are exempt, do not hold operational positions, and are not required to sign-in and sign-out at the beginning and end of their scheduled shifts using the ART software. Some specialists maintain currency to control air traffic for certain periods of time. Those specialists must sign into the ART system before controlling air traffic or "working on position." Def. App. 6-7.

TMC's, and Staff Support Specialists" is not disputed. Statement that "[m]ost Staff Support Specialists are exempt" is disputed as it sets forth a legal conclusion and is unsupported by citation to evidence. Statement that Staff Support Specialists "do not hold operational positions" is disputed as it is not supported by the evidence cited. Statement that Staff Support Specialists "are not required to sign-in and sign-out at the beginning and end of their scheduled shifts using the ART software" is undisputed. Statements that "[s]ome specialists maintain currency to control air traffic for certain periods of time" and that "[t]hose specialists must sign into the ART system before controlling air traffic or 'working on position'" are disputed as they are not supported by the evidence cited.

7. The design of Cru-X/ART software precludes an operational employee from performing work before or after his scheduled shift without compensation. Id. The following examples will demonstrate why this is true. The first example assumes that an operational employee, such as an ATCS, i s scheduled to work from 7:00 a.m. to 3:00 p.m.[5] The employee's schedule shift time is already stored in the ART software. When an employee signs in on the Cru- X/ART software at the beginning of her shift, the software prompts her to enter her start time. If the employee enters a time other than the scheduled start time, the software asks whether the employee is changing hi s shift time or is working "time outside shift" ("TOS") , such as overtime. The employee must affirmatively make an entry into the software in order to sign in, either by entering her scheduled shift time, indicating that she is changing her shift time, or that she is working TOS. Id.

RESPONSE: Disputed. Statement that "[t]he design of Cru-X/ART software precludes

[5] Operational employees work an eight-hour shift, including a paid thirty minute meal break, because they are always subject to recall. Non-operational employees, such as Staff Support Specialists, work an eight and a half hour (8.5) shift, which includes an unpaid thirty minute meal break.

an operational employee from performing work before or after his scheduled shift without compensation" is disputed. The statement sets forth a legal conclusion (i.e., "performing work") and is contradicted by the fact that plaintiffs perform work before and after their scheduled shifts without compensation. Plf. Fact ¶¶ 15-20, 23-27. Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 a.m. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the ART software or ***she could perform non-operational duties, such as reading required briefings, prior to 7:00 am***." Def. Fact ¶ 10 (emphasis added). Statement that "[w]hen an employee signs in on the Cru-X/ART software at the beginning of her shift, the software prompts her to enter her start time" is contradicted by the fact that when an employee signs in on the Cru-X/ART software, the software has already listed the actual time the employee signed in; then it allows her to manually change that time. Plf. Fact ¶24-25. The statement is further contradicted by defendant's own admission that it is aware plaintiffs may sign in to Cru-X/ART prior to their scheduled shift start time and manually change the time to reflect the shift start time. Def. App. 6-7, ¶7. Defendants further admit that "[t]he Cru-X/ART software [in this instance] would ***preclude [the employee] from recording that she performed any work*** prior to [the shift start time]." Def. App. 7, ¶7 (emphasis added). Statement that "[i]f the employee enters a time other than the scheduled start time, the software asks whether the employee is . . . working [TOS], such as overtime" is contradicted by the fact that plaintiffs regularly perform work-related duties prior to the scheduled start time of the shift, in workweeks in which they work over 40 hours, and do not use Cru-X/ART to label such time as TOS. Plf. Fact ¶¶ 15-20, 23-27; Bukovsky decl. ¶ 26 (Plf. App. 10). Statements that "[o]perational employees work an eight-hour shift" is not supported by citation any evidence and is disputed by fact that plaintiff TMCs and ATCs are

scheduled to work eight hour shifts, but regularly spend more than eight hours performing job duties. Peterson decl. ¶¶ 4-5 (Plf. App. 19-20); Bukovsky decl. ¶¶ 4-5 (Plf. App. 7). The remaining statements are undisputed.

