IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARK G. ABBEY, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 07-272C<br>Judge Emily C. Hewitt |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**<u>DEFENDANT'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS</u>**

Pursuant to Rule 56(h)(2) of the Rules of this Court, Defendant United States respectfully submits the following response to plaintiffs' proposed findings of uncontroverted facts ("Pl. PFUF"). Pl. PFUF are bold and single space. Our responses are double spaced.

1. **FAA's personnel handbook acknowledges that "[w]henever legislative, regulatory, or other authoritative changes invalidate any portion of this handbook, that portion is voided automatically." FAA Pay Order p.1 (Plf. App. 94). FAA's Personnel Management System also reveals that FAA is aware that it is not covered by the relevant provisions of Title V. Personnel Management System, Sections II and III (Plf. App. 41-42) (Section 5543 of Title V not listed in section of "Applicable Statutes"; conceding that "Congress did not include Chapter 71 of Title 5 . . . in the list of section that will continue to apply to FAA's new personnel management system.")**

<u>Response</u>: Admits the allegations contained in the first sentence of Pl. PFUF No. 1. Admits the allegations contained in the second sentence of Pl. PFUF No. 1 to the extent supported by the documents cited which are the best evidence of their contents; otherwise, denies the allegations contained in the second sentence of Pl. PFUF No. 1; denies the characterization of provisions of title 5 as "relevant;" further avers that Congress eventually included chapter 71 of title 5 in the

list of sections that apply to the FAA Personnel Management System. See Pub. L. 104-122, 110 Stat. 876 (Mar. 29, 1996), codified at 49 U.S.C. § 40122(g)(2)(C).

2. **FAA provides plaintiffs with compensatory time for hours worked in excess of plaintiffs' required 40 hours of work per week. FAA Pay Order pp. 9-10 (Plf. App. 95-96)(authorizing the payment of compensatory time for hours worked in excess of 40 hours per workweek).**

Response: Denies the allegations contained in Pl. PFUF No. 2 to the extent these suggest the FAA grants compensatory time to employees who have not requested it. The FAA provides compensatory time for hours worked in excess of an individual plaintiff's required forty hours of work per week upon request of the individual plaintiff. FAA Order 3550.10, Pay Administration, App. 10, § 3; Agreement between the National Air Traffic Controllers Association, AFL/CIO and the Federal Aviation Administration, Department of Transportation, Art. 38, § 7 (Sept. 2003) (hereinafter "2003 Contract") ("At the request of the employee, the Agency may grant compensatory time off from an employee's tour of duty instead of payment for an equal amount of irregular or occasional overtime work. At the request of an employee, the Agency may grant compensatory time off from an employee's basic work requirement under a flexible work schedule instead of payment for an equal amount of overtime work, whether or not irregular or occasional in nature. If an employee has any entitlement to overtime pay under FLSA at the end of a work week, the Agency cannot require the employee to take compensatory time instead of overtime."); Contract between the National Air Traffic Controllers Association, AFL-CIO and the Federal Aviation Administration, U.S. Department of Transportation, Art. 38, § 9 (June 5, 2006) (hereinafter "2006 Contract") (identical language as 2003 contract regarding compensatory time). Miniace Decl. ¶ 8 (Def. Supp. App. 39-40).

3. **Plaintiffs receive compensatory time at the straight rate, not the time and one-half rate of pay. Instead, plaintiffs receive compensatory time for hours worked in excess of forty (40) hours per week at the rate of "one hour for one hour of overtime work." FAA Pay Order p. 10 (Plf. App. 96) (employees receive compensatory time at a rate of "one hour for one hour of overtime work.").**

Response: Admits the allegations contained in Pl. PFUF No. 3, except for the citation to "FAA Pay Order P. 10." Avers that plaintiffs have not cited the correct section of the FAA Order to support their allegation. Appendix 10 of FAA Order 3550.10, Pay Administration, addresses the implementation of provisions of the FLSA. Cook Supp. Decl. ¶ 2 (Def. Supp. App. 1). Section 3.I.C. of Appendix 10 states: "Compensatory time continues to be earned at the rate of an hour for one hour of overtime work."

4. **FAA considers "credit hours" to be "non-overtime hours" worked by plaintiffs with Flexible Work Schedules Yet FAA provides "Credit Hours" for hours worked in excess of these plaintiffs' required 40 hours of work per week. Bukovsky [sic] decl. ¶6 (Plf. App. 8); Def. App. 14.**

Response: Denies the allegations contained in Pl. PFUF NO. 4 to the extent it suggests that employees other than those working a flexible work schedule ("FWS") may earn credit hours. Avers that only employees working a flexible work schedule (FWS) are permitted to earn credit hours, at the election of the employee and after approval by the Agency. Cook Decl. ¶ 6 (Def. App. 3); 2006 Contract, Art. 34, § 7 (Def. App. 14); 2003 Contract, Art. 34, § 8 (Def. App. 15).

5. **To receive credit for overtime hours that result in accrual of credit hours, plaintiffs must obtain prior management approval. Bukovsky [sic] decl. ¶7 (Plf. App. 8); Def. App. 20 ("Credit hours may be earned, with management approval"))**

Response: Denies the implied allegation that credit hours are "overtime hours." Credit hours are "non-overtime hours worked under an FWS which are in excess of an employee's basic work

requirement and which are worked at the election of the employee after approval by the Agency." 2006 Contract, Art. 34, § 7 (Def. App. 14). Defendant admits that employees must obtain prior management approval before earning credit hours.

