IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARK G. ABBEY, et al., | ) | |
| Plaintiffs, | ) | No. 07-272C |
| v. | ) | Judge Emily C. Hewitt |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of this Court, Defendant United States respectfully submits the following Reply to Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts. (Defendant's Proposed Findings of Uncontroverted Facts and Plaintiffs' Response thereto are highlighted in bold.)

**A. The FAA's Personnel Management System**

**1. On November 15, 1995, Congress authorized the Administrator of the FAA to develop and implement (no later than January 1, 1996), a personnel management system ("PMS") for the FAA. Def. App. 11. *See also* Department of Transportation and Related Agencies Appropriations Act of 1996, Pub. L. No. 104-50, § 347(a) (November 17, 1995). The Administrator was to develop the FAA PMS [i]n consultation with the employees of the FAA and such non-governmental experts in personnel management systems as he may employ, and notwithstanding the provisions of Title 5, United States Code, and other Federal personnel laws." Id., quoting *Department of Transportation and Related Agencies Appropriations Act of 1996*, P.L. 104-50, Section 347(a).**

**RESPONSE: Disputed. Entire statement sets forth conclusion of law, not fact. Statement is not supported by citation to admissible evidence. Evidence cited is a declaration which asserts conclusions of law and is not based on personal knowledge of the legislative history summarized therein.**

**<u>Reply</u>:** Deny. The Cook declaration (Def.App.1-4) refers to a description of the history of the FAA Personnel Management System (PMS). Ms. Cook, as a policy expert and pay and compensation specialist in the FAA Office of Human Resource management, has knowledge of the events that led up to the implementation of the PMS, the PMS itself, as well as the collective bargaining agreements that impact the PMS, as part of her job responsibilities in administering FAA pay and compensation policy. In any event, the legislative history concerning the PMS speaks for itself.

2. **The FAA PMS is comprised of a document specifically outlining (1) staffing; (2) compensation; (3) performance management; (4) training; (5) labor relations: and (6) executive systems. The PMS is also comprised of Personnel Reform Information Bulletins ("PRIB"); the Human Resource Policy Manual ("HRPM"); Human Resource Operating Instructions (HROI's); and FAA Orders. Def. App. 1. The PMS identifies the aspects of title 5, United State Code, from which the FAA is expressly exempt, as well as the aspects of title 5 that continue to apply to the FAA. Def. App. 25. The FAA Administrator or hi s/her designees have the authority to amend the PMS as necessary. The PMS is amended through PRIBs, HROIs and FAA orders. Def. App. 1.**

**<u>RESPONSE</u>: Disputed. Entire statement sets forth conclusion of law, not fact. Statement is not supported by citation to admissible evidence. Evidence cited is a declaration which asserts conclusions of law and is not based on personal knowledge of the legislative history summarized therein. Statement is further disputed by the fact that FAA's own personnel handbook acknowledges that "[w]henever legislative, regulatory, or other authoritative changes invalidate any portion of this handbook, that portion is voided automatically." Plf. Fact ¶1.**

**<u>Reply</u>: Deny.** The contents of the FAA PMS[1]are not in dispute; the PMS document speaks for itself. Ms. Cook, as a policy expert and pay and compensation specialist in the FAA Office of Human Resource management, has knowledge of the events that led up to the implementation of the PMS, the PMS itself, as well as the collective bargaining agreements that impact the PMS, as part of her job responsibilities in administering FAA pay and compensation policy.

[1] The FAA PMS can be found at https://employees.faa.gov/org/staffoffices/ahr/policy_guidance/hr_policies/pms/.

**B. Credit Hours Are Not Overtime.**

3. **According to FAA policy, credit hours are not considered overtime payment. Def. App. 3, 13-23. Instead, credit hours are hours that an employee elects to work with supervisory approval in excess of the employee's basic work requirement under a flexible work schedule. Id. Credit hours are not used at the FAA to compensate employees for overtime. Id.**

**RESPONSE: Disputed. Statement that "[a]ccording to FAA policy, credit hours are not considered overtime payment" is undisputed. Statement that "credit hours are hours that an employee elects to work" is disputed and contradicted by the fact that plaintiffs were assigned "credit hours" for work they were permitted to perform. Plf. Fact ¶¶ 4-5. Statement that "credit hours" are worked by employees "with supervisory approval" and that "credit hours" are worked "in excess of the employee's basic work requirement under a flexible work schedule" is undisputed. Statement that "[c]redit hours are not used at the FAA to compensate employees for overtime" is contradicted by the prior statement that "credit hours" are worked "in excess of the employee's basic work requirement," and as such is disputed.**

**Reply: Deny.** The factual allegation that credit hours are not used to compensate employees for overtime is not contradicted by the statement that credit hours are worked in excess of the employee's basic work requirement under an FWS. See Supplemental Declaration of Ellen B. Cook. Further, Defendant disputes the factual allegations to the extent that only employees working an FWS are permitted to earn credit hours, at the election of the employee and after approval by the Agency. Cook Decl. ¶ 6 (Def. Supp. App. 3); 2006 Contract, Art. 34, § 7 (Def. Supp. App. 14); 2003 Contract, Art. 34, § 8 (Def. Supp. App. 15).