8. If the employee attempts to sign in at 6:45 a.m. for a 7:00 am. shift, for example, and she does not enter 7:00 am. for her start time, she must indicate that she is changing her shift times to 6:45 am. to 2:45 p.m. or that she is working TOS from 6:45 am. to 7:00 a.m. Thus, any time she worked between 6:45 am. (her actual start time) and 7:00 am. (her scheduled start time) would be compensated. The same would hold true at the end of the shift. Assuming that the employee signed in for her shift at the scheduled start time (7:00 a.m.), if she attempted to sign out at 3:15 p.m., the software would ask her if she had worked TOS from 3:00 p.m. to 3: 15 p.m. Id.

RESPONSE: Disputed. Statement that "any time she worked between 6:45 a.m. (her actual start time) and 7:00 a.m. (her scheduled start time) would be compensated" is disputed as it is contradicted by the prior sentence which concedes that the plaintiff may "enter 7:00 a.m. for her start time" even though she signs in for her shift at 6:45 a.m., and is further contradicted by the fact that plaintiffs sign in prior to the scheduled start time of their shifts, manually change the listed time on Cru-X/ART to reflect the scheduled start time of the shift and are not paid for any time spent performing job duties prior to the manually-entered time on Cru-X/ART (Plf. Fact¶¶ 22-25). The statement is also contradicted by defendant's own declarant's statement that "[t]he Cru-X/ART software would ***preclude her from recording that she performed any work*** prior to 7:00 a.m." Def. App. 7, ¶7 (emphasis added). Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 a.m. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to

7:00 am." Def. Fact ¶ 10. Statement that "[t]he same would hold true at the end of the shift" is disputed for the same reasons set forth above. Statement is further disputed by defendant's declarant's own testimony that "the Cru-X/ART software ***will not allow an employee to record work*** after the scheduled end time of her shift unless the employee indicates that she is working TOS . . ." Def. App. 6, ¶6 (emphasis added).

9. Additionally, operational employees are required to sign in and sign out of specific operational positions, such as a radar scope, using the ART software. The software will not allow an employee to sign in to an operational position before or after her scheduled shift start or stop time. Thus, if an employee signed in for her 7: 00 a. m. shift at 6: 45 a.m. without changing her shift or indicating that she was working TOS, and then attempted to sign in to an operational position at 6:50 a.m. using the ART software, the software would not allow her to sign in to the position prior to the official start of her shift at 7:00 a.m. Id.

RESPONSE: Disputed. Statement that "[t]he [Cru-X/ART] software will not allow an employee to sign in to an operational position before or after her scheduled shift start or stop time" is disputed as it is contradicted by the fact that plaintiffs may work operational positions, such as radar scope, after having signed in to Cru-X/ART, but prior to the scheduled shift start time recorded on Cru-X/ART. Plf. Fact¶ 27(g); Bukovsky decl. ¶ 33 (Plf. App. 11-12); Robicheau decl. ¶ 13 (Plf. App. 27). Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a. m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 am." Def. Fact ¶ 10. Statement that "if an employee signed in for her 7: 00 a. m. shift at 6: 45 a.m. . . . and then attempted to sign in to an operational position at 6:50 a.m. . . . the software would not

allow her to sign in to the position [at that time]" is disputed as it is contradicted by the fact that plaintiffs sign in prior to their shift start times, change their sign in time to reflect their shift start time and commence operational position duties prior to the scheduled start time of their shifts. Plf. Fact¶ 27(g); Bukovsky decl. ¶ 33 (Plf. App. 11-12 ); Robicheau decl. ¶ 13 (Plf. App. 27-28). Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a. m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 am." Def. Fact ¶ 10.

10. The only way an employee could work and not receive compensation for the time before or after her shift would be if she was not following agency procedures. An employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a. m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 am. If that were the case, the employee is supposed to use the ART software to amend her time record to reflect that she worked prior to 7:00 a.m., either by adjusting her shift times or by indicating that she was working TOS. Either way, the employee would be compensated for the time. Id.