6. **"Credit hours" may be "used" by an employee for paid time off. Def. App. 14 ("credit hours" are accrued based on hours worked and may be used upon request to "substitute credit hours for approved annual leave"); Def. App. 20 ("Credit hours use is subject to management approval, as with any other form of leave").**

Response: Admits.

7. **"Credit hours" are not given at a cash rate of time and one-half but are instead provided at the straight rate of pay and any "credit hours" accrued in excess of 24 hours are forfeited. Def. App. 14 ("credit hours" are provided "at [the employee's] current rate of basic pay" and "any balances in excess of twenty-four (24) hours shall continue to have no cash value"); Def. App. 20 ("Credit hours in excess of the [24 hour] maximum carryover are forefeited [sic]"); Def. App. 21 ("Employees receive lump-sum payment for the 24 hour maximum of credit hours when they leave the agency. The payment is made at the employee's current rate of pay at the time that payment is made").**

Response: Denies; avers that credit hours are earned on an hour for hour basis, i.e. for each non-overtime hour worked under an FWS which is in excess of an employee's basic work requirement and is worked at the election of the employee, the employee receives one credit hour. Cook Supp. Decl. ¶ 3 (Def. Supp. App. 1). Credit hour balances in excess of twenty-four (24) hours are carried over and not forfeited. 2006 Contract Art. 32, § 7 (Def. App. 14).

8. **Prior to September 3, 2006, the FAA did not give bargaining unit members any cash value for accrued credit hours, nor was there a cap on the number of credit hours an employee could accrue. (Krasner decl. ¶16)(Plf. App. 16).**

Response: Admits; further avers that in 1998, the FAA agreed to remove the 24 hour "cap" on earning credit hours. Miniace Decl. ¶ 9 (Def. Supp. App. 40). In exchange, NATCA agreed that "controllers will in no circumstances be able to convert unused credit hours into pay." Id.

9. **By September 3, 2006, many FAA employees, including plaintiffs, had accrued in excess of 1,000 credit hours. (Krasner decl. ¶17)(Plf. App. 16). FAA was aware of potential legal liability for its employees' accrual of credit hours. *Id*.**

Response: Denies; avers that some FAA employees, not "many," possibly including some plaintiffs, had credit hour balances in excess of 1,000 hours; further avers that the FAA was aware that it had a responsibility to allow all employees with positive credit hour balances the opportunity to use those credit hours for time off from work. Ducharme Decl. ¶ 4 (Def. Supp. App. 13). Further avers that the allegations contained in Pl. PFUF No. 9 are immaterial to determining whether the FAA had the legal authority to award employees, including plaintiffs, credit hours in certain situations.

10. **Subsequent to September 3, 2006, FAA implemented a cap of 24 accrued credit hours whereby employees who had already accrued credit hours in excess of 24 hours were required to use all excess credit hours until the accrued hours level reached 24 hours. Only when their accrued credit hours dipped below 24 accrued credit hours were employees allowed to recommence accrual of credit hours. (Krasner decl. ¶18)(Plf. App. 16-17).**

Response: Admits. Further avers that the amount of credit hours employees could accrue after September 3, 2006, is immaterial to determining whether the FAA had the legal authority to award employees, including Plaintiffs, credit hours in certain situations.

11. **The Cru-X/ART system is a [sic] time-keeping software that plaintiffs log-in and out of each workday. Plaintiffs sign-in and out of Cru-X/ART on a computer located at their workplace. Robicheau decl. ¶7 (Plf. App. 26).**

Response: Admits.

12. **The Cru-X/ART system was not in effect in all FAA facilities throughout the period of May 2004 through present. Def. Br. at 62 (Cru-X/ART was started at some facilities "as early as November 2004" but "implementation was not completed at all facilities until August 2005").**

Response: Admits. Avers that the Cru-X/ART system was implemented in all FAA facilities by August 2005. Masson Decl. ¶ 3 (Def. App. 6).

13. **Prior to the implementation of the Cru-X/ART system, plaintiffs' hours of work were recorded manually. Bukovsky [sic] decl. ¶¶21, 29 (Plf. App. 9, 11); Savasta decl. ¶ 16 (Plf. App. 32); Peterson decl. ¶ 26 (Plf. App. 23).**

Response: Admits. Further avers that time and attendance records were ultimately recorded electronically in the appropriate FAA time and attendance system.