4. **The FAA negotiated the definition of credit hours in 1998 and again in 2006 with the National Air Traffic Controllers Association ("NATCA"). Def. App. 3, 13-16. The parties agreed upon the following language in Article 34, Section 7:**

> **"credit" hours are *non-overtime* hours worked under an FWS [Flexible Work Schedule] which are in excess of an employee's basic work requirement which are worked at the election of the employee after approval by the Agency.**

**(Emphasis added). Id.**

**<u>RESPONSE</u>: Disputed. Statement that "[t]he FAA negotiated the definition of credit hours in 1998 and again in 2006 with the National Air Traffic Controllers Association" is not supported by the evidence cited. The evidence cited includes declaration statements from a witness who established no personal knowledge concerning the relevant issues.[2] The remaining evidence cited is similarly inadmissible.[3] The cited evidence reveals nothing about a negotiation of the definition of "credit hours." The statement is further contradicted by the fact that the FAA and the National Air Traffic Controllers Association ("NATCA") did not negotiate the definition of "credit hours" in 2006. Plf. Fact ¶37. Statement that the FAA and NATCA "agreed upon the following language in Article 34, Section 7 . . ." is disputed and not supported by the evidence cited. The cited evidence is not an agreement or even part of an agreement between FAA and NATCA. The statement is contradicted by the fact that FAA and NATCA failed to reach any agreement in 2006. Plf. Fact ¶37. Statement is not disputed as it relates to the 1998 collective bargaining agreement between FAA and NATCA.**

**<u>Footnote 2</u>: The cited evidence in support of Def. Fact ¶4 includes a declaration statement by an individual who has no established personal knowledge of contract negotiations between the NATCA and FAA, nor any established knowledge of the substance of "Article 34, Section 7 of the 2003 and 2006 NATCA CBAs." The declarant merely stated that "for two years" she has held a position where it is her duty to "manage a team of employees who provide policy implementation, advice and guidance in the areas of staffing, classification, compensation and pay-setting" and that "[p]rior to that time, [she] was a Classification/Pay/Compensation Specialist in the Policy Management Division." Cook Decl. ¶ 1 (Def. App. 1). These positions and duties in no way establish personal knowledge regarding the status of NATCA and FAA's contract negotiations or whether any agreement between NATCA and FAA had been reached.**

**<u>Footnote 3</u>: The documents cited at Def. App. 13-16 are unauthenticated documents entitled "Article 34 Working Hours" and "Article 34 Working Hours." Not only do these items have the *same title,* they are submitted as what appears to be incomplete portions of a larger written document that was not submitted. Further, the documents contain no indicia of self-authentication, such as a cover page, letterhead or signature. Moreover, if these items are, as defendant asserts, excerpts from a larger document, defendant has submitted no explanation as to why the entirety of the document was excluded or why defendant failed to submit any documentation regarding the authenticity of the document. It is plaintiffs' position that FAA cannot establish the existence of a ratified 2006 collective bargaining agreement – the existence of which FAA has repeatedly represented to the Court in this action. Although plaintiffs do not seek sanctions, pursuant to Fed. R. Civ. P. 11, against defendant for submitting false statements to the Court, plaintiffs request that this Court ignore defendant's representations regarding an alleged 2006 collective bargaining agreement until such time as defendant can provide this Court with evidence that such an agreement has been ratified.**

**<u>Reply</u>: Deny.** Plaintiffs' assertion that Agency provided false statements to this Court about the status of the contract is inaccurate. The 2006 contract, which was ratified by Congress pursuant to 49 U.S.C. § 40122, is a legally binding contract. Miniace Decl. ¶ 7, Att. 5-7 (Def. Supp. App. 39). While Plaintiffs, who are also members of NATCA, do not agree with the recent decisions by the Federal Labor Relations Authority (FLRA), it cannot be disputed that the legality of the 2006 contract has twice been upheld by the FLRA. Miniace Decl. ¶¶ 4-7, Att. 4, 5, 10-12 (Def. Supp. App. 39. Plaintiffs cannot dispute that the FLRA is the legal entity empowered to decide the status of the contract. <u>NATCA v. FSIP</u>, 437 F.3d 1256 (D.C. Cir. 2006). Notwithstanding the fact that the 2006 contract has been found to be legally valid, Article 34 was tentatively agreed upon ("TAU'd") by the NATCA during contract negotiations in 2006. Miniace Decl. ¶9 (Def. Supp. App. 40). Moreover, Ms. Cook's declaration did not suggest that she participated in contract negotiations; rather, that, as part of her job responsibilities, she administers the FAA PMS, along with all collective bargaining agreements, including the 2006 contract.