RESPONSE: Disputed. Statement that "[t]he only way an employee could work and not receive compensation for the time before or after her shift would be if she was not following agency procedures" is disputed as it is not supported by citation to admissible evidence. The evidence cited comes from the testimony of a declarant who failed to establish personal knowledge regarding the topic about which he testified. Specifically, the declarant testifies about an "FAA policy" but merely established personal knowledge of "the Cru-X suite of software applications, including Cru-X/ART and Cru-Support." Def. App 6-7, ¶¶2, 8. As such,

he has no personal knowledge of agency procedures. Further, defendant failed to cite evidence of any policy, let alone the substance of such policy, as it relates to the statement asserted.[6] Statement that ***"[a]n employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 a.m."*** is undisputed. (Emphasis added). Statement that "the employee is supposed to use the ART software to amend her time record to reflect that she worked prior to [the scheduled start time of her shift]" is disputed as it is not supported by citation to any evidence. It is further disputed by the fact that plaintiffs sign in on Cru-X/ART prior to the scheduled start of their shifts, manually change Cru-X/ART to reflect their scheduled shift start time and perform job related duties prior to the scheduled start time of their shifts without indicating an adjustment in shift time or TOS for that overtime. Plf. Fact ¶¶ 15-20, 23-27; Bukovsky decl. ¶ 26 (Plf. App. 10). Statement that "[e]ither way, the employee would be compensated for the time" is disputed as it is not supported by citation to evidence. It is further disputed by the fact that plaintiffs are not compensated for this time. Plf. Fact ¶ 25-27.

11. Prior to the implementation of the Cru-X/ART software, time and attendance for employees, including ATCSs, TMCs, and Staff Support Specialists, was collected manually. Def. App. 11. The employee or her supervisor would record the time worked on a personnel log which was used for compilation of time and attendance data. Id. The FAA compensated employees for all time worked before or after an employee' s scheduled shift that was in addition to their scheduled shift. Id.

---

[6] Further, the same declarant makes assertions regarding employees' alleged communications with their "watch supervisor," their alleged certification of their time and attendance records, and their alleged "opportunity to correct" their employer's record of their hours of work. Def. App. 7, ¶8. Notably, the declarant has established no personal knowledge of what plaintiffs do at their individual work locations. As such, these statements are inadmissible and should be ignored.

RESPONSE: Disputed. Statement that "FAA compensated employees for all time worked before or after an employee's scheduled shift that was in addition to their scheduled shift" is disputed as it is contradicted by the fact that plaintiffs perform job duties before and after their scheduled shifts that is not recorded and for which they are not paid. Plf. Fact ¶¶ 13-14. The remaining statements are undisputed.

12. Finally, employees receive Leave and Earnings ("L&E") statements on a biweekly basis that reflect their time worked for the relevant pay period. Id. If an employee believes she is not paid correctly, she can bring the issue to FAA management's attention for resolution. Id. If the employee is not satisfied by management's response, she can grieve the issue under the grievance procedure contained in the applicable agreement. Id. Plaintiffs do not contend that they have complained previously concerning incorrect payments in one or more pay periods.

RESPONSE: Disputed. Statement that plaintiffs' Leave and Earning statements "reflect their time worked for the relevant pay period" is disputed by the fact that defendant does not record all job duties performed by plaintiffs prior to or subsequent to their scheduled shift. Plf. Fact¶¶ 14-20. The remaining statements are undisputed to the extent it is undisputed that a grievance procedure is in place, however, as is evident from defendant's position in this lawsuit, grieving FAA's FLSA violations would have been futile. Plaintiffs complain of FAA's FLSA violations through the pursuit of this lawsuit, as even FAA admits is in accordance with plaintiffs' rights. Plaintiffs similarly agree that they did not "*contend*" in their Complaint that they had complained previously.[7]

[7] Notably, defendant cites no evidence or law supporting their implicit allegation that 'complaining' is a prerequisite to filing an FLSA lawsuit. Further, defendant does not establish any facts that plaintiffs have ***not*** previously complained about the failure to be paid properly under the FLSA. Instead, defendant merely states that plaintiffs did not 'contend' in their complaint that they had previously complained.

D. Bidding For Work and Vacation Leave Schedules Off Duty

13. The FAA operates over 300 air traffic facilities to which the bulk of plaintiffs are assigned.[8] Def. App. 9. Each air traffic facility has the discretion to develop its own policies regarding the establishment of work and leave schedules, including procedures for employees bidding on the schedules.[9] Those policies and procedures are usually developed in conjunction with NATCA and the procedure may vary from facility to facility. Id. At many facilities, by agreement, FAA management allowed the union to conduct the bidding process for work and vacation leave schedules. Id.