14. **When plaintiffs' hours of work were recorded manually, plaintiffs performed job duties prior to and after their scheduled shifts for which they were never compensated. Bukovsky [sic] decl. ¶¶ 29-31 (Plf. App. 11); Savasta decl. ¶¶ 17-18 (Plf. App. 32-33); Peterson decl. ¶¶ 26-27 (Plf. App. 23).**

Response: Denies. Avers that as a general principle, all FAA employees, including plaintiffs, are compensated for all time worked, including work performed before or after their scheduled shifts. Cook Supp. Decl. ¶ 4 (Def. Supp. App. 2). If an individual plaintiff performed work before or after her scheduled shift when plaintiffs' hours of work were recorded manually, she should have notified her supervisor and requested compensation in the form of overtime or compensatory time, depending upon the plaintiff's situation. Id. ¶ 5 (Def. Supp. 2). Additionally, each pay period, plaintiffs were required to certify to the accuracy of their time and attendance record for that pay period. Id. If the time and attendance record did not accurately reflect work performed outside of their scheduled shift(s), they had an opportunity to have the record corrected. Id. Otherwise, plaintiffs would have certified to an inaccurate time and attendance record. Id. Finally, plaintiffs received Leave and Earning (L&E) Statements on a bi-weekly basis. Cassady Decl. ¶ 13 (Def. App. 11). If a Plaintiff believed she was not properly compensated for all hours worked, including hours worked outside of her scheduled shifts, she

could bring the issue to FAA management's attention. Id. If she was not satisfied with management's response, she could file a grievance pursuant to the negotiated grievance procedure contained in the applicable labor agreement. Id.

Defendant also denies the specific factual allegations contained in plaintiffs' declarations. Defendant is not aware of plaintiffs Savasta, Bukovskey, or Peterson ever working before or after their scheduled shifts without compensation. Dunne Decl. ¶ 3; Miller Decl. ¶ 3; Prosperi Decl. ¶ 3 (Def. Supp. App. 18, 22, 28). Defendant is also not aware of Mr. Savasta, Mr. Bukovskey, or Mr. Peterson ever claiming that they were not properly compensated for time worked either before or after their scheduled shifts or of any grievances making the same claim. Id.

15. **Plaintiffs perform job duties prior to signing on to the Cru-X/ART system. Savasta decl. ¶¶ 7-8, 15 (Plf. App. 31-32); Savasta decl. attach. (Plf. App. 35).**

Response: Denies. Avers that if plaintiffs are performing job duties prior to signing on to the Cru-X/ART system without authorization from FAA management, they are doing so in violation of FAA policies. Rooney Decl. ¶ 3 (Def. Supp. App. 14-15) "Cru-X/ART is the official time and attendance system for both signing in/out for a shift and on and off positions . . ." FAA Order JO 7210.3V, Facility Operation Administration, § 2-2-6 (Def. Supp. App. 7-9). "Employees shall use ART to sign in and out of their shifts." Id. Employees, including plaintiffs, should not perform any duties prior to the beginning of their assigned shift or prior to signing on the Cru-X/ART system without the authorization of their supervisor or manager. Rooney Decl. ¶ 4 (Def. Supp. App. 15).

Defendant also denies plaintiff Savasta's specific allegations. All of the tasks listed in the "Opening Procedures" and "Closing Procedures" in the attachment to Mr. Savasta's declaration (Pl. App. 35) are to be performed while in a paid duty status. Prosperi Decl. ¶¶ 4-5 (Def. Supp. App. 28-29). The Morristown Air Traffic Control Tower (ATCT), where Mr. Savasta is assigned, opens for air traffic at 6:45 a.m. Id. ¶ 4 (Def. Supp. App. 28).The scheduled shift start time for employees assigned to open the control tower, including plaintiff Savasta, is 6:15 a.m. in order for the employees to perform all of the "Opening Procedures" while on paid, duty time. Id. FAA management normally schedules two air traffic controllers to the opening shift so that all of the tasks can be completed prior to 6:45 a.m. Id. The Morristown ATCT closes at 10:30 p.m. Id. The "Closing Procedures" are all accomplished prior to 10:30 p.m. except for turning off the audio recorder and stairwell lights. Id. ¶ 5 (Def. Supp. App. 28-29). FAA management normally schedules two air traffic controllers to the closing shift so the last two tasks can be accomplished at 10:30 p.m. Id.

**16. Plaintiffs are not compensated for performing job duties prior to signing on to the Cru-X/ART system. Savasta decl. ¶ 9 (Plf. App. 31); Savasta decl. attach. (Plf. App. 35).**

Response: Denies. Avers that as a general principle, the FAA compensates employees, including plaintiffs, for all work performed, including any work performed before and after their scheduled shifts. In accordance with FAA policies, plaintiffs are required to sign on to the Cru-X/ART system prior to performing any work. Rooney Decl. ¶ 4 (Def. Supp. App. 15). If any of the plaintiffs performed work prior to signing on to the Cru-X/ART system, they had the opportunity afterwards to adjust their shift start time in the system or request Time Outside of Shift (TOS),

such as overtime or compensatory time, depending upon the situation, to compensate them for the work performed.

Moreover, the cited provision of Mr. Savasta's declaration does not support the factual allegation. Savasta Decl. ¶ 9 (Pl. App. 31). In his declaration, Mr. Savasta is alleging that he performs uncompensated work after he signs on to the Cru-X/ART system, but prior to the scheduled start time of his shift. Id. Nowhere in his declaration does Mr. Savasta state that he was not compensated for performing job duties prior to signing on to the Cru-X/ART system.