**C. The Cru-X/ART Computer System**

5. **FAA facilities use the Cru-X/ART software to track employee hours and to prevent non-exempt employees from working before or after their scheduled shift without compensation. Def. App. 6-7. The FAA has operated the Cru-X/ART system for ATCS personnel, including plaintiffs, since as early as November 2004, although implementation was not completed at all facilities until August 2005. <u>Id</u>.**

**<u>RESPONSE</u>: Disputed. Statement that "FAA facilities use the Cru-X/ART software to track employee hours" is contradicted by fact FAA is aware that plaintiffs regularly change the Cru-X/ART software to reflect their scheduled shift start time even though plaintiffs commence work prior to their scheduled shift start time. Plf. Fact ¶ 23; Plans & Programs Bulletin (Plf. App. 40)("[p]ersonnel must sign on at their scheduled shift time, or up to 15 minutes before their regular shift time"); FAA Order 7210.3U, § 2-2 (Plf. App. 76-88)("[s]ign in, using the assigned shift start time, may occur up to 15 minutes before an employee's assigned shift. . . . [overtime] time at the beginning of an assigned shift must**

**receive approval . . . prior to . . . recording it into Cru-X/ART"); Robicheau decl. ¶¶ 11-12 (Plf. App. 27) (supervisors see plaintiffs' names appear on Cru-X/ART screen prior to designated shift start time). Statement that "FAA facilities use the Cru-S/ART software to . . . prevent non-exempt employees from working before or after their scheduled shift without compensation" is contradicted by fact that plaintiffs perform work before and after their scheduled shifts without compensation. Plf. Fact ¶¶ 15-20, 23-27; see also FAA Order No. 7210.3 (Plf. App. 76-88) (requiring plaintiffs to review "facility/area/position status boards, weather status boards, 'hot item' binders, clip board information sheets, and designated areas for written notes" and engage in extensive position briefing before relinquishing or taking on a position) . Statement that "[t]he FAA has operated the Cru-X/ART system for ATCS personnel, including plaintiffs, since as early as November 2004, although implementation was not completed at all facilities until August 2005" is undisputed.**

**Reply: Deny.** If Plaintiffs are performing job duties prior to signing on to or after signing off of the Cru-X/ART system without authorization of FAA management, they are doing so in violation of FAA policies. Rooney Decl. ¶ 3 (Def. Supp. App. 14-15) "Cru-X/ART is the official time and attendance system for both signing in/out for a shift and on and off positions . . ." FAA Order 7210.3U, Facility Operation Administration, § 2-2-6 (Pl. App. 80). "Employees shall use ART to sign in and out of their shifts." *Id.* Employees, including Plaintiffs, should not perform any duties prior to the beginning of their assigned shift or prior to signing on the Cru-X/ART system without the authorization of their supervisor or manager. Rooney Decl. ¶¶ 4-7 (Def. Supp. App. 15-16). Likewise, employees, including Plaintiffs, should not perform any duties after the end of their assigned shift or after signing off of the Cru-X/ART system without the authorization of their supervisor or manager. *Id.*

6. **The ART software runs on a personal computer. Employees in operational positions, such as ATCS and TMC, are required to sign-in and sign-out of their shifts using the software.[4] They are also required to use the software to sign in and sign out each time they work an operational position, such as a radar scope. Id.**

**Footnote 4: Plaintiffs are comprised of ATCSs, TMCs, and Staff Support Specialists. Most Staff Support Specialists are exempt, do not hold operational positions, and are not**

**required to sign-in and sign-out at the beginning and end of their scheduled shifts using the ART software. Some specialists maintain currency to control air traffic for certain periods of time. Those specialists must sign into the ART system before controlling air traffic or "working on position." Def. App. 6-7.**

**<u>RESPONSE</u>: Disputed. Statement that "[t]he ART software runs on a personal computer" is disputed as it is contradicted by the fact that the Cru-X/ART software connects several computers via a Local Area Network connection. Robicheau decl. ¶ 11-12 (Plf. App. 27). Statement that "[e]mployees in operational positions, such as ATCS and TMC, are required to sign-in and sign-out of their shifts using the software" is disputed as it is contradicted by the fact that plaintiffs' key strokes on the Cru-X/ART software reflect plaintiffs' actual time signing in and out for their shifts, and that the sign-in and sign-out times reflected on the Cru-X/ART software merely show the scheduled start and end of plaintiffs' shifts. Robicheau decl. ¶ 14-15 (Plf. App. 28). Statement that plaintiffs "are also required to use the software to sign in and sign out each time they work an operational position, such as radar scope" is disputed as it is contradicted by fact that plaintiffs may work an operational position, such as radar scope, prior to signing-into the Cru-X/ART system by key stroking into the Cru-X/ART system prior to the scheduled start time of the shift. Plf. Fact ¶27(g); Bukovsky dec. ¶ 33 (Plf. App. 11-12); Robicheau decl. ¶ 13 (Plf. App. 27-28). Statement that "[p]laintiffs are comprised of ATCs, TMC's, and Staff Support Specialists" is not disputed. Statement that "[m]ost Staff Support Specialists are exempt" is disputed as it sets forth a legal conclusion and is unsupported by citation to evidence. Statement that Staff Support Specialists "do not hold operational positions" is disputed as it is not supported by the evidence cited. Statement that Staff Support Specialists "are not required to sign-in and sign-out at the beginning and end of their scheduled shifts using the ART software" is undisputed. Statements that "[s]ome specialists maintain currency to control air traffic for certain periods of time" and that "[t]hose specialists must sign into the ART system before controlling air traffic or 'working on position'" are disputed as they are not supported by the evidence cited.**