RESPONSE: Disputed. Statement that bidding "policies and procedures are usually developed in conjunction with NATCA" is disputed as it is contradicted by evidence that FAA enacted and implemented bidding procedures. Plf. Fact¶ 29. Statement that "by agreement, FAA management allowed the union to conduct the bidding process for work and vacation leave schedules" is disputed by evidence that FAA enacted and enforced the bidding process. *Id*. The remaining statements are undisputed.

14. Plaintiffs who are Staff Support Specialists do not bid on work and leave schedules. Def. App. 10-11. They normally work an administrative workweek and request vacation leave from their supervisors. Id. Plaintiffs who are ATCSs and TMCs do bid on work and vacation leave schedules. Def. App. 9. However, the FAA does not require that ATCSs and TMCs bid for work and vacation leave schedules. Def. App. 10. Bidding is completely

[8] Plaintiffs who are ATCSs and TMC' s work exclusively at air traffic facilities. Plaintiffs who are Staff Support Specialists work at either air traffic facilities or one of the FAA's nine regional offices.

[9] Many of the approximately 300 air traffic facilities operate continuously, i.e. twenty-four hours a day, seven days a week. Those that do not operate continuously usually operate seven days a week and more than eight hours a day. Therefore, plaintiffs who are ATCSs and TMC's do not customarily work a traditional administrative workweek, i.e. "business hours" Monday through Friday.

voluntary. Id.

RESPONSE: Statement is undisputed.

15. Because bidding is conducted by seniority pursuant to the collective bargaining agreement with NATCA, employees bid in a strict order and an employee's turn to bid may arise when she is off-duty. Id. Most facilities utilize a "proxy" system to avoid employees having to bid while off-duty, but use of the proxy is optional with the employee. Id.

RESPONSE: Disputed. Statement that "[m]ost facilities utilize a 'proxy' system to avoid employees having to bid while off-duty, but use of the proxy is optional with the employee" is disputed as it is contradicted by the fact that plaintiffs are unable to use a proxy for bidding. Peterson decl. ¶ 13 (Plf. App. 21).

16. Bidding occurs once annually at each facility. Id The total time that any individual spends bidding on the work and vacation leave schedules during the course of year is between five and ten minutes, regardless of whether the bidding occurs off- duty. Id. In no circumstances, should any employee spend more than one hour per year engaged in bidding the work and vacation leave schedules. Id.

RESPONSE: Disputed. Statement that "[b]idding occurs once annually at each facility" is disputed as it is contradicted by the fact that bidding occurs on multiple days each year. Plf. Fact ¶ 33; FAA Memorandum, Subject: Vacation Leave (Plf. App. 36-38))(bidding schedule revealing multiple dates for bidding); Adcock decl. ¶ 8 (Plf. App. 2, 5-6)(attached bidding schedule shows bidding occurred on multiple dates). Statement that the "total time that any individual spends bidding on the work and vacation leave schedules during the course of year is between five and ten minutes" is disputed as it is contradicted by evidence that plaintiffs spend over one hour bidding off-duty in a single year. Plf. Fact¶32. Statement that "[i]n no

circumstances, should any employee spend more than one hour per year engaged in bidding the work and vacation leave schedules" is disputed as it is contradicted by the fact that plaintiffs spend over one hour bidding off-duty in a single year. *Id.*

Respectfully submitted,

Dated: December 17, 2007

/s/ Gregory K. McGillivary
Gregory K. McGillivary
WOODLEY & MCGILLIVARY
1125 15th Street, N.W.
Suite 400
Washington, D.C. 20005
(202) 833-8855 (Telephone)
(202) 452-1090 (Facsimile)

Counsel of Record

Lauren Schwartzreich
WOODLEY & MCGILLIVARY
1125 15th Street, N.W.
Suite 400
Washington, D.C. 20005
(202) 833-8855 (Telephone)
(202) 452-1090 (Facsimile)

Of Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts was electronically filed on this 17th day of December with the Clerk of the Court using the CM/ECF System which will send notification of such filing to defendant's attorney:

Hillary A. Stern
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
(202) 616-0177 (telephone)
(202) 305-7643 (facsimile)

/s/ Gregory K. McGillivary
Gregory K. McGillivary