**17. Plaintiffs perform job duties after signing on to the Cru-X/ART system, but before their paid work time begins. Bukovsky [sic] decl. ¶¶ 24, 31 (Plf. App. 10-11); Savasta decl. ¶ 9 (Plf. App. 31); Peterson decl. ¶¶ 19-22 (Plf. App. 22).**

Response: Denies. Avers that pursuant to FAA policy, employees are supposed to sign on to the Cru-X/ART system for their scheduled shift time. Employees are aware of their scheduled shift times at least twenty-eight days in advance of the shift. Cassady Supp. Decl. ¶ 2 (Def. Supp. App. 10). When an employee signs on to the system, she must make an affirmative entry. Masson Decl. ¶ 5 (Def. App. 6). The employee must either: 1) enter her scheduled shift start time; 2) indicate that she is changing her shift time; or 3) indicate that she is working TOS. Id. The expectation is that the employee will enter her scheduled shift time and perform no work until then, i.e. an employee signing in at 6:45 a.m. for a scheduled shift start time of 7:00 a.m. would enter 7:00 a.m. The employee would neither be required nor expected to perform any work between 6:45 a.m. and 7:00 a.m. If an employee is required to perform work before 7:00 a.m., she would either change her scheduled shift start time or indicate that she was working TOS in order to be compensated for that time. Both actions require supervisory approval. Masson Supp. Decl. ¶ 3 (Def. Supp. App. 3). An employee who performs work prior to the start

of her scheduled shift without requesting to change her shift or to work TOS is doing so contrary to FAA policy. Rooney Decl. ¶ 5 (Def. Supp. App. 15).

The one exception to the foregoing is if an employee has elected to work a flexible work schedule (FWS). Under an FWS, an employee can "flex" her shift start time usually by thirty (30) minutes, i.e. an employee working an FWS with a scheduled shift start time of 7:00 a.m. may begin her shift anytime between 6:30 a.m. and 7:00 a.m. without supervisory approval. Masson Supp. Decl. ¶ 4 (Def. Supp. App. 4). The Cru-X/ART system is designed to accommodate employees working an FWS. Id. Thus, an employee working an FWS with a scheduled shift start time of 7:00 a.m. who signed on to the Cru-X/ART system at 6:45 a.m. could begin working immediately. Cru-X/ART would indicate that the employee's shift for that day began at 6:45 a.m. rather than 7:00 a.m. Id.

18. **Plaintiffs are not compensated for performing job duties when they sign on to the Cru-X/ART system prior to the start of their paid time. Bukovsky [sic] decl. ¶ 31 (Plf. App. 11); Savasta decl. ¶ 8 (Plf. App. 31); Peterson decl. ¶¶ 19-22 (Plf. App. 22).**

Response: Denies. Defendant incorporates its response to Pl. PFUF No. 17. Additionally, defendant avers that plaintiffs misapprehend the purpose of the Cru-X/ART system. It is not intended to be a "punch clock" whereby an employee's paid time begins the minute he signs on to the system, regardless of the scheduled start time of his shift. Masson Supp. Decl. ¶ 6 (Def. Supp. App. 4). Employees are expected to work their scheduled shifts, with the exception that employees on an FWS may come in earlier than their scheduled shift start time. Cassady Supp. Decl. ¶ 3 (Def. Supp. App. 10-11). The FAA expects that an employee who is scheduled to start her shift at 7:00 a.m. and is not on an FWS will be available to begin work at 7:00 a.m. The Cru-

X/ART system allows employees to sign in earlier than their scheduled shift start time in order to avoid congestion at and around the system computers. Masson Supp. Decl. ¶ 6 (Def. Supp. App. 4). The FAA, however, does not expect or require employees who sign in to the Cru-X/ART system prior to the beginning of their scheduled shift start time to perform any work until that time. Rooney Decl. ¶ 4 (Def. Supp. App. 15). Moreover, employees are aware of their scheduled shift times at least twenty-eight (28) days in advance. Cassady Supp. Decl. ¶ 2 (Def. Supp. App. 10).

19. **Plaintiffs perform job duties after signing off from the Cru-X/ART system. Bukovsky [sic] decl. ¶ 27 (Plf. App. 10); Savasta decl. ¶¶ 12-15 (Plf. App. 32); Savasta decl. attach. (Plf. App. 35).**

Response: Denies. The FAA is unaware of any plaintiff performing job duties after signing off from the Cru-X/ART system. Def. App. Defendant further avers that the duties that plaintiff Savasta allegedly performs after the end of his shift are part of his regular work assignments to be performed prior to the end of his shift while on duty time. Prosperi Decl. ¶ 5 (Def. Supp. App. 28-29). FAA management has never required, authorized, or expected plaintiff Bukovskey to perform work after the scheduled end of his shift without compensation. Miller Decl. ¶ 4 (Def. Supp. App. 23). FAA management is not aware of Mr. Bukovskey having performed work after the scheduled end of his shift without compensation. Id. ¶ 3 (Def. Supp. 22).

20**. Plaintiffs are not compensated for performing job duties after signing off from the Cru-X/ART system. Bukovsky [sic] decl. ¶ 27 (Plf. App. 10); Savasta decl. ¶ 12-15 (Plf. App. 32); Savasta decl. attach. (Plf. App. 35); Robicheau decl. ¶¶ 13, 15 (Plf. App. 27-28).**

Response: Denies. Avers that as a general principle, the FAA compensates employees, including plaintiffs, for all work performed, including any work performed before and after their scheduled shifts. In accordance with FAA policies, plaintiffs are required to sign off the Cru-X/ART

system at the end of their scheduled shift and are not supposed to perform any work after the scheduled end of their shift. Rooney Decl. ¶ 6 (Def. Supp. App. 15). If any of the plaintiffs performed work after signing off the Cru-X/ART system, they had the opportunity afterwards to request Time Outside of Shift (TOS), such as overtime or compensatory time, depending upon the situation, to compensate them for the work performed. Masson Decl. ¶ 6 (Def. App. 6).