**<u>Reply</u>: Deny.** Plaintiffs misapprehend the purpose of the Cru-X/ART system. It is not a "punch clock" whereby an employee's paid time begins the minute he signs on to the system, regardless of the scheduled start time of his shift. Masson Supp. Decl. ¶ 6 (Def. Supp. App. 4). Employees are expected to work their scheduled shifts, with the exception that employees on an FWS may come in earlier than their scheduled shift start time. Cassady Supp. Decl. ¶ 3 (Def. Supp. App. 10-11). The FAA expects that an employee who is scheduled to start her shift at 7:00 a.m. and is not on an FWS will be available to begin work at 7:00 a.m. The Cru-X/ART system allows

employees to sign in earlier than their scheduled shift start time in order to avoid congestion at and around the system computers. Masson Supp. Decl. ¶ 6 (Def. Supp. App. 4). The FAA, however, does not expect or require employees who sign in to the Cru-X/ART system prior to the beginning of their scheduled shift start time to perform any work until that time. Rooney Decl. ¶ 4 (Def. Supp. App. 15).

Pursuant to FAA policy, employees are supposed to sign on to the Cru-X/ART system for their scheduled shift time. Employees are aware of their scheduled shift times at least twenty-eight (28) days in advance of the shift. Cassady Supp. Decl. ¶ 2 (Def. Supp. App. 10). When an employee signs on to the system, she must make an affirmative entry. (Masson Decl. ¶ 5; Def. Supp. App. 6) The employee must either: 1) enter her scheduled shift start time; 2) indicate that she is changing her shift time; or 3) indicate that she is working TOS. *Id.* The expectation is that the employee will enter her scheduled shift time and perform no work until then, i.e. an employee signing in at 6:45 a.m. for a scheduled shift start time of 7:00 a.m. would enter 7:00 a.m. The employee would neither be required nor expected to perform any work between 6:45 a.m. and 7:00 a.m. If an employee is required to perform work before 7:00 a.m., she would either change her scheduled shift start time or indicate that she was working TOS in order to be compensated for that time. Both actions require supervisory approval. Masson Supp. Decl. ¶ 3 (Def. Supp. App. 3). An employee who performs work prior to the start of her scheduled shift without changing her shift or requesting TOS is doing so contrary to FAA policy. Rooney Decl. ¶ 3, 5 (Def. Supp. App. 14-15).

The one exception to the foregoing is if an employee has elected to work a flexible work schedule (FWS). Under an FWS, an employee can “flex” her shift start time usually by thirty

(30) minutes, i.e. an employee working an FWS with a scheduled shift start time of 7:00 a.m. may begin her shift anytime between 6:30 a.m. and 7:00 a.m. without supervisory approval. Masson Supp. Decl. ¶ 4 (Def. Supp. App. 4). The Cru-X/ART system is designed to accommodate employees working an FWS. *Id.* Thus, an employee working an FWS with a scheduled shift start time of 7:00 a.m. who signed on to the Cru-X/ART system at 6:45 a.m. could begin working immediately. Cru-X/ART would indicate that the employee's shift for that day began at 6:45 a.m. rather than 7:00 a.m. *Id.*

7. **The design of Cru-X/ART software precludes an operational employee from performing work before or after his scheduled shift without compensation. Id. The following examples will demonstrate why this is true. The first example assumes that an operational employee, such as an ATCS, is scheduled to work from 7:00 a.m. to 3:00 p.m.[5] The employee's schedule shift time is already stored in the ART software. When an employee signs in on the Cru- X/ART software at the beginning of her shift, the software prompts her to enter her start time. If the employee enters a time other than the scheduled start time, the software asks whether the employee is changing his shift time or is working "time outside shift" ("TOS"), such as overtime. The employee must affirmatively make an entry into the software in order to sign in, either by entering her scheduled shift time, indicating that she is changing her shift time, or that she is working TOS. Id.**

**Footnote 5: Operational employees work an eight-hour shift, including a paid thirty minute meal break, because they are always subject to recall. Non-operational employees, such as Staff Support Specialists, work an eight and a half hour (8.5) shift, which includes an unpaid thirty minute meal break.**

**RESPONSE: Disputed. Statement that "[t]he design of Cru-X/ART software precludes an operational employee from performing work before or after his scheduled shift without compensation" is disputed. The statement sets forth a legal conclusion (i.e., "performing work") and is contradicted by the fact that plaintiffs perform work before and after their scheduled shifts without compensation. Plf. Fact ¶¶ 15-20, 23-27. Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 a.m. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the ART software or *she could perform non-operational duties, such as reading required briefings, prior to 7:00 am*." Def. Fact ¶ 10 (emphasis added). Statement that "[w]hen an employee signs in on the Cru-X/ART software at the beginning of her shift, the software prompts her to enter her start time" is contradicted by the fact that when an employee signs in on the Cru-X/ART software, the software has already listed**