Defendant also denies plaintiffs' specific allegations. The duties that plaintiff Savasta allegedly performs after the end of his shift are part of his regular work assignments to be performed prior to the end of his shift while on duty time. Prosperi Decl. ¶ 5 (Def. Supp. App. 28-29). FAA management has never required, authorized, or expected plaintiff Bukovskey to perform work after the scheduled end of his shift without compensation. Miller Decl. ¶ 4 (Def. Supp. App. 23). FAA management is not aware of Mr. Bukovskey having performed work after the scheduled end of his shift without compensation. Id. ¶ 3 (Def. Supp. App. 22). Plaintiff Robicheau does not allege that he personally ever worked after the scheduled end time of his shift without compensation. Robicheau Decl. ¶¶ 13 and 15 (Pl. App. 3-4).

21. **Plaintiffs spend over 10 minutes performing these pre- and post-shift activities per day. Bukovsky [sic] decl. ¶ 32 (Plf. App. 11); Peterson decl. ¶ 20 (Plf. App. 22).**

Response: Denies. Plaintiffs do not specify in their Proposed Uncontroverted Fact No. 21 what tasks comprise "these pre- and post-shift activities." Paragraph 32 of plaintiff Bukovskey's declaration also does not specify any particular tasks, just "work related duties." Bukovskey Decl. ¶ 32 (Pl. App. 11). Likewise, paragraph 20 of plaintiff Peterson's declaration does not specify any particular tasks, just "aforementioned duties." Peterson Decl. ¶ 20 (Pl. App. 22). The duties referred to in the paragraph immediately preceding paragraph 20 refer to duties that Mr.

Peterson allegedly performs prior to the beginning of his shift are: "review the FAA mandatory review binder and other briefing items and exchange air-traffic information with the TMC whom I am relieving." Id. ¶ 19. These tasks are not "pre-shift duties" but are part of Mr. Peterson's regular work assignments to be performed during the course of his scheduled shift. Dunne Decl. ¶ 8 (Def. Supp. App. 19).

22. **As a regular practice, plaintiffs sign in for their shifts within 15 minutes prior to the scheduled start of their shift. When they do so, the Cru-X/ART system allows them to (1) manually change the time on Cru-X/ART to indicated [sic] the scheduled start of the shift; (2) change the shift start and end time if the plaintiffs is [sic] allowed to work a flex schedule; or (3) indicate that the time is Time Outside of Shift ("TOS"). Robicheau decl.¶¶ 9-10 (Plf. App. 26-27); Bukovsky [sic] decl. ¶ 24 (Plf. App. 10); Savasta decl. ¶ 9 (Plf. App. 31).**

Response: Denies the allegations contained in Pl. PFUF No. 22 to the extent that employees who are not on an FWS may also change their scheduled shift start and end times, with supervisory approval, if they are required to perform work prior to the scheduled start time of their shift. Masson Decl. ¶ 5 (Def. App. 6). Defendant does not otherwise dispute the factual allegations.

23. **When plaintiffs sign into Cru-X/ART within 15 minutes before the scheduled start time of their shift, they manually change the time indicated on Cru-X/ART to reflect the scheduled start time of the shift. Robicheau decl. ¶¶ 9-10 (Plf. App. 26-27); Bukovsky [sic] decl. ¶ 24 (Plf. App. 10); Savasta decl. ¶ 9 (Plf. App. 31); Plans and Programs Bulletin (Plf. App. 40).**

Response: Denies. Defendant incorporates its response to Pl. PFUF No. 17.

24. **For example, if an employee signs in at 6:16 a.m. for a 6:30 a.m. shift, the Cru-X/ART screen will show "6:16" as the time of sign-in. However, Cru-X/ART does not automatically use her actual time, 6:16 a.m., as the "start time" of her work hours. Instead, Cru-X/ART prompts her to manually enter a "start time." If the actual time of her sign-in precedes her scheduled shift-start time, she will enter her scheduled start time as the recorded "start time."**

Response: Denies. Defendant incorporates its response to Pl. PFUF No. 17. Moreover, plaintiffs cite no evidence to support the factual allegations.

25. **When plaintiffs sign into Cru-X/ART within 15 minutes before the scheduled start time of their shift and manually change the time indicated on Cru-X/ART to reflect the scheduled start time of the shift, plaintiffs are not compensated for any job duties performed during those 15 minutes. Bukovsky [sic] decl. ¶ 22, 24, 31 (Plf. App. 9-11); Savasta decl. ¶ 9 (Plf. App. 31); Robicheau decl. ¶13-15 (Plf. App. 27-28).**

Response: Denies. Defendant incorporates its response to Pl. PFUF No. 17.