**the actual time the employee signed in; then it allows her to manually change that time. Plf. Fact ¶24-25. The statement is further contradicted by defendant's own admission that it is aware plaintiffs may sign in to Cru-X/ART prior to their scheduled shift start time and manually change the time to reflect the shift start time. Def. App. 6-7, ¶7. Defendants further admit that "[t]he Cru-X/ART software [in this instance] would *preclude [the employee] from recording that she performed any work* prior to [the shift start time]." Def. App. 7, ¶7 (emphasis added). Statement that "[i]f the employee enters a time other than the scheduled start time, the software asks whether the employee is . . . working [TOS], such as overtime" is contradicted by the fact that plaintiffs regularly perform work-related duties prior to the scheduled start time of the shift, in workweeks in which they work over 40 hours, and do not use Cru-X/ART to label such time as TOS. Plf. Fact ¶¶ 15-20, 23-27; Bukovsky decl. ¶ 26 (Plf. App. 10). Statements that "[o]perational employees work an eight-hour shift" is not supported by citation any evidence and is disputed by fact that plaintiff TMCs and ATCs are scheduled to work eight hour shifts, but regularly spend more than eight hours performing job duties. Peterson decl. ¶¶ 4-5 (Plf. App. 19-20); Bukovsky decl. ¶¶ 4-5 (Plf. App. 7). The remaining statements are undisputed.**

**Reply:** Deny. Defendant incorporates its Reply to Plaintiffs' Response to Defendant's Proposed Uncontroverted Fact No. 6. Additionally, operational employees, such as ATCSs and TMCs, work an eight hour shift, Article 34, Section 1 of the 2003 labor contract, which covers the working conditions of ATCSs and TMCs, states: "The basic workday shall consist of eight (8) consecutive hours and the basic workweek shall consist of five (5) consecutive days." Miniace Decl. ¶ 9 (Def. Supp. App. 13 (2003 excerpt)). Article 34, Section 1 of the 2006 labor contract, which replaced the 2003 contract, states: "A full-time employee's basic workday shall consist of eight (8) consecutive hours and the basic workweek shall consist of five (5) consecutive days except as authorized in this Article." Miniace Decl. ¶ 9 (Def. Supp. App. **2006 Contract** ).

8. **If the employee attempts to sign in at 6:45 a.m. for a 7:00 am. shift, for example, and she does not enter 7:00 am. for her start time, she must indicate that she is changing her shift times to 6:45 am. to 2:45 p.m. or that she is working TOS from 6:45 am. to 7:00 a.m. Thus, any time she worked between 6:45 am. (her actual start time) and 7:00 am. (her scheduled start time) would be compensated. The same would hold true at the end of the shift. Assuming that the employee signed in for her shift at the scheduled start time (7:00 a.m.), if she attempted to sign out at 3:15 p.m., the software would ask her if she had worked TOS from 3:00 p.m. to 3:15 p.m. Id.**

**<u>RESPONSE</u>: Disputed. Statement that "any time she worked between 6:45 a.m. (her actual start time) and 7:00 a.m. (her scheduled start time) would be compensated" is disputed as it is contradicted by the prior sentence which concedes that the plaintiff may "enter 7:00 a.m. for her start time" even though she signs in for her shift at 6:45 a.m., and is further contradicted by the fact that plaintiffs sign in prior to the scheduled start time of their shifts, manually change the listed time on Cru-X/ART to reflect the scheduled start time of the shift and are not paid for any time spent performing job duties prior to the manually-entered time on Cru-X/ART (Plf. Fact¶¶ 22-25). The statement is also contradicted by defendant's own declarant's statement that "[t]he Cru-X/ART software would *preclude her from recording that she performed any work* prior to 7:00 a.m." Def. App. 7, ¶7 (emphasis added). Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 a.m. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 am." Def. Fact ¶ 10. Statement that "[t]he same would hold true at the end of the shift" is disputed for the same reasons set forth above. Statement is further disputed by defendant's declarant's own testimony that "the Cru-X/ART software *will not allow an employee to record work* after the scheduled end time of her shift unless the employee indicates that she is working TOS . . ." Def. App. 6, ¶6 (emphasis added).**

**<u>Reply</u>: Deny.** Defendant incorporates its Reply to Plaintiffs' Response to Defendant's Proposed Uncontroverted Fact No. 5.

9. **Additionally, operational employees are required to sign in and sign out of specific operational positions, such as a radar scope, using the ART software. The software will not allow an employee to sign in to an operational position before or after her scheduled shift start or stop time. Thus, if an employee signed in for her 7: 00 a. m. shift at 6: 45 a.m. without changing her shift or indicating that she was working TOS, and then attempted to sign in to an operational position at 6:50 a.m. using the ART software, the software would not allow her to sign in to the position prior to the official start of her shift at 7:00 a.m. <u>Id</u>.**

**<u>RESPONSE</u>: Disputed. Statement that "[t]he [Cru-X/ART] software will not allow an employee to sign in to an operational position before or after her scheduled shift start or stop time" is disputed as it is contradicted by the fact that plaintiffs may work operational positions, such as radar scope, after having signed in to Cru-X/ART, but prior to the scheduled shift start time recorded on Cru-X/ART. Plf. Fact¶ 27(g); Bukovsky decl. ¶ 33 (Plf. App. 11-12); Robicheau decl. ¶ 13 (Plf. App. 27). Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a. m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 am." Def. Fact ¶ 10. Statement that "if an employee signed**