26. **FAA allows plaintiffs to manually change the time indicated on Cru-X/ART to reflect the scheduled start time of the shift even if the actual time is up to 15 minutes prior to the scheduled start time of the shift. Plans & Programs Bulletin (Plf. App. 40)("[p]ersonnel must sign on at their scheduled shift time, or up to 15 minutes before their regular shift time"); FAA Order 7210.3U, § 2-2 (Plf. App. 76-87)("[s]ign in, using the assigned shift start time, may occur up to 15 minutes before an employee's assigned shift. . . . [overtime] time at the beginning of an assigned shift must receive approval . . . prior to . . . recording it into Cru-X/ART"); Bukovsky [sic] decl. ¶ 24 (Plf. App. 10).**

Response: Denies. Defendant incorporates its response to Pl. PFUF No. 17.

27. **Plaintiffs perform the following pre- and post-shift activities without compensation:**

a. **replace the tape recorder; turn on all machines, radars and computers (including Cru-X/ART), close out logs, give verbal broadcast of termination of services, contact other FAA facilities regarding transfer of control, "[e]nsure the appearance of the operational quarters", set thermostat, secure windows and doors, turn off tape recorders, machines, radars, computers and lights (Savasta decl. ¶¶ 7, 12, 15) (Plf. App. 31-32);**
b. **review: FAA mandatory review binders and other briefing items (Peterson decl. ¶19) (Plf. App. 22); Hot Binder (Plf. App. 66);**
c. **review "Hot Boards," "Read and Initial" documents, current weather, runway configuration, equipment condition/configuration and other information (Roanoke ROA 7110.1A) (Plf. App. 39);**
d. **review FAA training memoranda (FAA training memoranda) (Plf. App. 67-75); Bukovsky [sic] decl. ¶22 (Plf. App. 9);**
e. **exchange air-traffic control information with the person being relieved (Peterson decl. ¶19) (Plf. App. 22) (Bukovsky [sic] decl. ¶22) (Plf. App. 9); (FAA Order 7210.3U, § 2-2) ("[t]he [Air Traffic Control] specialist being relieved shall be responsible for ensureing [sic] that any pertinent status information of which he/she is aware is relayed to the relieving specialist . . . . [and] [t]he specialists engaged in apposition relief shall conduct the relief process at the position being relieved . . .")(Plf. App. 76-87);**

**f. check in with supervisor (Bukovsky [sic] decl. ¶22) (Plf. App. 9); (FAA Order 7210.3U, § 2-2) (Air Traffic Managers shall "[e]nsure that all employees . . . are thoroughly briefed on [procedure/practice] change[s] prior to performing their duties.") (Plf. App. 11)**

**g. use the radar scope (Bukovsky [sic] decl. ¶33) (Plf. App. 11-12); Robicheau decl. ¶ 13 (Plf. App. 27).**

Response: Denies. Avers that the duties listed are not "pre- and post-shift activities".[1] They are activities that are part of plaintiffs regular work assignments to be performed during the course of their scheduled shifts and for which they are compensated. Dunne Decl. ¶ 8; Prosperi Decl. ¶¶ 4-5 (Def. Supp. App. 19, 28-29).

28. **Plaintiffs have logged out of Cru-X/ART up to 15 minutes prior to the scheduled end of their shifts. However, when they do so, plaintiffs are required to remain on premises until the scheduled end of their shifts in case FAA needs them to cover a post. Plaintiffs are subject to discipline for leaving the work premises prior to the scheduled end of their shifts, even if they have logged out of the Cru-X/ART system. Bukovsky [sic] decl. ¶ 28 (Plf. App. 10-11)**

Response: Admits. Further avers that employees are expected to work their entire shift and are compensated for doing so. The Cru-X/ART system allows an employee to sign out from his shift fifteen minutes before the scheduled end of the shift in order to avoid congestion at the computer at the end of the shift. Masson Supp. Decl. ¶ 6 (Def. Supp. App. 4). Employees, however, are still on paid, duty time between when they sign out of the Cru-X/ART system until the scheduled end of their shift. For example, an employee scheduled to work a shift from 7:00 a.m. until 3:00 p.m. may sign out of her shift at 2:45 p.m. She is expected to remain at the work site until 3:00 p.m. because she is being compensated until that time. Rooney Decl. ¶ 6 (Def. Supp. App. 15).

[1] The list of "pre- and post-shift activities" that Plaintiffs allegedly perform without compensation is based, in part, upon a series of unauthenticated documents (Pl. App. 39, 66, and 76-87), all of which appear to be incomplete portions of larger written documents that were not submitted. Further, the documents contain no indicia of self-authentication, such as a cover page, letterhead or signature. Moreover, if these documents are an excerpt from larger documents, Plaintiffs have submitted no explanation as to why the entirety of the document was excluded or why Plaintiffs failed to submit any documentation regarding the authenticity of the documents.