**in for her 7: 00 a. m. shift at 6: 45 a.m. . . . and then attempted to sign in to an operational position at 6:50 a.m. . . . the software would not allow her to sign in to the position [at that time]" is disputed as it is contradicted by the fact that plaintiffs sign in prior to their shift start times, change their sign in time to reflect their shift start time and commence operational position duties prior to the scheduled start time of their shifts. Plf. Fact¶ 27(g); Bukovsky decl. ¶ 33 (Plf. App. 11-12); Robicheau decl. ¶ 13 (Plf. App. 27-28). Statement is further contradicted by defendant's own admission that "[a]n employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a. m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 am." Def. Fact ¶ 10.**

**Reply: Deny.** Defendant incorporates its Reply to Plaintiffs' Response to Defendant's Proposed Uncontroverted Fact No. 5.

10. **The only way an employee could work and not receive compensation for the time before or after her shift would be if she was not following agency procedures. An employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a. m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 am. If that were the case, the employee is supposed to use the ART software to amend her time record to reflect that she worked prior to 7:00 a.m., either by adjusting her shift times or by indicating that she was working TOS. Either way, the employee would be compensated for the time. Id.**

**RESPONSE: Disputed. Statement that "[t]he only way an employee could work and not receive compensation for the time before or after her shift would be if she was not following agency procedures" is disputed as it is not supported by citation to admissible evidence. The evidence cited comes from the testimony of a declarant who failed to establish personal knowledge regarding the topic about which he testified. Specifically, the declarant testifies about an "FAA policy" but merely established personal knowledge of "the Cru-X suite of software applications, including Cru-X/ART and Cru-Support." Def. App 6-7, ¶¶2, 8. As such, he has no personal knowledge of agency procedures. Further, defendant failed to cite evidence of any policy, let alone the substance of such policy, as it relates to the statement asserted.[6] Statement that *"[a]n employee could sign in for her 7:00 am. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the ART software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 a.m."* is undisputed. (Emphasis added). Statement that "the employee is supposed to use the ART software to amend her time record to reflect that she worked prior to [the scheduled start time of her shift]" is disputed as it is not supported by citation to any evidence. It is further disputed by the fact that plaintiffs sign in on Cru-X/ART prior to the scheduled start of their shifts, manually change Cru-X/ART to reflect their scheduled shift start time and perform job related duties prior to the scheduled start time of their shifts without indicating an adjustment in shift time or TOS**

**for that overtime. Plf. Fact ¶¶ 15-20, 23-27; Bukovsky decl. ¶ 26 (Plf. App. 10). Statement that "[e]ither way, the employee would be compensated for the time" is disputed as it is not supported by citation to evidence. It is further disputed by the fact that plaintiffs are not compensated for this time. Plf. Fact ¶ 25-27.**

**Footnote 6: Further, the same declarant makes assertions regarding employees' alleged communications with their "watch supervisor," their alleged certification of their time and attendance records, and their alleged "opportunity to correct" their employer's record of their hours of work. Def. App. 7, ¶ 8. Notably, the declarant has established no personal knowledge of what plaintiffs do at their individual work locations. As such, these statements are inadmissible and should be ignored.**

**Reply: Deny.** Defendant incorporates its Reply to Plaintiffs' Response to Defendant's Proposed Uncontroverted Fact No. 5.

11. **Prior to the implementation of the Cru-X/ART software, time and attendance for employees, including ATCSs, TMCs, and Staff Support Specialists, was collected manually. Def. App. 11. The employee or her supervisor would record the time worked on a personnel log which was used for compilation of time and attendance data. Id. The FAA compensated employees for all time worked before or after an employee' s scheduled shift that was in addition to their scheduled shift. Id.**

**RESPONSE: Disputed. Statement that "FAA compensated employees for all time worked before or after an employee's scheduled shift that was in addition to their scheduled shift" is disputed as it is contradicted by the fact that plaintiffs perform job duties before and after their scheduled shifts that is not recorded and for which they are not paid. Plf. Fact ¶¶ 13-14. The remaining statements are undisputed.**

**Reply: Deny.** Plaintiffs' assertions that they perform job duties before and after their scheduled shifts that is not recorded are vague and unsubstantiated. Plaintiffs fail to provide a single date or time to support these allegations. Moreover, Plaintiffs fail to provide the identity of any FAA management official who has allegedly directed or required them to perform job duties before and after their scheduled shifts that were not recorded or for which they were not compensated.