29. **Subsequent to September 3, 2006, FAA unilaterally (without negotiation with the union) implemented bidding procedures plaintiffs' work schedules and vacation time. (Krasner decl. ¶13)(Plf. App. 16).**

Response: Denies. Avers that the FAA implemented its final bargaining offer on September 3, 2006, pursuant to authority granted under 49 U.S.C. §§ 106 and 40122. Miniace Decl. ¶ 3 (Def. Supp. App. 38). The Federal Labor Relations Authority has recognized the legality of the FAA's actions in implementing the 2006 labor contract between the Agency and NATCA. Id. ¶ 7 (Def. Supp. App. 39). During the negotiations over the 2006 labor contract, NATCA, with plaintiff Krasner serving as the Union's Chief Negotiator, tentatively agreed to Article 32 of the contract, which addresses procedures for bidding on work schedules. Id. ¶ 3 (Def. Supp. App. 38). The FAA and NATCA did not agree on Article 24 of the contract, which addresses bidding on vacation leave. Id. That contract article, along with others at impasse, were submitted to Congress and implemented by the FAA pursuant to authority granted under 49 U.S.C. §§ 106 and 40122. Id. The FAA and NATCA negotiated agreements addressing the bidding process after the implementation of the 2006 contract. Miller Decl. ¶ 6; Fuentes Decl. ¶ 5 (Def. Supp. App. 23-24, 31-32).

30. **Plaintiffs are scheduled to bid for their work and vacation time schedules while off-duty. Bukovsky [sic] decl. ¶¶ 11-15 (Plf. App. 8-9); Adcock decl. ¶¶ 6-9 (Plf. App. 2-3, 5-6) (actual bidding schedules); Peterson decl. ¶¶ 11-12 (Plf. App. 2021).**

Response: Denies. Avers that plaintiffs are not "scheduled" to bid for work and vacation schedules as bidding is not a required duty. Rather, plaintiffs are provided with windows of opportunity during which they may bid on work and leave schedules if they wish theyir preferences to be taken into account by the agency. Plaintiffs also have the option of submitting

a "proxy" bid with a co-worker or union representative or waiting until they return to duty to bid. Cassady Decl. ¶ 7 (Def. App. 10). Typically, employees spend a total of five (5) to (10) minutes annually bidding their work and vacation leave schedules. Id. ¶ 8. In no circumstance should any employee spend more than one (1) hour per year total bidding on her work and vacation leave schedules. Id. The foregoing amounts of times include both time spent bidding while on duty and off duty, if any. Id.

Defendant also denies plaintiffs' specific allegations. FAA management has either provided sufficient time for employees to bid while on duty or have provided for bidding by proxy in agreement with NATCA. At Miami Air Traffic Control Tower (ATCT), where plaintiff Adcock is assigned, FAA management negotiated a memorandum of understanding (MOU) with NATCA regarding the bidding of work schedules in 2007. Fuentes Decl. ¶ 5 (Def. Supp. App. 31-32). The MOU specifically provides that if an employee is absent from the facility on his or her "bidding days," the employee can submit their bid to a supervisor prior to that absence. Id.

At Houston TRACON, where plaintiff Peterson is assigned, FAA management conducts bidding in accordance with the NATCA-established seniority policy and the labor contract with NATCA. Dunne Decl. ¶ 5 (Def. Supp. App. 19). FAA management has provided Mr. Peterson with ample time to bid on his work schedule and vacation leave while on duty. Id.

At Jacksonville Air Route Traffic Control Center (ARTCC), where plaintiff Bukovskey is assigned, FAA management negotiated an MOU with NATCA addressing bidding of work schedules and vacation leave in 2006. Miller Decl. ¶ 6 (Def. Supp. App. 23-24). The MOU provided that employees who will not be present during the bid process shall provide the NATCA representative or the scheduling supervisor with their selections. Id.

31. **Plaintiffs spend over 10 minutes per day bidding while off-duty. Adcock decl. ¶¶ 8-9 (Plf. App. 2, 5-6)(bidding schedule showing 3-hour bidding windows on specific dates); FAA Memorandum, Subject: Vacation Leave (Plf. App. 36-38)(bidding schedule showing 30-minute bidding windows on specific dates).**

Response: Denies. The evidence cited by plaintiffs does not support their allegations. Plaintiff Adcock states that she was supposedly allocated three-hour windows in which to conduct bidding, but nowhere in her declaration does she allege that she or any other plaintiff spent "over 10 minutes per day bidding while off-duty." Adcock Decl. ¶¶ 8-9 (Pl. App. 2). The other document cited by plaintiffs shows thirty minute windows for bidding but does not indicate which, if any, of the plaintiffs were scheduled to bid during those windows and, more importantly, it does not indicate whether they were off-duty at the time of their scheduled bidding.[2] (Pl. App. 36-38).

32. **Plaintiffs spend over 1 hour per year bidding while off-duty. Bukovsky [sic] decl. ¶ 16-18 (Plf. App. 9); Adcock decl. ¶¶ 8-9 (Plf. App. 2, 5-6); Peterson decl. ¶ 14-16 (Plf. App. 21).**

Response: Denies. Avers that part of the evidence cited by plaintiffs is internally inconsistent. Plaintiff Bukovskey states that in 2004, 2005, and 2006, he spent approximately 70-95 minutes each year "bidding while off duty." Bukovskey Decl. ¶¶ 16-18 (Def. App. 3). Yet, Mr. Bukovskey also states: "Prior to 2006, bidding was performed during scheduled hours of work." Id. ¶ 20. Other evidence cited by plaintiffs does not support the allegations. Nowhere in plaintiff Adcock's declaration does she state that she spends over one hour per year bidding while off duty. Adcock Decl. ¶¶ 8-9 (Pl. App. 2). Plaintiff Peterson alleges that he spent two hours per year bidding on his schedule outside his scheduled hours of work in 2005, 2006, and 2007.