12. **Finally, employees receive Leave and Earnings ("L&E") statements on a biweekly basis that reflect their time worked for the relevant pay period. Id. If an employee believes she is not paid correctly, she can bring the issue to FAA management's attention for resolution. Id. If the employee is not satisfied by management's response, she can grieve the issue**

**under the grievance procedure contained in the applicable agreement. Id. Plaintiffs do not contend that they have complained previously concerning incorrect payments in one or more pay periods.**

**RESPONSE: Disputed. Statement that plaintiffs' Leave and Earning statements "reflect their time worked for the relevant pay period" is disputed by the fact that defendant does not record all job duties performed by plaintiffs prior to or subsequent to their scheduled shift. Plf. Fact¶¶ 14-20. The remaining statements are undisputed to the extent it is undisputed that a grievance procedure is in place, however, as is evident from defendant's position in this lawsuit, grieving FAA's FLSA violations would have been futile. Plaintiffs complain of FAA's FLSA violations through the pursuit of this lawsuit, as even FAA admits is in accordance with plaintiffs' rights. Plaintiffs similarly agree that they did not "*contend*" in their Complaint that they had complained previously.**[7]

**Footnote 7: Notably, defendant cites no evidence or law supporting their implicit allegation that 'complaining' is a prerequisite to filing an FLSA lawsuit. Further, defendant does not establish any facts that plaintiffs have *not* previously complained about the failure to be paid properly under the FLSA. Instead, defendant merely states that plaintiffs did not 'contend' in their complaint that they had previously complained.**

**Reply: Deny.** Employees are responsible for reviewing time and attendance records to ensure a timely submission of an accurate, written record of time worked and leave taken for each pay period. Cook Supp. Decl. ¶ 6, Att. 1 (Def. Supp. App. XX). In fact, "failure to do so may lead to disciplinary action." *Id.* Also, Plaintiffs fail to provide any evidence or basis for their argument that it would have been futile to file a grievance pursuant to the grievance procedure in the collective bargaining agreement.

**D. Bidding For Work and Vacation Leave Schedules Off Duty**

13. **The FAA operates over 300 air traffic facilities to which the bulk of plaintiffs are assigned.**[8] **Def. App. 9. Each air traffic facility has the discretion to develop its own policies regarding the establishment of work and leave schedules, including procedures for employees bidding on the schedules.**[9] **Those policies and procedures are usually developed in conjunction with NATCA and the procedure may vary from facility to facility. Id. At many facilities, by agreement, FAA management allowed the union to conduct the bidding process for work and vacation leave schedules. Id.**

**<u>Footnote 8</u>: Plaintiffs who are ATCSs and TMC s work exclusively at air traffic facilities. Plaintiffs who are Staff Support Specialists work at either air traffic facilities or one of the FAA's nine regional offices.**

**<u>Footnote 9</u>: Many of the approximately 300 air traffic facilities operate continuously, i.e. twenty-four hours a day, seven days a week. Those that do not operate continuously usually operate seven days a week and more than eight hours a day. Therefore, plaintiffs who are ATCSs and TMCs do not customarily work a traditional administrative workweek, i.e. "business hours" Monday through Friday.**

**<u>RESPONSE</u>: Disputed. Statement that bidding "policies and procedures are usually developed in conjunction with NATCA" is disputed as it is contradicted by evidence that FAA enacted and implemented bidding procedures. Plf. Fact¶ 29. Statement that "by agreement, FAA management allowed the union to conduct the bidding process for work and vacation leave schedules" is disputed by evidence that FAA enacted and enforced the bidding process. *Id*. The remaining statements are undisputed.**

**<u>Reply</u>:** Deny. The FAA and NATCA regularly negotiated agreements addressing the bidding process, both before and after the implementation of the 2006 contract. At Miami Air Traffic Control Tower (ATCT) in September 2007, the agency and the union entered into a memorandum of understanding (MOU) covering bidding on the "basic watch schedule" that would be effective in 2008. Fuentes Decl. ¶ 5-6, Att. 1 (Def. Supp. App. 31-32). Also at Miami ATCT, NATCA regularly ran the bidding process for work schedules and vacation leave. Fuentes Decl. ¶ 6, Att. 1 and 2 (Def. Supp. App. 35-36).

14. **Plaintiffs who are Staff Support Specialists do not bid on work and leave schedules. Def. App. 10-11. They normally work an administrative workweek and request vacation leave from their supervisors. Id. Plaintiffs who are ATCSs and TMCs do bid on work and vacation leave schedules. Def. App. 9. However, the FAA does not require that ATCSs and TMCs bid for work and vacation leave schedules. Def. App. 10. Bidding is completely voluntary. <u>Id</u>.**

**<u>RESPONSE</u>: Statement is undisputed.**

15. **Because bidding is conducted by seniority pursuant to the collective bargaining agreement with NATCA, employees bid in a strict order and an employee's turn to bid may arise when she is off-duty. Id. Most facilities utilize a "proxy" system to avoid**

**employees having to bid while off-duty, but use of the proxy is optional with the employee. Id.**

**<u>RESPONSE</u>: Disputed. Statement that "[m]ost facilities utilize a 'proxy' system to avoid employees having to bid while off-duty, but use of the proxy is optional with the employee" is disputed as it is contradicted by the fact that plaintiffs are unable to use a proxy for bidding. Peterson decl. ¶ 13 (Plf. App. 21).**

**<u>Reply</u>: Deny.** Plaintiffs' basis for this factual statement is that Plaintiff Peterson was personally "unable to use a proxy" for his bidding. Peterson Decl. ¶ 13 (Def. App. 21). There is no basis for alleging that none of the other approximately 7,000 Plaintiffs use or have the option of using a proxy to bid. Moreover, while Mr. Peterson claims that he was unable to use a proxy, he also claims that the "FAA delegated the bidding process for TMCs at Houston" to him and had to work approximately forty to fifty hours per year assisting other TMCs with their bidding. Peterson Decl. ¶ 13 fn. 1 (Def. App. 21).