[2] Plaintiffs failed to submit any documentation regarding the authenticity of the document.

Peterson Decl. ¶¶ 14-16 (Pl. App. 21). Assuming *arguendo* that Mr. Peterson's allegations are true, he was neither directed nor expected to spend his off-duty time bidding for his schedule. Dunne Decl. ¶ 6 (Def. Supp. App. 19).

**33. Plaintiffs bid over the course of several days per year. Adcock decl. ¶ 8-9 (Plf. App. 2, 5-6).**

Response: Defendant admits the factual allegation.

**34. Plaintiffs are not compensated for time spent bidding while off-duty. Bukovsky [sic] decl. ¶ 15 (P lf. App. 8); Adcock decl. ¶ 10 (Plf. App. 3); Peterson decl. ¶¶ 13-16 (Plf. App. 21).**

Response: Admits.

**35. Plaintiffs do not use proxies for bidding. Peterson decl. ¶ 13 (Plf. App. 21).**

Response: Denies. Plaintiffs' basis for this factual statement is plaintiff Peterson's allegation that he personally was "unable to use a proxy" for his bidding. Peterson Decl. ¶ 13 (Def App. 21). This does not demonstrate that the other approximately 7,000 plaintiffs could not and did not use a proxy to bid. Moreover, while Mr. Peterson claims that he was unable to use a proxy, he also claims that the "FAA delegated the bidding process for TMCs at Houston" to him and had to work approximately forty to fifty hours per year assisting other TMCs with their bidding. Peterson Decl. ¶ 13 fn. 1 (Def. App. 21).

Agreements between FAA management and NATCA regarding bidding specifically provide for proxy bidding. At Miami Air Traffic Control Tower (ATCT), where plaintiff Adcock is assigned, FAA management negotiated a memorandum of understanding (MOU) with NATCA regarding the bidding of work schedules in 2007. Fuentes Decl. ¶ 5 (Def. Supp. App.

31-32). The MOU specifically provides that if an employee is absent from the facility on his or her "bidding days," the employee can submit their bid to a supervisor prior to that absence. Id. The "Primetime Leave Bidding Notice" distributed by NATCA at Miami ATCT in 2005 states: "If you will be out of town or on leave during this process, please leave a *proxy* or phone number where you can be reached." Id. ¶ 6, Att. 3 (Def. Supp. App. 32, 36).

At Jacksonville Air Route Traffic Control Center (ARTCC), where plaintiff Bukovskey is assigned, FAA management negotiated an MOU with NATCA addressing bidding of work schedules and vacation leave in 2006. Miller Decl. ¶ 6 (Def. Supp. App. 23-24). The MOU provided that employees who will not be present during the bid process shall provide the NATCA representative or the scheduling supervisor with their selections. Id.

**36. FAA is aware of and/or schedules the times during which plaintiffs engage in bidding while off-duty. Bukovsky [sic] decl. ¶¶ 12-15 (Plf. App. 8); Adcock decl. ¶¶ 6-8 (Plf. App. 2, 5-6); Peterson decl. ¶ 12 (Plf. App. 21).**

Response: Denies. Avers that the FAA is aware of and schedules the windows of opportunity during which plaintiffs may engage in bidding off duty. They also have the option of submitting a "proxy" bid with a co-worker or union representative or waiting until they return to duty to bid. Cassady Decl. ¶ 7 (Def. App. 10).

37. **NATCA and FAA commenced negotiations ("the negotiations") in July 2005 regarding a successor agreement to the 2003 Extension Agreement. Those negotiations continued through early April 2006. (Krasner decl. ¶6)(Plf. App. 15) On or about April 5, 2006 FAA declared an impasse of the negotiations. (Krasner decl. ¶8)(Plf. App. 15). On June 5, 2006, FAA notified NATCA of the FAA's intention to implement its last offer. On September 3, 2006, FAA unilaterally implemented its last offer. Thus, since September 3, 2006 FAA has operated unilaterally and not subject to a collective bargaining agreement. (Krasner decl. ¶9)(Plf. App. 15). There is no 2006 bargaining agreement between NATCA and FAA. (Krasner decl. ¶10)(Plf. App. 15).**

Response: Admits the allegations contained in the first five sentences of Pl. PFUF No. 36. Denies the allegations contained in the sixth and seventh sentences. Avers that the FAA implemented its final bargaining offer on September 3, 2006, pursuant to authority granted under 49 U.S.C. §§ 106 and 40122. Miniace Decl. ¶ 3 (Def. Supp. App. 38). The Federal Labor Relations Authority has recognized the legality of the FAA's actions in implementing the 2006 labor contract between the Agency and NATCA. Id. ¶ 7 (Def. Supp. App. 39).

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Assistant Attorney General

JEANNE M. DAVIDSON
Director

s/Hillary A. Stern
HILLARY A. STERN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0177
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

EDEN BROWN GAINES
ELIZABETH HEAD
MICHAEL DOHERTY
Federal Aviation Administration
600 Independence Ave., S.W.
Suite 1E-100
Washington, D.C. 20591
Tele: (202) 385-8254
Facsimile: (202) 493-5085

March 12, 2008

CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of March, 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Hillary A. Stern