Moreover, agreements between FAA management and NATCA regarding bidding specifically provide for proxy bidding. At Miami Air Traffic Control Tower (ATCT), where Plaintiff Adcock is assigned, FAA management negotiated a memorandum of understanding (MOU) with NATCA regarding the bidding of work schedules in 2007. Fuentes Decl. ¶ 5, Att. 1 (Def. Supp. App. 33-34). The MOU specifically provides that if an employee is absent from the facility on his or her "bidding days," the employee can submit their bid to a supervisor prior to that absence. *Id.* The "Primetime Leave Bidding Notice" distributed by NATCA at Miami ATCT in 2005 states: "If you will be out of town or on leave during this process, please leave a *proxy* or phone number where you can be reached." *Id.* ¶ 6, Att. 2 (Def. Supp. App. 36).

At Jacksonville Air Route Traffic Control Center (ARTCC), where Plaintiff Bukovskey is assigned, FAA management negotiated an MOU with NATCA addressing bidding of work

schedules and vacation leave in 2006. Miller Decl. ¶ 6, Att. 1 (Def. Supp. App. 33-34). The MOU provided: "An employee who will not be present during the bid process and will not be available by phone may designate RDO and annual leave selections with the [NATCA] Area Representative who will then bid for the absent employee in the designated order." *Id.*

16. **Bidding occurs once annually at each facility. Id. The total time that any individual spends bidding on the work and vacation leave schedules during the course of year is between five and ten minutes, regardless of whether the bidding occurs off- duty. Id. In no circumstances, should any employee spend more than one hour per year engaged in bidding the work and vacation leave schedules. Id.**

**RESPONSE: Disputed. Statement that "[b]idding occurs once annually at each facility" is disputed as it is contradicted by the fact that bidding occurs on multiple days each year. Plf. Fact ¶ 33; FAA Memorandum, Subject: Vacation Leave (Plf. App. 36-38))(bidding schedule revealing multiple dates for bidding); Adcock decl. ¶ 8 (Plf. App. 2, 5-6)(attached bidding schedule shows bidding occurred on multiple dates). Statement that the "total time that any individual spends bidding on the work and vacation leave schedules during the course of year is between five and ten minutes" is disputed as it is contradicted by evidence that plaintiffs spend over one hour bidding off-duty in a single year. Plf. Fact¶ 32. Statement that "[i]n no circumstances, should any employee spend more than one hour per year engaged in bidding the work and vacation leave schedules" is disputed as it is contradicted by the fact that plaintiffs spend over one hour bidding off-duty in a single year. *Id*.**

**Reply:** Deny. The process for bidding for work schedules and vacation leave occurs once annually at each facility, but that process may take place over a number of days during the process. Part of the evidence cited by Plaintiffs is internally inconsistent. Plaintiff Bukovskey states that in 2004, 2005, and 2006, he spent approximately 70-95 minutes each year "bidding while off duty." Bukovskey Decl. ¶¶ 16-18 (Def. App. 3). Yet, Mr. Bukovskey also states: "Prior to 2006, bidding was performed during scheduled hours of work." *Id.* ¶ 20. Therefore, Mr. Bukovskey's declaration must be discounted as not credible. Other evidence cited by Plaintiffs does not support the allegations. Nowhere in Plaintiff Adcock's declaration does she state that

she spends over one hour per year bidding while off duty. Adcock Decl. ¶¶ 8-9 (Pl. App. 2). Plaintiff Peterson alleges that he spent two hours per year bidding on his schedule outside his scheduled hours of work in 2005, 2006, and 2007. Peterson Decl. ¶¶ 14-16 (Pl. App. 21). Assuming *arguendo* that Mr. Peterson's allegations are true, he was neither directed nor expected to spend his off-duty time bidding for his schedule. Dunne Decl. ¶ 9 (Def. Supp. App. 20).

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Assistant Attorney General

JEANNE M. DAVIDSON
Director

s/Hillary A. Stern
HILLARY A. STERN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0177
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

EDEN BROWN GAINES
ELIZABETH HEAD
MICHAEL DOHERTY
Federal Aviation Administration
600 Independence Ave., S.W.
Suite 1E-100
Washington, D.C. 20591
Tele: (202) 385-8254
Facsimile: (202) 493-5085

March 12, 2008

CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of March, 2008, a copy of the foregoing “DEFENDANT’S REPLY TO PLAINTIFFS’RESPONSE TO DEFENDANT’S PROPOSED FINDINGS OF UNCONTROVERTED FACTS” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court’s electronic filing system. Parties may access this filing through the Court’s system.

s/Hillary A. Stern