# In the United States Court of Federal Claims

No. 07-272 C

(E-Filed: July 31, 2008)

| | |
|---|---|
| MARK G. ABBEY, ET AL., | ) Motion for Partial Summary<br>) Judgment; RCFC 56; Motion to<br>) Dismiss; RCFC 12(b)(6); FLSA; |
| Plaintiff, | ) 29 U.S.C. §§ 201-219; Federal<br>) Aviation Administration; Air |
| v. | ) Traffic Control Specialists;<br>) Traffic Management |
| THE UNITED STATES, | ) Coordinators; Staff Specialists<br>) |
| Defendant. | )<br>) |

Gregory K. McGillivary, Washington, DC, for plaintiff. Lauren E. Schwartzreich, Washington, DC, of counsel.

Hillary A. Stern, with whom were Peter D. Keisler, Assistant Attorney General, and Jeanne M. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Eden Brown Gaines, Elizabeth Head, and Michael Doherty, Federal Aviation Administration, Washington, DC, of counsel.

## OPINION

HEWITT, Judge

This is an action concerning overtime pay as provided for by the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219 (2006). Plaintiffs are 7,438 current and former employees of the Federal Aviation Administration (FAA), an organization within the United States Department of Transportation (DOT), 49 U.S.C. § 106(a), classified as Air Traffic Control Specialists (ATCS), Traffic Management Coordinators (TMC) and Staff Specialists. Plaintiffs' Third Amended Complaint[1] (plaintiffs' Complaint or

---

[1]When plaintiffs' Complaint was initially filed there were 6,458 plaintiffs. Complaint 1.

(continued...)

Compl.) ¶¶ 1, 4.  Plaintiffs filed a complaint with this court, alleging that the United States violated the FLSA "[b]y failing to pay plaintiffs at the rate of one and one half times their regular rate of pay for each overtime hour worked." Id. at ¶ 29.  Plaintiffs seek "declaratory judgment, backpay and other relief," id. at ¶ 1, for defendant's failure properly to compensate plaintiffs for hours worked "in excess of forty (40) hours per week," id. at ¶ 8.  Plaintiffs rely on the FLSA to support their claims. Id. at ¶¶ 5-7; see 29 U.S.C. §§ 201-19.  Under the FLSA "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

Plaintiffs' Complaint contains four separate counts. Id. at ¶¶ 13-40.  Count I of plaintiffs' Complaint alleges that defendant "failed to properly calculate the 'regular rate of pay' used to calculate FLSA overtime pay." Id. at ¶ 14.  Count II alleges that defendant violated the FLSA by compensating plaintiffs with compensatory time or credit hours at a rate of one hour for each hour of overtime worked instead of paying them at a rate of one and one-half times an employee's regular rate of pay as required by the FLSA. Id. at ¶ 21.  Count III alleges that "[a]t all times material herein, the defendant has suffered or permitted plaintiffs to work before and after the official starting times of their shifts without compensating plaintiffs with compensation for such work time." Id. at ¶ 11.  Count IV alleges that "defendant has conducted the schedule and vacation leave bidding process for plaintiffs during time periods in which plaintiffs are 'off-duty' (time periods defendant does not schedule plaintiffs to be on-duty), such as conducting this process by telephone while plaintiffs are at home or at the facility after plaintiffs have been clocked out[,] . . . [yet] defendant has not provided plaintiffs with any compensation for this work time." Id. at ¶ 12.  Plaintiffs claim that "[p]ursuant to 29 U.S.C. § 216(b), [they] are entitled to recover liquidated damages in an amount equal to their back pay damages for the [d]efendant's failure to pay overtime compensation." Id. at ¶¶ 31, 38.  Plaintiffs also contend that they are entitled to "interest on their back pay damages" and to "attorneys' fees and costs." Id. at ¶¶ 32-33, 39-40.

---

[1](...continued)
Plaintiffs amended their Complaint on November 1, 2007, to include 7,210 plaintiffs.  First Amended Complaint 33-34.  Plaintiffs filed a Second Amended Complaint on June 6, 2008 to include 7,438 plaintiffs.  Second Amended Complaint 11.  Plaintiffs filed a Third Amended Complaint on July 3, 2008 to correct a typographical error in plaintiffs' Second Amended Complaint.  See Order of July 1, 2008; Third Amended Complaint (plaintiffs' Complaint or Compl.).  The Complaint, First Amended Complaint, Second Amended Complaint, and Third Amended Complaint are substantially identical except for the number of plaintiffs.

This case is now before the court on Defendant's Partial Motion to Dismiss and Partial Motion For Summary Judgment (defendant's Motion or Def.'s Mot.). Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant seeks dismissal of Count II of plaintiffs' complaint for failure to state a claim upon which relief can be granted. Def.'s Mot. 1. Defendant also moves for summary judgment pursuant to RCFC 56(b) as to Count III "because the material facts pertaining to [C]ount III are undisputable and the [g]overnment is entitled to prevail as a matter of law," id. 12, and to Count IV because the "time spent by plaintiffs bidding on vacation and work schedules amounts to no more than five or ten minutes a year" and is "de minimis," id. at 13.

Plaintiffs filed a motion for summary judgment as to Count II of plaintiffs' complaint and opposed defendant's motion for summary judgment as to Counts III and IV. Plaintiffs' Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment and Motion to Dismiss (plaintiffs' Motion or Pls.' Mot.). Now before the court are defendant's Motion, Defendant's Proposed Findings of Uncontroverted Facts (defendant's Facts or Def.'s Facts), plaintiffs' Motion, Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts (plaintiffs' Response to defendant's Facts or Pls.' Resp. to Def.'s Facts), Plaintiffs' Proposed Findings of Uncontroverted Facts (plaintiffs' Facts or Pls.' Facts), Defendant's Reply to Plaintiffs' Opposition to Defendant's Partial Motion to Dismiss and Partial Motion For Summary Judgment and Opposition to Plaintiffs' Motion For Summary Judgment (defendant's Reply or Def.'s Reply), Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Facts (defendant's Response to plaintiffs' Facts or Def.'s Resp. to Pls.' Facts), Defendant's Reply to Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts (defendant's Reply to plaintiffs' Response to defendant's Facts or Def.'s Reply to Pls.' Resp. to Def.'s Facts), Plaintiffs' Reply to Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Facts (plaintiffs' Reply to defendant's Response to plaintiffs' Facts or Pls.' Reply to Def.'s Resp. to Pls.' Facts), and Plaintiffs' Reply in Support of Their Motion For Partial Summary Judgment (plaintiffs' Reply or Pls.' Reply). The court held an oral argument on the parties' motions on July 29, 2008.

For the following reasons, with regard to Count II of plaintiffs' Complaint, defendant's motion to dismiss, treated as a motion for summary judgment, is DENIED. Plaintiffs' motion for summary judgment as to Count II is GRANTED. With regard to Counts III and IV of plaintiffs' Complaint, because the court concludes that genuine issues of material fact still remain, defendant's Motion is DENIED.

I.     Legal Standards

3

A.      Failure to State a Claim

A motion to dismiss for failure to state a claim is brought pursuant to RCFC
12(b)(6).  See RCFC 12(b)(6).  "When reviewing a dismissal for failure to state a claim
upon which relief can be granted . . . , we must accept as true all the factual allegations in
the complaint, and . . . we must indulge all reasonable inferences in favor of the
[plaintiff]. . . ."  Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001)
(citations omitted).  The consequence of a plaintiff's failing to establish all the elements
of its claim is that "plaintiff loses on the merits for failing to state a claim on which relief
can be granted."  Fisher v. United States (Fisher), 402 F.3d 1167, 1175-76 (Fed. Cir.
2005).  If, on a 12(b)(6) motion, "matters outside the pleadings are presented to and not
excluded by the court, the motion shall be treated as one for summary judgment and
disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity
to present all material made pertinent to such a motion by RCFC 56."  RCFC 12(b).

B.      Summary Judgment

The grounds for summary judgment are set forth in RCFC 56.  See RCFC 56.
RCFC 56(c) provides:

> [Summary] judgment . . . shall be rendered . . . if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue as to any material fact
> and that the moving party is entitled to a judgment as a matter of law.

RCFC 56(c); see also Mann v. United States, 334 F.3d 1048, 1050 (Fed. Cir. 2003)
("Summary judgment is appropriate where there is no genuine issue of material fact and
the moving party is entitled to judgment as a matter of law." (citing RCFC 56(c))).  The
moving party has the initial burden of demonstrating "the absence of any genuine issue of
material fact and entitlement to judgment as a matter of law."  Crater Corp. v. Lucent
Techs., Inc., 255 F.3d 1361,1366 (Fed. Cir. 2001) (citing Celotex Corp. v. Catrett
(Celotex), 477 U.S. 317, 322-24 (1986)).[2]  This burden may be discharged by "pointing

---

[2]The Rules of the United States Court of Federal Claims (RCFC) generally mirror the
Federal Rules of Civil Procedure (FRCP).  RCFC 56 Rules Committee Notes ("The subdivision
structure of RCFC 56 was reordered to more closely conform to FRCP 56."); see Flowers v.
United States, 75 Fed. Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and
is similar in language and effect."); Champagne v. United States, 35 Fed. Cl. 198, 205 n.5 (1996)
("In general, the rules of this court are closely pattered on the [FRCP].  Therefore, precedent
under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."); see also
(continued...)

out . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323 (emphasis omitted). However, the moving party must file with the court documentary evidence, such as declarations, that support its assertions that material facts are beyond genuine dispute, see RCFC 56(h), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case," Celotex Corp., 477 U.S. at 325; see also Anchor Sav. Bank, FSB v. United States, 59 Fed. Cl. 126, 139-40 (2003). The adverse party then "must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e). RCFC 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

RCFC 56(e). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." Celotex, 477 U.S. at 324. "The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250; see Matsushita Elec. Ind. Co. v. Zenith Radio Corp. (Matsushita), 475 U.S. 574, 587 (1986) (stating that there is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"). To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in

---

[2](...continued)
C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Therefore, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

a form that would be admissible at trial." <u>Celotex Corp.</u>, 477 U.S. at 324.  However, the non-movant must establish the existence of a material element on which the party will bear the burden of proof at trial. <u>Id.</u> at 322-23.

Under RCFC 56, the court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party. <u>Matsushita</u>, 475 U.S. at 587; <u>Mann v. United States</u>, 334 F.3d 1048, 1050 (Fed. Cir. 2003) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

C.     Claims For Overtime Compensation Under the FLSA

To prevail on a FLSA claim for an overtime activity suffered or permitted to be performed, plaintiffs must carry their burden of proof on all of the elements of the particular claim.  <u>See</u> <u>Anderson v. Mt. Clemens Pottery Co.</u> (<u>Anderson</u>), 328 U.S. 680, 686-87 (1946).  "First, plaintiffs must establish that each activity for which overtime compensation is sought constitutes 'work.'  For an activity to constitute work, plaintiffs must prove that the activity was (1) undertaken for the benefit of the employer; (2) known or reasonably should have been known by the employer to have been performed; and (3) controlled or required by the employer." <u>Bull v. United States</u> (<u>Bull I</u>), 68 Fed. Cl. 212, 220 (2005) (citations omitted).  "To benefit the employer, an activity need not be 'productive'–rather, it must be necessary" to the employee's ability to accomplish the principal duties owed to the employer. <u>Id.</u> at 223 (citation omitted).  "Compensable work under the FLSA includes work that is 'suffer[ed] or permit[ted].'" <u>Id.</u> at 220 (quoting 29 U.S.C. § 203(g)) (alterations in original).  "Suffered or permitted work means any work performed by an employee for the benefit of an agency, whether requested or not, provided the employee's supervisor knows or has reason to believe that the work is being performed and has an opportunity to prevent the work from being performed." 5 C.F.R. § 551.104 (2006).

> Work not requested but suffered or permitted is work time.  For example, an employee may voluntarily continue to work at the end of the shift.  He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records.  The reason is immaterial.  The employer knows or has reason to believe that he is continuing to work and the time is working time.

29 C.F.R. § 785.11 (2006).  "This actual or constructive knowledge must be attributable to someone with the authority to bind the government."  <u>Bull I</u>, 68 Fed. Cl. at 224 (citation omitted).  Under OPM (Office of Personnel Management) regulations, "An agency is responsible for exercising appropriate controls to assure that only that work for which it intends to make payment is performed."  5 C.F.R. § 551.402(a) (2006).  Furthermore, under Department of Labor regulations:

> In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13 (2006).

Plaintiffs must also establish that the hours of work performed are not de minimis, <u>Bull I</u>, 68 Fed. Cl. at 220-21 (citing <u>Anderson</u>, 328 U.S. at 693; <u>Bobo v. United States</u> (<u>Bobo</u>), 136 F.3d 1465, 1468 (Fed. Cir. 1998); <u>Adams v. United States</u>, 65 Fed. Cl. 217, 222 (2005)), and that the work performed is "reasonable in relation to the principal activity," <u>Bull I</u>, 68 Fed. Cl. at 220-21 (citing <u>Anderson</u>, 328 U.S. at 688; <u>Amos v. United States</u>, 13 Cl. Ct. 442, 449 (1987)).  "To establish that preliminary or postliminary work is compensable, plaintiffs first must show that the time spent engaged in the activity was not so 'insubstantial and insignificant' as to bar recovery under the 'de minimis doctrine.'" <u>Bull I</u>, 68 Fed. Cl. at 225 (quoting <u>Anderson</u>, 328 U.S. at 693).  "The de minimis doctrine limits FLSA liability for overtime activities that consume negligible amounts of time." <u>Id.</u>  "It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."  <u>Anderson</u>, 328 U.S. at 692.  "The factors that trial courts must examine when assessing whether the work underlying a compensation claim is <u>de minimis</u>" are "'(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work.'" <u>Bobo</u>, 136 F.3d at 1468 (quoting <u>Lindow v. United States</u>, 738 F.2d 1057, 1063 (9th Cir. 1984)).  "OPM limits the application of the de minimis doctrine to periods of 10 minutes or less per day."  <u>Bull I</u>, 68 Fed. Cl. at 226 (citing 5 C.F.R. § 551.412(a)(1)).

> If an agency reasonably determines that a preparatory or concluding activity is closely related to an employee's principal activities, and is indispensable to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per workday, the agency shall credit all of the time spent in that activity, including the 10 minutes, as hours of work.

7

5 C.F.R. § 551.412(a)(1).  "When the pleadings and submissions, viewed in the light most favorable to the claimant and analyzed according to these factors, indicate that the claim is for work that is merely <u>de minimis</u>, summary judgment is entirely appropriate.  <u>Bobo</u>, 136 F.3d at 1468.

II.     Discussion

    A.     Count II

      Count II of plaintiffs' Complaint alleges that "during the work weeks in which plaintiffs have worked in excess of forty (40) hours per week, defendant United States has violated the FLSA by paying plaintiffs in the form of compensatory time or 'credit hours' at the rate of one hour for each hour of overtime hour worked."  Compl. ¶ 21.  Count II is the subject of cross motions for summary judgment.  <u>See</u> Def.'s Mot. <u>passim</u>; Pls.' Mot. <u>passim</u>.  Defendant moved under Rule 12(b)(6) for dismissal on the grounds of failure to state a claim.  Def.'s Mot. 1.  Defendant argues that "plaintiffs' claims lack merit because the FAA has regulatory authority to grant compensatory time off in lieu of FLSA overtime pay as well as authority to grant credit hours for hours worked in a flexible work schedule."  <u>Id.</u> at 2.  Furthermore, defendant asserts that "credit hours granted by the agency do not . . . constitute overtime hours."  <u>Id.</u>  Because "matters outside the pleadings [were] presented to and not excluded by the court [<u>see</u>, <u>e.g.</u>, Appendix to defendant's Motion (defendant's Appendix or Def.'s App.) 13-26], the [court treats the 12(b)(6)] motion . . . as one for summary judgment," RCFC 12(b), and notes that plaintiffs were "given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56," <u>id.</u>  Along with plaintiffs' response to defendant's motion to dismiss, plaintiffs themselves moved "for partial summary judgment regarding defendant's liability with respect to Count II of plaintiffs' [C]omplaint."  Pls.' Mot. 1.

      The differing views of the parties arise as a result of their different views of the laws governing pay applicable to FAA employees.  <u>See</u> Compl. ¶¶ 21-22; Def.'s Mot. 2. The major dispute is whether the FLSA, enacted in 1938, which generally provides that overtime shall be paid for time worked in excess of forty hours a week "at a rate not less than one and one-half times the regular rate at which [the employee] is employed," 29 U.S.C. § 207(a)(1), is applicable to the calculation of plaintiffs' pay.  Pls.' Mot. 8, 15; Def.'s Mot. 2.  The dispute centers on whether the specific compensation scheme for the FAA that became effective on April 1, 1996, as implemented by the FAA in its personnel management system, leaves intact the FLSA regime applicable to overtime, Compl. ¶ 21, or covers the overtime for which plaintiffs' claim is made, Def.'s Mot. 2.

      To prevail on its Motion with respect to Count II, defendant must demonstrate that there is no "genuine issue of material fact," <u>see</u> <u>Celotex</u>, 477 U.S. at 323, as to whether

"the FAA has regulatory authority to grant compensatory time off in lieu of FLSA overtime pay as well as authority to grant credit hours for hours worked in a flexible work schedule," Def.'s Mot. 2.  To prevail on its motion for summary judgment with respect to Count II, plaintiffs must demonstrate that there is no "genuine issue of material fact," see Celotex, 477 U.S. at 323, as to whether "defendant's payment of hour-for-hour compensatory time or 'credit hours' plainly violates the statutory requirement, under § 207 of the FLSA, that overtime compensation be paid at 'one and one-half times' the employee's regular rate of pay," Pls.' Mot. 3.  Except for factual issues related to the terms of a collective bargaining agreement discussed below in Part II.A.4, the disputed issues are legal in nature.

        1.        Whether Existing Statutory Exceptions to the Time-and-a-Half Requirement For Pay For Overtime Work in the FLSA Apply to Plaintiffs

The FLSA requires employers, to provide compensation to employees who engage in work "for a workweek longer than forty hours . . . at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). In 1974, Congress extended application of the FLSA to federal employees.  Pub. L. No. 93-259, 88 Stat. 55 (1974) (codified at 29 U.S.C. § 203(e)(2)) (defining individuals covered by the FLSA to include "[a]ny individual employed by the Government of the United States").  As individuals "employed by the Government of the United States," 29 U.S.C. § 203(e)(2); see Compl. ¶¶ 1, 4, plaintiffs are covered by the FLSA, see 29 U.S.C. § 203(e)(2), unless excepted by law.

In addition to the FLSA, various compensation laws have been enacted that pertain to overtime compensation.  The Federal Employees Pay Act (FEPA) was enacted in 1945. Federal Employees Pay Act of 1945, ch. 212, 59 Stat. 295 (initially codified at 5 U.S.C. §§ 911-41; re-codified as amended at 5 U.S.C. §§ 5541-50b).  FEPA provides for overtime compensation when overtime has been "officially ordered or approved."  5 U.S.C. § 5542(a); see also Doe v. United States, 372 F.3d 1347, 1349 (Fed. Cir. 2004).  In 1990, Congress amended FEPA by enacting the Federal Employees Pay Comparability Act of 1990 (FEPCA).  FEPCA, Pub. L. No. 101-509, § 529, 104 Stat. 1389 (1990). FECPA amended 5 U.S.C. § 5542 by adding subsection (c), which provides for coordination between FEPCA and the FLSA and states:

        Subsection (a) [which requires that federal employees be paid overtime pay for work in excess of eight hours in a day or 40 hours in a week] shall not apply to an employee who is subject to the overtime pay provisions of section 7 of the Fair Labor Standards Act of 1938. In the case of an employee who would, were it not for the preceding sentence, be subject to this section, the Office of Personnel Management shall by regulation prescribe what hours shall be deemed to be hours

of work and what hours of work shall be deemed to be overtime hours for the purpose of such section 7 so as to ensure that no employee receives less pay by reason of the preceding sentence.

5 U.S.C. § 5542(c).  FEPCA eliminated the need to compute overtime compensation under both FEPA and the FLSA.  See id.

Plaintiffs argue that they should receive monetary compensation for overtime because "absent [the] existence of an express statutory exception, employers, including the federal government, are prohibited from providing their employees with compensatory time in lieu of cash for overtime hours covered by the FLSA."  Pls.' Mot. 18.

The FLSA itself contains exceptions to the requirement that overtime compensation be paid "at a rate not less than one and one-half times the regular rate."  See 29 U.S.C. § 207(a)(1).  Specifically, there are statutory exceptions to the prohibition against compensatory time for commissioned sales persons, id., § 207(i), and for firefighters and police, id. § 207(k).  None of these exceptions applies to plaintiffs.  Section 207(o) of the FLSA also provides for the granting of compensatory time to state, local, and interstate agency employees.  Id. § 207(o).  Section 207(o), however, omits any reference to federal employees.  See id.

Plaintiffs argue that Congress's omission of federal employees from 29 U.S.C. § 207(o) shows that Congress "did not intend for the § 207(o) exemption to apply to plaintiffs."  Pls.' Mot. 10.  Plaintiffs rely on Doe v. United States (Doe I), 74 Fed. Cl. 592 (2007) for the applicability to this dispute of the principle of statutory interpretation, expressio unius est exclusio alterius:  "where a statute expressly designates entities within its coverage, there is an inference that all omissions should be understood as exclusions."  Doe I, 74 Fed. Cl. at 597; see Pls.' Reply 9.  In Doe I, federal employees brought an action alleging that the Social Security Administration violated the FLSA by granting credit hours and compensatory time for overtime work.  Doe I, 74 Fed. Cl. at 593-94.  In deciding a motion to dismiss, the court reviewed whether the FLSA or FEPCA provides an exception to the FLSA or FEPCA requirements to pay overtime pay to the Doe plaintiffs.  Id. at 597-600.  The court noted that the FLSA contains an explicit exemption for state, local, and interstate agency employees in 29 U.S.C. § 207(o)(1), id. at 597, and that "[u]nder the maxim of statutory interpretation expressio unius est exclusio alterius, where a statute expressly designates entities within its coverage, there is an inference that all omissions should be understood as exclusions," id.  The court stated, "As such, the exclusion of federal employees from Section 207(o) means this category of employees cannot receive comp time off at a rate of one and one-half hours for each hour of

overtime worked." Id. at 597-98.  Unlike plaintiffs in this case[3], however, the Doe plaintiffs were subject to both FLSA and FEPCA.  Id. at 597.  The court read the FLSA and FEPCA together and determined that "an agency may grant an employee comp time on an hour-for-hour basis in lieu of overtime pay under the FLSA for occasional or irregular overtime work."  Id. at 598.  The court dismissed the Doe I plaintiffs' claim for failure to state a claim upon which relief could be granted.  Id. at 600.  The Court of Appeals for the Federal Circuit upheld the trial court's finding regarding the Doe I plaintiffs' FLSA claim.  Doe v. United States (Doe II), 513 F.3d 1348, 1358 (Fed. Cir. 2008) ("Because Title 5 authorizes the SSA to grant compensatory time and credit hours to non-exempt federal employees, and because section 5542(c) does not limit that authority, the trial court correctly dismissed the appellants' FLSA claims for failure to state a claim.").

In its motion, defendant anticipates plaintiffs' reliance on Doe I and argues that "[a]ny attempt by plaintiffs to present this argument [is] without merit" because "the conclusion drawn in Doe [I] from its application to section 207(o) is inconsistent with the decision of the United States Court of Appeals for the Federal Circuit in Billings v. United States (Billings), 322 F.3d 1328, 1332-33 (Fed. Cir. 2003)."  Def.'s Mot. 15.  The Billings plaintiffs sought overtime pay under the FLSA.  Billings, 322 F.3d at 1330.  At issue in Billings was whether the plaintiffs were exempt from the overtime provisions as "executives."  Id.  The Billings plaintiffs argued that the OPM definition of "executive" employee conflicted with the Department of Labor definition and that the Department of Labor definition should prevail.  Id.

The Billings court noted that the FLSA is silent on the definition of "executive" employee and acknowledged that the OPM could fill that gap by implementing regulations produced through notice-and-comment rulemaking.  Id. at 1333.  In contrast to the silence of the FLSA as to the definition of "executive" employee addressed in Billings, the FLSA is not silent as to the acceptable form of compensation for overtime hours or as to which employees will be exempt from its requirements.  See 29 U.S.C. § 207(a)-(o).  Section 207(o) contains no "gap" to fill because Congress specifically omitted federal employees from 29 U.S.C. § 207(o).  The exceptions to the FLSA's requirement of time and a half monetary compensation found in 29 U.S.C. § 207 do not apply to plaintiffs.

---

[3]As discussed below in this Part II.A.1, plaintiffs are exempted from the Federal Employees Pay Comparability Act of 1990 (FEPCA) pursuant to 49 U.S.C. § 40122(g)(2) (2000).

Additional exceptions to the FLSA's requirement that overtime compensation be paid "at a rate not less than one and one-half times the regular rate," 29 U.S.C. § 207(a)(1), are contained in title 5 of the United States Code, see 5 U.S.C. §§ 5543, 6122-23.  Under § 5543:

> The head of an agency may – (1) on request of an employee, grant the employee compensatory time off from his scheduled tour of duty instead of payment under section 5542 or section 7 of the [FLSA] for an equal amount of time spent in irregular or occasional overtime work[.] . . .

5 U.S.C. § 5543(a).  In 1982 Congress amended title 5 of the United States Code "to provide permanent authorization for Federal agencies to use flexible and compressed employee work schedules.  Federal Employees Flexible and Compressed Work Schedule Act of 1982 (FEFCWSA), Pub. L. No. 97-221, 96 Stat. 227 (1982) (codified as amended at §§ 6120-6133 (2000)).  Under § 6123:

> [T]he head of an agency may, on request of the employee, grant the employee compensatory time off in lieu of payment for such overtime hours, whether or not irregular or occasional in nature and notwithstanding the provisions of sections 5542(a), 5543(a)(1) and section 5544(a) of this title, section 7453(e) of title 38, section 7 of the [FLSA] (29 U.S.C. [§] 207), or any other provision of law[.] . . .

5 U.S.C. § 6123(a)(1).  FEFCWSA also allowed agencies to grant credit hours for work in certain circumstances.  See 5 U.S.C. §§ 6121(4), 6122.

The exceptions contained in sections 5543, 6121, 6122, and 6123 do not, however, apply to plaintiffs under the provisions of the Department of Transportation and Related Agencies Appropriation Act of 1996, Pub. L. No. 104-50, § 347, 109 Stat. 436 (1995) (codified as amended at 49 U.S.C. § 40122(g) (2000)), which granted the FAA the authority to develop a personnel management system:

> In consultation with the employees of the [FAA] and such non-governmental experts in personnel management systems as he may employ, and notwithstanding the provisions of title 5 and other Federal personnel laws, the [FAA] shall develop and implement, not later than January 1, 1996, a personnel management system for the [FAA] that addresses the unique demands on the agency's workforce.  Such a new system shall, at a minimum, provide for greater flexibility in the hiring, training, compensation, and location of personnel.

49 U.S.C. § 40122(g)(1).   The 1996 FAA personnel management system (PMS), effective on April 1, 1996, id. § 40122(g)(4), is exempt from most of the provisions of title 5, see id. § 40122(g)(2).  Section 40122(g)(2) of title 49 states:

> The provisions of title 5 shall not apply to the new personnel management system developed and implemented pursuant to paragraph (1), with the exception of –
>
> (A)   section 2302(b), relating to whistleblower protection, including the provisions for investigation and enforcement as provided in chapter 12 of title 5;
> (B)   sections 3308-3320, relating to veteran's preference;
> (C)   chapter 71, relating to labor-management relations;
> (D)   section 7204, relating to antidiscrimination
> (E)   chapter 73, relating to suitability, security, and conduct;
> (F)   chapter 81, relating to compensation for work injury;
> (G)   chapters 83-85, 87, and 89, relating to retirement, unemployment compensation, and insurance coverage; and
> (H)   sections 1204, 1211-1218, 1221, and 7701-7703, relating to the Merit Systems Protection Board.

49 U.S.C. § 40122(g)(2).  In particular, section 40122(g)(2) excludes plaintiffs from the operation of the provisions of 5 U.S.C. §§ 5543 and 6123, which authorize granting compensatory time in lieu of FLSA overtime pay.  See 49 U.S.C. § 40122(g)(2).  While it is true that § 5543 of title 5 of the United States Code authorizes the payment of compensatory time at a straight time rate for irregular or unscheduled overtime worked by certain federal employees, 5 U.S.C. § 5543, and 5 U.S.C. §§ 6120-33 allows compensatory time to be granted for hours worked beyond an employee's flextime schedule, id. §§ 6120-33, none of these provisions applies to plaintiffs because none of these provisions is listed among the exceptions to the express provision of 49 U.S.C. § 40122(g)(2) that "[t]he provisions of title 5 shall not apply to [the FAA's] new personnel management system."  49 U.S.C. § 40122(g)(2).

> 2.   Whether the FAA Has Authority Pursuant to 49 U.S.C. §§ 40122(g)(1) and 106(l) to Grant Plaintiffs Compensatory Time in Lieu of FLSA Overtime Pay and to Provide Credit Hours

Defendant acknowledges that the new PMS is not covered by 5 U.S.C. §§ 5543 and 6121, which allow for compensatory time in lieu of FLSA compensatory pay.  Def.'s Reply 6; Def.'s Mot. 14; see 49 U.S.C. § 40122(g)(2).  According to defendant, however, "section 5543 is not the only source of authority for agencies of the Federal Government to grant compensatory time as compensation pursuant to the FLSA for excess hours of work."  Def.'s Mot. 14.  Defendant argues, notwithstanding the unavailability of 5 U.S.C.

13

§ 5543, that the FAA "has authority pursuant to 49 U.S.C. §§ 40122(g)(1) and 106(l) and the FAA's implementing regulations, to grant plaintiffs compensatory time in lieu of [FLSA] overtime pay and to provide credit hours as part of a flexible work schedule." Def.'s Reply 1.

In 1996, Congress passed the Air Traffic Management System Performance Improvement Act (Improvement Act). Pub. L. No. 104-264, §§ 201-30, 110 Stat. 3213 (Oct. 9, 1996) (codified at 49 U.S.C. § 106(l)). Congress noted in § 221 of the Improvement Act that the FAA "is a unique agency, being one of the few non-defense government agencies that operates 24 hours a day, 365 days a year, while continuing to rely on outdated technology to carry out its responsibilities for a state-of-the-art industry." Improvement Act § 221(1). The Improvement Act "authorized [the FAA] to change the Federal procurement and personnel systems to ensure that the [FAA] has the ability to keep pace with new technology and is able to match resources with the real personnel needs of the [FAA]." Id. § 221(14). Relevant to the FAA's personnel management system compensation provisions, § 225 of the Improvement Act authorizes the FAA to set compensation guidelines for FAA employees. Id. § 225 (codified at 49 U.S.C. § 106(l)(1)). Section 106(l)(1) of title 49 of the United States Code states:

> Except as provided in subsections (a) and (g) of section 40122, the Administrator is authorized, in the performance of the functions of the Administrator, to appoint, transfer, and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Administrator and the [FAA]. In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in section 40122(a)[4], nor shall the Administrator be bound by any requirement to establish such compensation or benefits at particular levels.

49 U.S.C. § 106(l)(1) (footnote added) (emphasis added).

---

[4]Section 40122(a) of title 49 of the United States Code provides general information about consultation and negotiation, mediation, cost savings and productivity goals, and annual budget discussions. In particular, § 40122(a)(1) states:

> (1) Consultation and negotiation. In developing and making changes to the personnel management system initially implemented by the Administrator of the Federal Aviation Administration on April 1, 1996, the Administrator shall negotiate with the exclusive bargaining representatives of employees of the Administration certified under section 7111 of title 5 and consult with other employees of the Administration.

49 U.S.C. § 40122(a)(1).

The parties contest the meaning of §§ 106(l)(1) and 40122(g)(1), especially the phrases emphasized in the quotations above and below. Def.'s Reply 6; Pls.' Reply 2. Section 40122(g)(1) states:

> In consultation with the employees of the Administration and such non-governmental experts in personnel management systems as he may employ, and notwithstanding the provisions of title 5 and other Federal personnel laws, the Administration shall develop and implement, not later than January 1, 1996, a personnel management system for the Administration that addresses the unique demands on the agency's workforce. <u>Such a new system shall, at a minimum, provide for greater flexibility in the hiring, training, compensation, and location of personnel.</u>

49 U.S.C. § 40122(g)(1) (emphasis added).

Defendant argues that "the FAA Administrator [had] broad authority to fashion a new personnel management system that would grant increased flexibility in personnel matters, including the authority to set pay for employees" because of language in the Improvement Act. Def.'s Reply 7; <u>see</u> 49 U.S.C. § 106(l)(1). According to defendant, §§ 40122(g)(1) and 106(l) "authorized the FAA to create a personnel system for its employees in place of the title 5 statutes formerly applicable to them." Def.'s Reply 1. Defendant argues: "As the statutory language makes clear, when Congress excluded the FAA from most of the personnel rules in title 5, it intended for the Agency to replace them with regulations promulgated as part of its newly created personal management system." <u>Id.</u> at 8; <u>see id.</u> at 11-12 (arguing that the FAA has properly interpreted title 49 as a grant to the FAA of "authority to promulgate regulations providing for the granting of compensatory time in lieu of FLSA overtime pay as well as credit hours for employees who work a FWS as indicated by the adoption of policies permitting both in the FAA PMS"); <u>id.</u> at 13 (arguing that "when Congress authorized an overhaul of the FAA personnel system, it charged the FAA with developing and administering its own PMS," and that "[t]he language of these statutes clearly and unambiguously gave FAA the authority to 'fix compensation'"). According to defendant, "Congress did not expressly or implicitly indicate any intention to limit the FAA's authority to pay compensatory time in lieu of FLSA overtime or to issue credit hours, authorities the FAA had possessed since 1990 and 1982 respectively." <u>Id.</u> at 8. Defendant asserts that "[i]nstead, Congress expressed its intention to give the FAA more flexibility in administering its personnel management system," including "the ability to continue flexible compensation practices the FAA had enjoyed prior to 1996." <u>Id.</u> Defendant argues that "[I]n light of: 1) Congress's intent to grant the FAA greater flexibility; 2) the FAA's long-standing prior ability to grant compensatory time and issue credit hours; and 3) the absence of any indication that Congress intended to take away the FAA's ability to do either, it is clear

15

that the FAA's interpretation of title 49 as permitting it to continue both of these practices in the context of its new PMS is reasonable." Id. at 13.

Plaintiffs argue, however, that because "the FAA is free to provide and negotiate pay and benefits unrestricted by the provisions of title 5[,] . . . the presumption should be that Congress intended the FAA to adhere to the floor-level FLSA overtime requirements applicable to other non-title 5 employers." Pls.' Reply 10. According to plaintiffs, the flexibility given to the FAA pursuant to 49 U.S.C. § 40122 and 49 U.S.C. § 106(l)(1) did not enable the FAA to disregard the provisions of the FLSA:

> In truth, in granting the FAA the flexibility to design a personnel management system untethered to the pay and benefits requirements of title 5, Congress intended to permit the FAA the freedoms of a private sector employer – but with those freedoms comes the obligation to follow the FLSA's basic overtime pay requirements, just as private sector employers must do.

Id. at 2.

The court now examines the extent to which these conflicting contentions – defendant's view that title 5 may in effect be continued by regulation or plaintiffs' view that with the freedoms of the private sector come FLSA's basic overtime pay requirements – are supported by the texts on which the parties rely and their legislative histories.

Defendant relies on general propositions regarding statutory construction and the discernment of legislative intent in support of its assertion that the FAA properly interpreted the Improvement Act as authority to grant compensatory time. Def.'s Reply 12-13 (citing Chevron, U.S.A. Inc. v. Natural Res. Def. Council (Chevron), 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); Haggar Co. v. Helvering, 308 U.S. 389, 394 (1940) ("All statutes must be construed in light of their purpose.")).

The court agrees with defendant that the starting point for statutory interpretation is the language of the statute. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) (citations omitted) (stating that analysis "in any case of statutory construction . . . begins with 'the language of the statute'"); Ventas, Inc. v. United States, 381 F.3d 1156, 1160 (Fed. Cir. 2004) (citing Hughes Aircraft Co., 525 U.S. at 438) ("Statutory interpretation necessarily begins with the text of the statute."); Norman J. Singer, 2A Sutherland Statutory Construction, § 47:1 (7th ed. 2007) ("The starting point in statutory construction

16

is to read and examine the text of the act and draw inferences concerning the meaning from its composition and structure." (footnote omitted)).  However, it is not clear to the court that either plaintiffs' or defendant's construction is required by the text of the statute, nor does it appear that the court can ascertain Congress's intention with respect to the "precise question at issue," <u>Chevron</u>, 467 U.S. at 843 n.9, namely the applicability of the FLSA to the FAA compensation system, from the text alone.

Defendant's textual argument relies principally on the last sentence in § 40122(g)(1).  Def.'s Reply 6.  The last sentence of § 40122(g)(1) provides that the new PMS "shall, at a minimum, provide for greater flexibility in the hiring, training, compensation and location of personnel."  49 U.S.C. § 40122(g)(1).  However, the apparently applicable words "flexibility in . . . compensation," 49 U.S.C. § 40122(g)(1), are far from requiring an interpretation that they eliminate the FLSA standard of pay for overtime work.  Moreover, the very next subsection, 49 U.S.C. § 40122(g)(2), states that "[t]he provisions of title 5 shall not apply to the new personnel management system," with certain exceptions, none of which addresses overtime compensation.  49 U.S.C. § 40122(g)(2).  This language not only does not clearly support defendant's argument that "Congress did not expressly or implicitly indicate any intention to limit the FAA's authority to pay compensatory time in lieu of FLSA overtime or to issue credit hours," Def.'s Reply 8, but in fact removed the FAA's authority, then existing under the provisions of title 5, to grant compensatory time in lieu of FLSA overtime pay, 49 U.S.C. § 40122(g)(2).  The view that Congress intended to remove the FAA's authority to grant compensatory time is consistent with the legislative history[5] of § 40122(g).[6]

---

[5]Use of legislative history may be permissible regardless of whether the statute is clear on its face:

Source materials other than intrinsic aids are considered relevant in construing statutes.  Sources outside the text are known as extrinsic aids.

Extrinsic aids consist of background information about circumstances which led to the enactment of a statute, events surrounding enactment, and developments pertinent to subsequent operation.  These facts comprise the history of a statute. . . .

. . . .

It is said that extrinsic aids may be considered only when a statute is ambiguous and unclear.  However, ambiguity is not always considered a prerequisite to the use of extrinsic aids.

(continued...)

Section 106(l)(1) specifies that the Administrator may set compensation and benefits for FAA employees, but the Administrator's authority is limited by subsections (a) and (g) of § 40122.  49 U.S.C. § 106(l)(1).  Section 40122(g)(2) specifically states that

---

[5](...continued)

Norman J. Singer, 2A Sutherland Statutory Construction, § 48:1 (7th ed. 2007) (footnotes omitted); see also United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543-44 (1940) ("When aid to construction of meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" (footnotes omitted)).

[6]An April 10, 1996 senate report including a proposal for 49 U.S.C. § 40122 included the following language under subsection (f), language which mandates that FAA follow certain provisions of title 5 but is silent on the impact of the proposed act on the provisions relating to compensatory time and credit hours:

> EMPLOYEE RIGHTS AND BENEFITS.— The enactment of this section shall not result in the exemption of employees of the Administration from any of the following provisions of title 5:
>     (1) Section 2302(b) (relating to whistleblower protection).
>     (2) Section 3308-3320 (relating to veterans' preference).
>     (3) Section 7116(b)(7) (relating to prohibition of the right to strike).
>     (4) Section 7204 (relating to antidiscrimination).
>     (5) Chapter 63 (relating to leave).
>     (6) Chapter 71 (relating to labor-management relations).
>     (7) Chapter 73 (relating to suitability, security, and conduct).
>     (8) Chapter 81 (relating to compensation for work injuries).
>     (9) Chapter 83 (relating to retirement).
>     (10) Chapter 84 (relating to the Federal Employees' Retirement System).
>     (11) Chapter 85 (relating to unemployment compensation).
>     (12) Chapter 87 (relating to life insurance).
>     (13) Chapter 89 (relating to health insurance).
>     (14) Subchapter II of chapter 53 (with respect to the pay of the Administrator).

S. Rep. No. 104-251, at 59 (1996).  Similar language was contained in a House Report from March 7, 1996.  H.R. Rep. No. 104-475, at 4 (1996).  The final text of § 40122, however, states: "The provisions of title 5 shall not apply to the new personnel management system developed and implemented pursuant to paragraph (1), with the exception of [certain provisions]."  49 U.S.C. § 40122(g)(2) (emphasis added).  Instead of listing provisions of title 5 from which the FAA must not deviate – while apparently allowing the continued applicability of certain provisions of title 5 – Congress instead chose specifically to remove from the FAA the majority of the provisions of title 5, including those that authorized payment for overtime by compensatory time and credit hours.

18

most title 5 provisions, including 5 U.S.C. § 5543, do not apply to the PMS.  49 U.S.C. § 40122(g)(2).  As with the legislative history of § 40122(g), see supra note 6, the legislative history of § 106(l)(1) shows a clear intent to eliminate most provisions of title 5 from the PMS.  Legislative proposals in the Senate contemplated that the PMS would apply the compensation provisions of title 5.  The proposals for 49 U.S.C. § 106(l)(1) in the Senate on April 10, 1996 and July 26, 1996 included the following language:

> Upon development of a personnel management system under section 40122(c), the Administrator is authorized, in the performance of the functions of the Administrator, to appoint, transfer, and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Administrator and the Administration.  Except as otherwise provided by law, such officers and employees shall be appointed in accordance with civil service laws and compensated in accordance with title 5.  In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in section 40122(c), nor shall the Administrator be bound by any requirement to establish such compensation or benefits at particular levels.

S. Rep. No. 104-251, at 50 (1996) (emphasis added); S. Rep. No. 104-333, at 52 (1996). A July 26, 1996 House Report proposed amending § 106(l)(1) with the following language which eliminated the application of the title 5 compensation provisions:

> Except as provided in section 40122(a) of this title and section 347 of Public Law 104-50 [49 U.S.C. § 40122(g)], the Administrator is authorized, in the performance of the functions of the Administrator, to appoint, transfer, and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Administrator and the Administration.  In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in section 40122(a), nor shall the Administrator be bound by any requirement to establish such compensation or benefits at particular levels.

H.R. Rep. No. 104-848, at 21 (1996) (emphasis added).  This language from the House Report was adopted by Congress on October 9, 1996.  Pub. L. No. 104-264, § 225, 110 Stat. 3213 (Oct. 9, 1996) (codified at 49 U.S.C. § 106(l)).  Congress chose to exclude the language from the Senate bill requiring compensation "in accordance with title 5," S. Rep. No. 104-251, at 50, and chose instead to retain the language from the House bill that

most provisions of title 5 shall not apply to the PMS.  <u>See</u> Pub. L. No. 104-264, § 225, 110 Stat. 3213 (Oct. 9, 1996) (codified at 49 U.S.C. § 106(l)); 49 U.S.C. § 40122(g).

Furthermore, the provision that the Administrator shall not "be bound by any requirement to establish such compensation or benefits at particular levels," 49 U.S.C. § 106(l)(1), does not require an interpretation that the Administrator is free from the constraints of all other laws and regulations relating to pay, including the FLSA.  In particular, the concept of "establish[ing] . . . compensation or benefits at particular levels" does not appear to address the particular issue in this case, which is not "compensation . . . levels" but rather the calculation of overtime pay, regardless of the underlying "compensation . . . levels."

There is an absence in either the text of the legislation or in the legislative history of § 106(l)(1) of a clearly discernable indication of congressional intent to abrogate the protections of the FLSA.  The statute lacks a phrase such as "[n]otwithstanding any other provision of law," a phrase which has been interpreted to "connote[] a legislative intent to displace any other provision of law that is contrary to the Act." <u>Shoshone Indian Tribe of the Wind River Reservation v. United States</u>, 364 F.3d 1339, 1346 (Fed. Cir. 2004).  In the absence of such a direct statement, a repeal must be found by implication.  <u>Town of Red Rock v. Henry</u> (<u>Town of Red Rock</u>), 106 U.S. 596, 601 (1883) (stating that where an act, contains no express repeal of an earlier act, "[t]he question is . . . whether the [later] act repeals the [earlier act] by implication").  The Supreme Court has stated that as a "cardinal rule . . . repeals by implication are not favored." <u>Posadas v. Nat'l City Bank of New York</u> (<u>Posadas</u>), 296 U.S. 497, 503 (1936); <u>see</u> <u>Town of Red Rock</u>, 106 U.S. at 601.  Of particular relevance is the guidance that the court should give effect to two statutes upon the same subject "if possible:"  "Where there are two acts upon the same subject, effect should be given to both if possible." <u>Posadas</u>, 296 U.S. at 503.  "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." <u>Morton v. Mancari</u> (<u>Morton</u>), 417 U.S. 535, 551 (1974).

Some aspects of the legislative history of the Improvement Act indicate that, through 49 U.S.C. § 106(l)(1), Congress intended to remove some legal requirements that applied to the FAA, S. Rep. No. 104-251, at 11 (1996) (speaking of "giving the FAA much more autonomy" and waiving "many federal laws and regulations in the areas of personnel and procurement that inhibit the effectiveness of FAA"), but neither the text nor the legislative history contains any indication of an intention to diminish the protections of the FLSA.

The goals of the Senate bill to allow innovation by the FAA by waiving "many federal laws and regulations" do not address the FLSA specifically:

> The bill as reported would provide for a comprehensive overhaul of the entire FAA by giving the FAA much more autonomy, while at the same time keeping it within the DOT.  The FAA would have authority to develop new, innovative personnel and procurement systems, and be able to waive many federal laws and regulations in the areas of personnel and procurement that inhibit the effectiveness of FAA.

S. Rep. No. 104-251, at 11 (1996).  Moreover, the overtime provisions of the FLSA do not appear to fall under "federal laws and regulations . . . that inhibit the effectiveness of FAA."  See id.  Senate and House Reports discussing the effectiveness of the FAA indicate that the FAA's effectiveness was inhibited by a heavily bureaucratic system.  Id. at 2-3 (stating that "a complex [Air Traffic Control (ATC)] system, however, tends to function much less efficiently than it should in the heavily bureaucratic environment of the existing FAA"); id. at 8 ("The substantial number of federal requirements governing personnel also place a significant burden on FAA's ability to effectively manage its workforce."); S. Rep. No. 104-333, at 5, 9 (1996); H.R. Rep. No. 104-475, at 30 (1996) (stating that because "FAA managers and employees must deal with 47,200 pages of personnel laws and regulations . . . it is impossible to recruit, pay, and reward employees properly").

Instead, the legislative history of the Improvement Act appears to the court to be focused on safety, management reform, and administrative flexibility.  A Senate Report from April 10, 1996 discussing the new personnel management system stated that "[t]he overriding goal of FAA reform is the enhancement of aviation safety."  S. Rep. No. 104-251, at 29 (1996).  The April 10, 1996 Senate Report focused on the inefficiencies in the ATC system.

> In effect, the FAA, which operates the ATC system 365 days per year, 24 hours per day, is running the production line for commercial airlines and all other segments of the aviation system.  Such a complex ATC system, however, tends to function much less efficiently than it should in the heavily bureaucratic environment of the existing FAA.

Id. at 2-3.  A Senate Report from July 26, 1996 reiterated the same concern.  See S. Rep. No. 104-333, at 5 (1996).  The April 10, 1996 Senate Report stated:  "This bill will put the FAA on the path of being better able to address all ATC system inefficiencies in a coordinated and comprehensive manner."  S. Rep. No. 104-251, at 3 (1996).  Relating to personnel issues, the Senate Report stated:

The substantial number of federal requirements governing personnel also place a significant burden on FAA's ability to effectively manage its workforce.  FAA managers and employees must work with 47,200 pages of federal personnel laws and regulations.  According to the DOT, the restrictions contained in these laws and regulations create an environment lacking flexible recruiting, flexible salary setting, and performance-based rewards.  A more flexible and innovative personnel program or structure, such as that envisioned by this bill, could provide incentives for increased productivity, compensate employees based on performance, facilitate moving employees based on changes in the demand for ATC services, and improve overall management of FAA's workforce.

Id. at 8.  The July 26, 1996 Senate Report restated the same goals.  See S. Rep. No. 104-333, at 9 (1996).  A March 7, 1996 House Report discussed similar issues, stating:

FAA managers and employees must deal with 47,200 pages of personnel laws and regulations.  The restrictions contained therein create an environment [where] it is impossible to recruit, pay, and reward employees properly.

H.R. Rep. No. 104-475, at 30 (1996).  The July 26, 1996 Senate Report stated a purpose "to reform the [FAA] and make it a more efficient and effective organization by significantly improving how the FAA operates in the following areas:  governance, funding, rulemaking, procurement management, and personnel management."  S. Rep. No. 104-333, at 1 (1996).

The legislative history of § 106(l)(1) also indicates an intention to attract employees and to increase morale.  See S. Rep. No. 104-251, at 29; H.R. Rep. No. 104-475, at 31.  The April 10, 1996 Senate Report stated:  "Although the new system would be exempt from many Federal personnel laws and regulations, certain key Federal laws protecting workers' rights and benefits would still apply to the FAA and its employees, including retirement, health and life insurance benefits, and veterans preference."  S. Rep. No. 104-251, at 29.  The House Report stated:

Attempts have been made to deal with these problems by creating pay demonstration programs or providing incentives to employees through pay differentials.  However, these programs are often too small.  Those that have been adequate have either been eliminated or are threatened with elimination.  Morale and productivity suffer as the pay demonstrations and differentials come under attack.

22

The reported bill would deal with these problems by giving the agency the
flexibility to develop its own procurement and personnel systems best suited
to its unique mission.  It would do this by exempting the agency from
current procurement and personnel laws that hinder its flexibility.

H.R. Rep. 104-475, at 31.

In <u>Morton</u> the Supreme Court noted that the Civil Rights Act of 1964 contained
provisions that exempted private employers located on or near Indian Reservations from
its anti-discrimination provisions.  <u>Morton</u>, 417 U.S. at 547-48.  The Court found that
"[i]t would be anomalous to conclude that Congress intended to eliminate the
longstanding statutory preferences in BIA employment, as being racially discriminatory,
at the very same time it was reaffirming the right of tribal and reservation-related private
employers to provide Indian preference."  <u>Id.</u> at 548.  In this case the legislative history of
§ 106(l)(1) indicates an intention to attract employees and to increase morale.  <u>See</u> S. Rep.
No. 104-251, at 29; H.R. Rep. No. 104-475 at 31.  It would be anomalous to conclude that
Congress intended to eliminate the protections of the FLSA at the same time it was trying
to attract employees and increase morale.  <u>See</u> S. Rep. No. 104-251, at 29; H.R. Rep. No.
104-475, at 31.

Furthermore, the March 7, 1996 House Report indicates an intention to provide
flexibility similar to that in the private sector through the enactment of § 106(l)(1):

The Committee envisions FAA setting up systems that will allow it to
operate in a more efficient and business-like manner.  It should have the
flexibility to hire and fire as in the private sector, to provide incentives for
personnel to move to where they are most needed, and to provide them with
the equipment they need to do the job.  There should no longer be a need to
separate statutory pay differentials that stand out as a target for budget
cutters.  Rather FAA should be able to pay employees in accordance with
the job they do and the cost of living in the area that they do it.

H.R. Rep. 104-475, at 31.  The April 10, 1996 Senate Report also indicates that Congress
considered treating FAA employees like private sector employees when it notes:
"exempting the FAA from personnel requirements and allowing the agency to offer
wages that are competitive in the private market, in order to retain its most qualified
employees, could significantly increase the FAA's personnel costs."  S. Rep. No. 104-
251, at 17 (1996). The Senate Report contemplated that despite the exemptions from
personnel requirements, the bill "could reduce the FAA's costs by streamlining the
agency's acquisition process through procurement reform."  <u>Id.</u>  The court notes that
overtime is standard in the private sector under the FLSA.  If, as it appears, Congress

23

sought to enable the FAA to operate in a more businesslike manner analogous to the private sector, abrogating the overtime provisions of the FLSA does not appear consistent with that goal.

Because effect should be given to both the FLSA and the Improvement Act "if possible," see Posadas, 296 U.S. at 503, the court does not view the Improvement Act as having displaced the FLSA. The court therefore concludes that the FLSA applies to FAA employees and that regulations promulgated by the PMS must be consistent with the FLSA.

Defendant asserts, however, that the "PMS is a binding regulatory scheme." Def.'s Mot. 17-18 (citing Brodowy v. United States (Brodowy), 482 F.3d 1370 (Fed. Cir. 2007)). Defendant argues that "[t]he United States Court of Appeals for the Federal Circuit has endorsed the FAA's retention of personnel rules in existence prior to its conversion to the PMS in 1996." Def.'s Reply 11. In Brodowy, FAA employees filed a claim for pay lost when they transferred to higher-level airport facilities, which entitled them to a two-step pay increase. Brodowy, 482 F.3d at 1372. The case arrived at the Federal Circuit after the Court of Federal Claims dismissed the FAA employees' complaint for lack of jurisdiction. Id. The Brodowy court acknowledged that the General Schedule system, or compensation system, remained in effect after the new PMS was implemented. Id. at 1372 n.1, 1375. The court noted that the Brodowy plaintiffs "were not technically being paid pursuant to the GS schedule set forth in title 5 of the U.S. Code, but instead were being paid pursuant to the FAA's [PMS], [according to] the administrative order that adopted the GS pay system for the interim period pending conversion of the air traffic controllers to the [new pay system]. Id. at 1375. The court also noted that "[t]he statute that authorized the Administrator to implement a compensation scheme for the agency in 1996 also provided that the portions of title 5 containing the GS system would no longer apply to FAA employees." Id. (citing 49 U.S.C. § 40122). In reviewing the jurisdictional issue, the court determined that "[t]he FAA's adoption of the GS pay system in the 1996 [PMS] clearly qualifies as a regulation" for purposes of jurisdiction under 28 U.S.C. § 1491 because "[i]t was specifically authorized by statute and is not in conflict with the GS system compensation provisions or any other law." Id.

The two-step pay increase which was the focus of the Brodowy court did not involve a claim under the FLSA. Here, plaintiffs specifically argue that defendant's practices are in conflict with an "other law," the FLSA. Brodowy did not address the issue posed by this case.

3.     Whether the FAA Has Authority Pursuant to 29 U.S.C. § 204(f) to Grant Plaintiffs Compensatory Time In Lieu of Overtime Compensation

24

Defendant argues, in the alternative, "that the FAA has authority to grant compensatory time pursuant to regulations promulgated by the Office of Personnel Management ([OPM]) in accordance with the broad authority granted to it by Congress in 29 U.S.C. [§] 204(f)."  Def.'s Reply 2.  Congress gave OPM the authority to administer the FLSA with respect to most federal employees.  See 29 U.S.C. § 204(f).

> Notwithstanding any other provision of this chapter, or any other law, the Director of the Office of Personnel Management is authorized to administer the provisions of this chapter with respect to any individual employed by the United States (other than an individual employed in the Library of Congress, United States Postal Service, Postal Regulatory Commission, or the Tennessee Valley Authority). Nothing in this subsection shall be construed to affect the right of an employee to bring an action for unpaid minimum wages, or unpaid overtime compensation, and liquidated damages under section 216(b) of this title.

Id.  Section 5548 of FEPCA grants OPM the authority to "prescribe regulations . . . necessary for the administration of this subchapter, except section 5545(d), insofar as this subchapter affects employees in or under an Executive agency."  5 U.S.C. § 5548.  OPM promulgated regulations implementing the procedures set forth in FEPCA.  5 C.F.R. Parts 532, 550, 551 (2008).  OPM regulations regarding pay administration under the FLSA are found at 5 C.F.R. Part 551.  Defendant argues that, pursuant to 29 U.S.C. § 204(f), "OPM is authorized to administer the provisions of the FLSA with respect to plaintiffs."  Def.'s Mot. 14; see 29 U.S.C. § 204(f).  According to defendant, OPM has exercised this authority "by promulgating regulations found at 5 C.F.R. § 551.101 et seq."  Def. Mot. 14.

Relevant to overtime compensation, § 551.501 provides that "[a]n agency shall compensate an employee who is not exempt under subpart B of this part for all hours of work in excess of 8 in a day or 40 in a workweek at a rate equal to one and one-half times the employee's hourly regular rate of pay . . . ."  5 C.F.R. § 551.501(a).  Section 551.531(a) states:

> (a) At the request of an employee who is not exempt under subpart B of this part,[7] the head of an agency (or designee) may grant compensatory time off from an employee's tour of duty instead of payment under § 551.501 for an equal amount of irregular or occasional overtime work.

---

[7]Subpart B of part 551 of title 5 of the Code of Federal Regulations contains the exemptions and exclusions for pay administration under the FLSA.  None of the exemptions or exclusions applies to plaintiffs.  5 C.F.R. §§ 551.201-551.216.

Id. § 551.531(a) (footnote added).  Defendant asserts that 5 C.F.R. § 551.531(a) provides the FAA with authority to grant compensatory time off for an amount equal to the time spent working overtime instead of monetary payment.  Def.'s Mot. 14.  Plaintiffs contend that "[s]ection 551.531(a) is nearly word-for-word identical to section 5543 of title 5." Pls.' Mot. 9.  Plaintiffs argue that, because "the statutory authority for OPM's compensatory time regulations is clearly derived from provisions of title 5 that do not apply to the plaintiffs[,] . . . these OPM regulations do not apply to the plaintiffs."  Id.

Plaintiffs acknowledge the authority of the OPM to promulgate regulations in order to administer the FLSA, but argue that such regulations must be consistent with the FLSA.  Id. at 18 (quoting Bull v. U.S., 68 Fed. Cl. 212, 224 n.9 (2007) ("OPM promulgates regulations supplementing and implementing the FLSA, which must be read in conjunction with the FLSA.  However, the OPM regulations must be consistent with the FLSA itself and with the standards set by the DOL for the private sector.")).  The Court of Federal Claims has previously held that "OPM's regulations and interpretations must be consistent with the FLSA itself and with the standards set by [the Department of Labor (DOL)] for the private sector."  Aamold v. United States, 39 Fed. Cl. 735, 739 n.4 (1997).  According to the Court of Appeals for the Federal Circuit, "An employee in federal employment should receive the same overtime compensation as an employee in the private sector."  Billings, 322 F.3d at 1334.  Plaintiffs argue that defendant's reliance on the OPM regulations for authority to grant compensatory time is misplaced because, if "the relevant statutory language is clear, regulations inconsistent with that language are invalid."  Pls.' Reply 10 (citing Brown v. Gardner, 513 U.S. 115, 122 (1994) (striking down VA regulations inconsistent with the statute); AFGE v. Gates, 486 F.3d 1316, 1322 (D.C. Cir. 2006) (DOD regulations invalid as inconsistent with the statute)).  Plaintiffs contend that 5 C.F.R. § 551.531 conflicts with the FLSA, Pls.' Reply 10-11, and that "OPM's failure to expressly exclude FAA employees from coverage under 5 C.F.R. § 551.531(a) is inconsistent with the FLSA and legally invalid," id. at 11.

Plaintiffs also argue that OPM's regulation regarding overtime compensation, 5 C.F.R. § 551.531, does not apply to plaintiffs because "the statutory authority for OPM's compensatory time regulations is clearly derived from provisions of title 5 that do not apply to the plaintiffs."  Pls.' Mot. 9.  Plaintiffs base their argument on the references to title 5 in section 551.531(b)[8], and on the assertion that "[s]ection 551.531(a) is nearly

_____

[8]Plaintiffs argue "[w]ith respect to 'credit hours,' it is clear on its face that OPM's regulation at 5 C.F.R. § 551.531(b) does not grant any authority to the FAA to provide comp time or credit hours in lieu of FLSA overtime pay."  Plaintiffs' Reply in Support of Their Motion For Partial Summary Judgment (plaintiffs' Reply or Pls.' Reply) 11.  Section 551.531(b) states "the head of an agency may grant compensatory time off from an employee's basic work

(continued...)

word-for-word identical to section 5543 of title 5." Id.  Plaintiffs explain that "[t]itle 5 applies to all federal employees other than FAA employees," and argue that since "the FLSA first applied in the federal sector, OPM has consistently and exclusively relied upon title 5 as its sole source of authority to pay comp time to employees in lieu of section 7 overtime and to do so at straight time rates." Pls.' Reply 11.  Absent the provisions of title 5, the FLSA does not permit the granting of compensatory time for overtime work.  Pls.' Reply 11-12; see Appendix to Plaintiffs' Motion For Partial Summary Judgment and Opposition to Defendant's Motion For Summary Judgment and Motion to Dismiss (Pls.' App.) 142-51 (United States Civil Service Commission, Federal Personnel Manual System Letter 551-6 (June 12, 1975)) (FPMS Letter 551-6) A(1)(a). FPMS Letter 551-6 states:  "If a nonexempt employee earns his overtime pay entitlement in a given workweek solely under FLSA, he must be paid for the overtime work.  No compensatory time off is allowed." Id. at A(1)(c).  Plaintiffs argue that this letter indicates "that, for certain employees to whom title 5 does not apply, such as Federal Wage System employees, comp time cannot be a substitute for section 7 overtime under any circumstances; these employees must be paid in cash." Pls.' Reply 12.

Defendant argues that "OPM promulgated section 551.531 pursuant to its authority as set forth in 29 U.S.C. § 204(f)," noting that "Congress excluded FAA employees from most provisions of title 5, [but] it did not exclude them from the FLSA, 29 U.S.C. § 204(f) or from OPM regulations implementing the FLSA." Def.'s Reply 15.  Defendant points out that in Doe II, the Court of Appeals for the Federal Circuit cited 29 U.S.C. § 204(f) as the authority for OPM to promulgate 5 C.F.R. § 551.531.  Id. (citing Doe II, 513 F.3d at 1358-59 ("[T]he FLSA delegates to the OPM the task of determining how to apply the FLSA to non-exempt federal employees.  29 U.S.C. § 204(f).  Under the authority of that delegation, OPM has issued a regulation allowing agencies to grant compensatory time off 'for an equal amount of irregular or occasional overtime work.'  5

---

[8](...continued)
requirement under a flexible word schedule under 5 U.S.C. § 6122 instead of payment [in cash]." 5 C.F.R. § 551.531(a).  Plaintiffs argue:  "Since § 6121 does not apply to plaintiffs – as it is a section [of] title 5 – the provisions of 5 C.F.R. § 551.531(b) cannot apply to the plaintiffs." Plaintiffs' Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment and Motion to Dismiss (plaintiffs' Motion or Pls.' Mot.) 30.  Although defendant refers generally to 5 C.F.R. § 551.531, defendant does not expressly rely on subsection b of § 551.531.  Defendant's Partial Motion to Dismiss and Partial Motion For Summary Judgment (defendant's Motion or Def.'s Mot.) passim; Defendant's Reply to Plaintiffs' Opposition to Defendant's Partial Motion to Dismiss and Partial Motion For Summary Judgment and Opposition to Plaintiffs' Motion For Summary Judgment (defendant's Reply or Def.'s Reply) passim.

27

C.F.R. § 551.531(a).")). The introductory text of the interim rule with request for comments that preceded the promulgation of § 551.531, however, stated:

> Part 551 has also been revised to reflect the new FEPCA provision that amends section 5543(a)(1) of title 5, United States Code, to provide that <u>on request of an employee</u>, the head of an agency may grant an employee compensatory time off from the employee's scheduled tour of duty instead of payment under title 5 or the FLSA for an equal amount of time spent in irregular or occasional overtime work. . . . The legal authority for compensatory time off previously did not extend to nonexempt employees. Consequently, compensatory time off for nonexempt employees has been permitted only under very limited circumstances.

56 Fed. Reg. 20,339, 20,340 (May 3, 1991) (emphasis added). The introductory text further stated: "<u>However, there is no legal authority for an agency to require that a nonexempt employee take compensatory time off in lieu of overtime pay under the FLSA. . . . The interim regulations provide that an agency may not require that a nonexempt employee be paid for overtime work earned under the FLSA and part 551 with an equivalent amount of compensatory time off.</u>" <u>Id.</u> at 20,340-41 (emphasis added). Defendant does not address whether its reliance on 5 C.F.R. § 551.531(a) is at the request of an employee, and, absent such a request, any reliance on 5 C.F.R. § 551.531(a) is misplaced. 5 C.F.R. § 551.531(a). Furthermore, the authority for Part 551 of the Code of Federal Regulations is listed as "5 U.S.C. 5542(c); Sec 4(f) of the [FLSA], as amended by Pub. L. No. 93-259, 88 Stat. 55 (29 U.S.C. § 204[(]f[)])." 64 Fed. Reg. 69,180 (Dec. 10, 1999); 62 Fed. Reg. 28,307 (May 23, 1997).

Regardless of whether OPM promulgated § 551.531 under the authority of 29 U.S.C. § 204(f) or 5 U.S.C. § 5543, OPM's regulations must still be consistent with the FLSA. In <u>Lanehart v. Horner</u>, 818 F.2d 1574 (Fed. Cir. 1987), the court noted that the OPM was "instructed by the Congress to administer the 1974 Amendments [to the FLSA, <u>see</u> 29 U.S.C. § 203(e)(2),] in a manner consistent with the Department of Labor's administration of FLSA in the private sector," 818 F.2d at 1578 (citation omitted). Based on legislative intent, the courts have concluded that "OPM is . . . obliged to exercise its administrative authority in a manner that is consistent with the Secretary of Labor's implementation of the FLSA." <u>American Fed'n of Gov't Employees v. Office of Pers. Mgmt.</u>, 821 F.2d 761, 770 (D.C. Cir. 1987). However, the predecessor to this court has previously stated that "[i]t would be inappropriate . . . to elevate [this] statement in the committee report to an ironclad rule barring any inconsistency." <u>Riggs v. United States</u>, 21 Cl. Ct. 664, 681 (1990). The question then, is whether OPM's regulations are "impermissibly inconsistent" with the FLSA. <u>Adams v. United States</u>, 40 Fed. Cl. 303, 306 (1998).

28

Here, the relevant OPM regulation, 5 C.F.R. § 551.531(a), mirrors 5 U.S.C. § 5543. Compare 5 C.F.R. § 551.531(a) with 5 U.S.C. § 5543. The question is whether its application to FAA employees, to whom, after 1996, 5 U.S.C. § 5543 does not apply, is inconsistent with the FLSA. Defendant argues that "Congress has never amended section 204(f) or limited OPM's authority to make regulations implementing the FLSA only for employees covered by title 5," Def.'s Reply 15, and therefore the FAA may rely on 5 C.F.R. § 551.531 as authority to grant compensatory time, id. In response to plaintiffs' argument that § 551.531 is inconsistent with the FLSA standards set by the Department of Labor for comparable employees in the private sector, Pls.' Mot. 18; Pls.' Reply 10, defendant argues that "OPM's regulations allowing compensatory time for Federal employees, including plaintiffs, meet the test of treating Federal employees the same as those non-Federal employees to whom they are most comparable," Def.'s Reply 17. Defendant argues that state and local government employees are the "most closely comparable" to Federal employees and that, because the FLSA and DOL allow compensatory time for state and local government employees, "OPM's regulations allowing the same treatment of Federal employees, including plaintiffs, is completely consistent with the FLSA and Congress's intent for Federal employees to be treated consistently with comparable non-Federal employees." Id. Defendant argues that "the omission of any reference to Federal employees in 29 U.S.C. § 207(o) is less reflective of an implicit intention upon the part of Congress to exclude Federal employees [than] of an opportunity for OPM to fill in the gap in the FLSA with respect to the possibility of compensating Federal employees with compensatory time off." Def.'s Mot. 17. The court simply does not perceive this gap. The court has already determined, supra Part II.A.1, that Congress did not intend the exemptions under 29 U.S.C. § 207(o) to apply to federal employees. A regulation purporting to create such an exception without explicit statutory authority is inconsistent with the FLSA upon the removal of plaintiffs from the title 5 provisions concerning compensatory time and credit hours. No such statutory authority exists.

4.    Whether Plaintiffs Are Entitled to FLSA Overtime Pay For Extra Hours Worked Under A Flexible Work Schedule.

Count II of plaintiffs' Complaint alleges that defendant violated the FLSA by granting credit hours as compensation for hours worked in excess of 40 hours per week. Compl. ¶ 21. According to plaintiff, the FAA "permitted certain plaintiffs to amass hundreds of hours of comp time in the form of 'credit hours'" that "have no 'cash value' and are forfeited under certain circumstances." Pls.' Reply 5-6 (citing Pls.' Facts ¶¶ 7-9). Like the compensatory time discussed above, credit hours are provided at a straight rate of pay, not a rate of time and a half. Pls.' Mot 5-6. One credit hour "equals one hour of paid leave." Id. at 5. Plaintiffs are not given any cash value for accrued credit hours. Id.

29

at 6.  Prior to September 3, 2006[9], there was no cap on the amount of credit hours plaintiffs could accrue.  Id.  Plaintiffs allege that, by September 3, 2006, many plaintiffs had accrued over 1,000 credit hours.  Id.  Sometime after September 3, 2006, the FAA placed a cap on the number of credit hours that plaintiffs could accrue.  Id.  The cap was set at 24 credit hours and is currently in place.  Id.  ("Only when their accrued credit hours dipped below 24 accrued credit hours were employees allowed to recommence accrual of credit hours.").  According to plaintiffs, "'credit hours' accrued in excess of 24 hours are forfeited."  Id.

Defendant asserts "that credit hours earned in the context of a flexible work schedule do not constitute overtime hours for purposes of the FLSA."  Def.'s Reply 2 (citing Doe II, 513 F.3d at 1358).  According to defendant, "credit hours are not granted as compensation for FLSA overtime but, rather, as part of a flexible work program authorized by the FAA [the PMS] and included as part of the collective bargaining agreement between the union representing plaintiffs [the National Air Traffic Controllers Association (NATCA)] and the FAA."  Def.'s Mot. 12.  Defendant contends that it has "established that these excess hours are expressly defined as non-overtime hours and, therefore, the FLSA'a provisions pertaining to overtime are irrelevant to credit hours earned pursuant to a flexible work schedule."  Def.'s Reply 17.  Plaintiff argues that even if credit hours are not considered overtime under title 5, credit hours are considered overtime under the FLSA.  Pls.' Mot. 23.  According to plaintiffs, "[t]he 'credit hours' earned by plaintiffs are hours actually worked in excess of 40 hours per workweek, i.e., 'overtime' hours under the FLSA."  Pls.' Mot. 23 n.13 (emphasis omitted).

Defendant relies on Doe II to support its argument.  Def.'s Reply 17-18.  In Doe II, the United States Court of Appeals for the Federal Circuit rejected an argument that the FLSA required the SSA to provide one and one-half hours in credit hours for each hour worked in excess of 40 hours in a workweek.  Doe II, 513 F.3d at 1358.  The Federal Circuit held that "credit hours, by statutory definition, are not overtime hours."  Id. (citing 5 U.S.C. § 6121(6)).  The court further stated:  "Employees who receive credit hours as part of a flexible work schedule program can work overtime hours, but agencies may compensate those employees for their overtime either by providing overtime pay or by

---

[9]  September 3, 2006 is the date of the implementation of the collective bargaining agreement (CBA) between the National Air Traffic Controllers Association (NATCA), the union representing plaintiffs, and the FAA.  Plaintiffs' Proposed Findings of Uncontroverted Facts (plaintiffs' Facts or Pls.' Facts) ¶ 37; Appendix to Defendant's Reply to Plaintiffs' Opposition to Defendant's Partial Motion to Dismiss and Partial Motion for Summary Judgment and Opposition to Plaintiffs' Motion For Summary Judgment (defendant's Supplemental Appendix or Def.'s Supp. App.) 44 (NATCA charge against FAA before the Federal Labor Relations Authority (Sept. 6, 2006)).

granting compensatory time." Id. (citing 5 U.S.C. § 6123(a)).  Unlike the SSA discussed in Doe II, however, the FAA is not covered by the relevant provisions of title 5 of the United States Code.  49 U.S.C. § 40122(g)(2).

Defendant also asserts that credit hours are authorized pursuant to the PMS.  Def.'s Mot. 18.  The PMS is "comprised of the Agency Human Resource Policy Manual (HRPM), Human Resource Operating Instructions ([HROI]), and guidance contained in FAA orders, action notices, the Federal Aviation Personnel Manual (FAPM), Letters, Line of Business (LOB) [Personnel Reform Implementation Bulletins (PRIBs)] and memoranda."  Def.'s App. 1-4 (Declaration of Ellen B. Cook[10]) (Cook Declaration) ¶ 3; see also Def.'s Mot. 5.  Chapter 8.15 of the HRPM discusses policies and procedures pertaining to Alternative Work Schedules.  HRPM 8.15 (Alternative Work Schedules (AWS)), available at https://employees.faa.gov/org/staffoffices/ahr/policy_guidance/ hr_policies/hrpm/lws/lws-8-15/.  Section 13 of chapter 8.15 contains information on credit hours.  HRPM 8.15(13).  According to the HRPM, "[c]redit hours are only available under a Flexible Work Schedule."  HRPM 8.15(13)(a).  "Credit hours are hours that employees voluntarily elect to work in excess of their basic work requirements, subject to manager's approval."  Id.  The HRPM explicitly states that "[c]redit hours are not considered overtime hours."  HRPM 8.15(13)(d).  Defendant asserts that the definition of credit hours was negotiated between the FAA and NATCA in 1998 and 2006.  Def.'s Mot. 5.  The 2006 collective bargaining agreement[11] (2006 CBA) between

---

[10]Ellen B. Cook is "a first-line supervisor in the Policy Management Division (AHP-300), Office of Human Resource Management Programs and Policies, Office of the Assistant Administrator for Human Resource Management, FAA."  Appendix to defendant's Motion (defendant's Appendix or Def.'s App.) 1-4 (Declaration of Ellen B. Cook) (Cook Declaration) ¶ 1.  Prior to her current position, Ms. Cook "was a Classification/Pay/Compensation Specialist in the Policy Management Division."  Id.

[11]According to defendant, "The FAA's policies with respect to both compensatory time and credit hours as they apply to plaintiffs in particular are set out in great detail and specificity in the 2006 collective bargaining agreement [(2006 CBA)] between the FAA [and] the National Air Traffic Controllers Association (NATCA), the union representing plaintiffs."  Def.'s Reply 10.  Plaintiffs, however, dispute the existence of the 2006 CBA.  Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts (plaintiffs' Response to defendant's Facts or Pls.' Resp. to Def.'s Facts) 3-4.  According to plaintiff, "the FAA and the [NATCA] did not negotiate the definition of 'credit hours' in 2006.  Id. at 4.  In plaintiffs' Response to defendant's Facts, plaintiffs requested "that this Court ignore defendant's representations regarding an alleged 2006 collective bargaining agreement until such time as defendant can provide this Court with evidence that such an agreement has been ratified."  Id. at 4 n.3.  Defendant contends that "the 2006 collective bargaining agreement is valid and binding," Def.'s

(continued...)

the FAA and NATCA defines credit hours as "non-overtime hours worked under an FWS which are in excess of an employee's basic work requirement and which are worked at the election of the employee after approval by the Agency." Def.'s App 13-14 (Excerpt from 2006 CBA Art. 34 § 7. Defendant asserts that the 2003 collective bargaining agreement between the FAA and the NATCA contained a similar provision. Def.'s Reply 11 n.5; see Appendix to Defendant's Reply to Plaintiffs' Opposition to Defendant's Partial Motion to Dismiss and Partial Motion For Summary Judgment and Opposition to Plaintiffs' Motion For Summary Judgment (Def.'s Supp. App.) 83-97 (Excerpts from "Agreement between the National Air Traffic Controllers Association AFL/CIO and the Federal Aviation Administration Department of Transportation (Sept. 2003) (2003 CBA)) Art. 34 § 8.

Plaintiffs contend that "[r]ights under the FLSA prevail over conflicting provisions in a collective bargaining provision." Pls.' Mot. 32 n.19. Plaintiffs are correct. "[C]ongressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement." Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 740-41 (1981) (citations omitted). The Supreme Court has stated:

---

[11](...continued)
Reply 10, and that its legality has been upheld by the Federal Labor Relations Authority (FLRA), id. at 10 n.3. According to defendant, "the FLRA is the proper forum for" the adjudication of such disputes over contract legality. Id. (citing Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel, 437 F.3d 1256, 1264-66 (D.C. Cir. 2006)). The United States Court of Appeals for District of Columbia Circuit has held that "any alleged unfair labor practices must be addressed in the first instance by the FLRA." Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel, 437 F.3d at 1265; see EEOC v. Fed. Labor Relations Auth., 476 U.S. 19, 23 (1986). On September 6, 2006, the NATCA filed unfair labor practice charges against the FAA with the FLRA. Def.'s Supp. App. 44 (NATCA charge against FAA before the Federal Labor Relations Authority (Sept. 6, 2006)); see Def.'s Supp. App. 37-40 (Declaration of Joseph N. Miniace) (Miniace Declaration) ¶ 4. Among the charges was that the FAA had implemented the 2006 CBA prior to the completion of bargaining. Def.'s Supp. App. 44 (NATCA charge against FAA before the Federal Labor Relations Authority (Sept. 6, 2006)). On July 25, 2007 the FLRA dismissed the NATCA's charges against the FAA. Def.'s Supp. App. 45-54 (FLRA letter to NATCA, July 25, 2007). According to the FLRA, "where NATCA did not hold a ratification vote, the evidence does not establish that FAA's conduct deprived NATCA of an opportunity to exercise this right." Id. at 52. NATCA filed its appeal on August 27, 2007. Def.'s Supp. App. 65-66 (FLRA Order Denying Appeal, Case No. WA-CA-06-0366 (Jan. 29, 2008)). The appeal was denied by the FLRA General Counsel on January 29, 2008. Id. NATCA filed a Motion for Reconsideration on February 6, 2008. Def.'s Supp. App. 74-76 (FLRA Order Denying Motion for Reconsideration, Case No. WA-CA-06-0366 (Feb. 26, 2008)). The FLRA General Counsel denied the Motion for Reconsideration on February 26, 2008. Id.

> This Court's decisions interpreting the FLSA have frequently emphasized
> the nonwaivable nature of an individual employee's right to a minimum
> wage and to overtime pay under the Act.  Thus, we have held that FLSA
> rights cannot be abridged by contract or otherwise waived because this
> would "nullify the purposes" of the statute and thwart the legislative
> policies it was designed to effectuate.

Id. at 740 (citations omitted).  Facts concerning the 2006 CBA are simply not material to the disposition of Count II.  Regardless of the existence or the terms of the 2006 CBA, provisions in a collective bargaining agreement defining credit hours as non-overtime hours cannot be enforced in violation of the FLSA.  The FLSA defines overtime hours as hours worked in excess of 40 hours in a workweek.  29 U.S.C. § 207(a).  Plaintiffs must be compensated for overtime hours "at a rate not less than one and one-half times the regular rate."  Id.  The granting of credit hours at a rate of one-to-one violates section 207(a) of the FLSA.

OPM relies on title 5 for authority to provide credit hours.  See 5 C.F.R. § 551.501(a)(6).  Section 551.501 states that employees shall not receive overtime compensation "[f]or hours of work that are not 'overtime hours,' as defined in 5 U.S.C. 6121, for employees under flexible or compressed work schedules."  5. C.F.R. § 551.501(a)(6).  Because 5 U.S.C. § 6121 does not apply to the FAA, 49 U.S.C. § 40122(g)(2), credit hours do not fall under the category of "hours of work that are not 'overtime hours'" discussed in 5 C.F.R. § 551.501.  Therefore, plaintiffs should be compensated for all overtime work "at a rate not less than one and one-half times the regular rate at which he [or she] is employed."  29 U.S.C. § 207(a)(1).

Because defendant's payment of hour-for-hour compensatory time and credit hours violates the FLSA requirement that overtime compensation be paid at 'one and one-half times' the employee's regular rate of pay, 29 U.S.C. § 207(a)(1), defendant's motion to dismiss Count II, treated as a motion for summary judgment, is DENIED, and plaintiffs' motion for summary judgment with respect to Count II is GRANTED.

B.     Count III

Count III of plaintiffs' Complaint alleges that "defendant has suffered or permitted plaintiffs to work before and after the official starting times of their shifts without compensating plaintiffs . . . for such work time."  Compl. ¶ 11.  Defendant seeks summary judgment with respect to Count III on the grounds that plaintiffs "cannot demonstrate any entitlement to overtime pay over and above any they have already

received" and "because the material facts pertaining to [C]ount III are undisputable." Def.'s Mot. 12.  In order to prevail on its Motion, defendant must demonstrate "the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  In particular, defendant must demonstrate that there is an absence of evidence to support plaintiffs' claim that plaintiffs are entitled to overtime pay.  See id. at 325.  The question of whether plaintiffs are entitled to overtime pay turns on whether defendant failed "to compensate plaintiffs for pre-shift and post-shift activities that plaintiffs are 'suffered or permitted' to work . . . in violation of sections 203(g) and 207(a) of the FLSA."  Pls.' Mot. 2.  Therefore, the facts concerning whether plaintiffs were suffered or permitted to perform pre-shift and post-shift work for which they were not compensated are material facts.  To prevail on its Motion for summary judgment with respect to Count III, defendant must demonstrate that there is no "genuine issue of material fact," see Celotex, 477 U.S. at 323, as to whether plaintiffs "performed uncompensated pre-shift and/or post-shift work," Pls.' Mot. 11, and as to whether, if such work was performed, it was suffered or permitted by the FAA, see id. at 36 n.23.  In its determination of whether defendant has carried its burden under RCFC 56, the court must draw all factual inferences in favor of plaintiffs as the non-moving parties.  See Matsushita, 475 U.S. at 587.  For the following reasons, the court concludes that defendant has not met its burden under RCFC 56.

      1.      Whether Plaintiffs Performed Pre-Shift and Post-Shift Work For Which They Were Not Compensated

The FAA uses a computerized time keeping system known as Cru-X/ART.  Def.'s Mot. 6.  The Cru-X/ART system was implemented "at all facilities [by] August 2005."  Def.'s Facts ¶ 5; see Pls.' Resp. to Def.'s Facts ¶ 5.  The software for the Cru-X/ART system runs on a personal computer.  Def.'s Mot. 6.  "Plaintiffs sign-in and out of Cru-X/ART on a computer located at their workplace."  Pls.' Mot. 6.  "Employees in operational positions, such as ATCS and TMC, are required [to use the software] to sign-in and sign-out of their shifts" and "to sign in and sign out each time they work an operational position, such as radar scope."  Def.'s Mot. 6.  Defendant contends that the FAA's Cru-X/ART system "is actually designed to . . . prevent employees from working before or after their scheduled shift without compensation."  Def.'s Mot. 21 (footnote and citation omitted).  Defendant notes that "[p]laintiffs have not asserted that they were not compensated for all hours reflected by this software" and contends that "[a]ccordingly, they cannot demonstrate any entitlement to overtime pay over and above any they have already received."  Id. at 12.

Defendant supports its contention that the "Cru-X/ART software precludes an operational employee from performing work before or after his scheduled shift without compensation," id. at 6-7, with the following description of the Cru-X/ART system:

> The employees' scheduled shift time is already stored in the [Cru-X/ART] software. When an employee signs in on the Cru-X/ART software at the beginning of her shift, the software prompts her to enter her start time. If the employee enters a time other than the scheduled start time , the software asks whether the employee is changing his shift time or is working "time outside shift" ([TOS]), such as overtime. The employee must affirmatively make an entry into the software in order to sign in, either by entering her scheduled shift time, indicating that she is changing her shift time, or that she is working TOS.

Id. at 7. Furthermore, defendant contends, the Cru-X/ART system prevents employees from signing in to an operational position before or after the scheduled start or end time of a shift, as amended by the employee when they actually sign in or out.

> The software will not allow an employee to sign in to an operational position before or after her scheduled shift start or stop time. Thus, if an employee signed in for her 7:00 a.m. shift at 6:45 a.m. without changing her shift or indicated that she was working TOS, and then attempted to sign in to an operational position at 6:50 a.m. using the [Cru-X/ART] software, the software would not allow her to sign in to the position prior to the official start of her shift at 7:00 a.m.

Id. at 8. According to defendant, the only way that an employee would fail to be compensated for pre-shift and/or post-shift work would be if the employee was not following agency procedures. Id. For example:

> An employee could sign in for her 7:00 a.m. shift at 6:45 a.m. and then work an operational position prior to 7:00 a.m. without signing in to the position on the [Cru-X/ART] software or she could perform non-operational duties, such as reading required briefings, prior to 7:00 a.m. If that were the case, the employee is supposed to use the [Cru-X/ART] software to amend her time record to reflect that she worked prior to 7:00 a.m., either by adjusting her shift times or by indicating that she was working TOS. Either way, the employee would be compensated for the time.

Id. at 8-9.

Defendant further argues that the FAA compensated plaintiffs for all time worked "in addition to their scheduled shift[s]" before the implementation of the Cru-X/ART system. Id. at 9. Prior to the implementation of the Cru-X/ART system, "[t]he employee

35

or her supervisor would record the time worked on a personnel log which was used for compilation of time and attendance data." Id.  Defendant argues that "[t]he FAA compensated employees for all time worked before or after an employee's scheduled shift that was in addition to their scheduled shift." Id.

Defendant provides evidence, in the form of declarations from several of plaintiffs' supervisors, that plaintiffs did not perform pre-shift and post-shift duties for which they were not compensated.  See Def.'s Supp. App. 17-20 (Declaration of Gregory Dunne) (Dunne Declaration) ¶ 3; id. at 21-24 (Declaration of Miles R. Miller) (Miller Declaration) ¶¶ 3-4; id. at 27-29 (Declaration of Fred Prosperi) (Prosperi Declaration) ¶ 3; id. at 30-32 (Declaration of Juan Fuentes) (Fuentes Declaration) ¶ 3.

Plaintiffs also provide evidence, in the form of declarations addressing the matters covered in the declarations of plaintiffs' supervisors.  See Appendix to Plaintiffs' Motion For Partial Summary Judgment and Opposition to Defendant's Motion For Summary Judgment and Motion to Dismiss (plaintiffs' Appendix or Pls.' App.) 19-24 (Declaration of Donald A. Peterson) (D. Peterson Declaration) ¶¶ 18-27; Pls.' App. 118-19 (Declaration of Kevin Peterson) (K. Peterson Declaration) ¶¶ 5-7; Pls.' App. 7-13 (Declaration of Gary A. Bukovskey) (Bukovskey Declaration) ¶¶ 21-33; Pls.' App. 30-34 (Declaration of Frank J. Savasta) (Savasta Declaration) ¶¶ 5-18; Pls.' App. 114-17 (Declaration of Richard Santa) (Santa Declaration) ¶ 10; Pls.' App. 25-29 (Declaration of Michael F. Robicheau) (Robicheau Declaration) ¶ 9.

Gregory Dunne is the Traffic Management Officer at the George Bush Intercontinental Air Traffic Control Tower (IAH) and Houston Terminal Radar Approach Control (I90) (collectively IAH/I90).  Dunne Declaration ¶ 1.  Mr. Dunne is responsible for managing the Traffic Management Coordinators at IAH/I90, including plaintiff Donald Peterson.  Id. at ¶ 2.  Mr. Dunne states:

> Both prior to and after the Cru-X/ART system was implemented at
> IAH/I90, FAA management regularly authorized and approved Mr.
> Peterson to work overtime before and after his shift to compensate him for
> work performed.

Dunne Declaration ¶ 9.  However, Mr. Peterson's declaration states:  "My employer requires me to perform work-related activities prior to the scheduled start time of my shift each day. . . . I am not compensated for my performance of these activities."  D. Peterson Declaration ¶ 19.

Miles R. Miller is an Air Traffic Manager responsible for managing Air Traffic Control Specialists at ZJX (Jacksonville Air Route Traffic Control Center), including plaintiff Gary Bukovskey.  Miller Declaration ¶¶ 1-2.  Mr. Miller states:

> As a general principle, all ZJX employees, including Mr. Bukovskey, are compensated for all [work] performed, including work performed before or after their scheduled shifts.  Prior to this lawsuit, I do not recall nor does the facility have any record of Mr. Bukovskey ever claiming that he was not compensated for work performed either before or after one of his scheduled shifts.

Miller Declaration ¶ 3.  However, Mr. Bukovskey's declaration states:  "I often spend more than 10-20 minutes per day performing uncompensated work related duties outside the scheduled start and/or end times of my shift.  Bukovskey Declaration ¶ 32.

Fred Prosperi is the Air Traffic Manager of the Morristown, NJ Air Traffic Control Tower (MMU) and responsible for managing the Air Traffic Control Specialists at MMU, including plaintiff Frank Savasta.  Prosperi Declaration ¶¶ 1-2.  Mr. Prosperi states:

> As a general principle, all MMU employees, including Mr. Savasta, are compensated for all [work] performed, including work performed before or after their schedule[d] shifts.  Prior to this lawsuit, I do not recall nor does the facility have any record of Mr. Savasta ever claiming that he was not compensated for work performed either before or after one of his scheduled shifts.

Id. at ¶ 3.  However, Mr. Savasta's declaration states that he performed work both prior to the start of his shift and after the end of his shift for which he was not compensated. Savasta Declaration ¶¶ 9, 11, 12, 18.

Juan Fuentes is the Assistant Air Traffic Manager of the Miami Air Traffic Control Tower (MIA) and is responsible for managing the Air Traffic Control Specialists at MIA, including Katherine Adcock.  Fuentes Declaration ¶¶ 1-2.  According to Mr. Fuentes:  "As a general principle, all MIA employees, including Ms. Adcock, are compensated for all [work] performed, including work performed before or after their scheduled shifts."  Id. at ¶ 3.  Mr. Fuentes does "not recall nor does the facility have any record of M[s]. Adcock ever claiming that she was not compensated for work performed either before or after one of her scheduled shifts . . . ."  Id.  Ms. Adcock's declaration refers only to the bidding process, it does not address the performance of pre-shift or post-shift work.  See Pls.' App. 1-4 (Declaration of Katherine H. Adcock) (Adcock

Declaration) <u>passim</u>; Pls.' App. 112-13 (Supplemental Declaration of Katherine H. Adcock) (Supp. Adcock Declaration) <u>passim</u>.

Defendant contends that the "duty familiarization" functions that plaintiffs allegedly performed prior to the start of their shifts "are part of a TMCs regularly assigned duties and are to be performed on duty time, after signing on to the Cru-X/ART system." Dunne Declaration ¶ 8.  Furthermore, according to defendant, plaintiffs' "shifts are designed to overlap so that these 'duty familiarization' functions, including exchanging information with the TMC being relieved, occur during the relieving and relieved TMCs['] regularly scheduled shift[s]." <u>Id.</u> (emphasis omitted).

Plaintiffs argue that, despite the submission of the declarations, "defendant failed to submit any evidence regarding whether a single plaintiff performed uncompensated pre-shift and/or post-shift work." Pls.' Mot. 11.  Plaintiffs contend that plaintiffs "have submitted evidence directly disputing the alleged infallibility of defendant's timekeeping system and showing that plaintiffs are suffered or permitted to work before and after their scheduled shift times." <u>Id.</u> at 4.  Additionally, "[p]laintiffs also submit evidence that the timekeeping system has not been in effect throughout the recovery period and that plaintiffs have, in fact, performed work before and after their shift times without compensation throughout the duration of the entire recovery period." <u>Id.</u>; <u>see</u> Savasta Declaration ¶ 16 ("Prior to the implementation of the Cru-X system, I documented my scheduled and credited hours of work on a general sign in sheet.  It is my understanding that I was required to record my shift start time rather than my actual hours of work, because I was expected to perform the pre- and post-shift activities before and after my shift without compensation."); <u>see also</u> Santa Declaration ¶ 10 ("Prior to the implementation of the Cru-X system, I documented my scheduled and credited hours of work on a general sign in sheet.  It is my understanding that I was required to record my shift start time rather than my actual hours of work, because I was expected to perform the pre-shift activities before my shift without compensation.").

Plaintiffs allege that they perform the following pre-shift and post-shift work:

replace tapes; turn on/off machines, radars, computers (including the Cru-X/ART sign-in computer), and lights; close out logs; make verbal broadcasts; contact other FAA facilities regarding transfer of control; set thermostat; secure windows and doors; exchange air-traffic control information with person being relieved; check in with supervisor; use radar scope; and review the following:  FAA mandatory review binders, briefing items, "Hot Boards," "Read and Initial" documents, current weather patterns, runway configurations and equipment condition/configuration.

Pls.' Mot. 6-7 (citing Pls.' Facts ¶ 27); <u>see</u> Bukovskey Declaration ¶ 32 ("I often spend more than 10-20 minutes per day performing uncompensated work related duties outside the scheduled start and/or end times of my shift."); Savasta Declaration ¶ 7 ("I perform the following activities prior to the scheduled start time of my shift:  replace the tape recorder; review any FAA-issued memoranda; turn on all machines, radars and computers (including Cru-X.  I spend over 10 minutes performing these duties."); Savasta Declaration ¶ 12 ("After the scheduled end of my shift, I am required to perform the following activities:  the traffic count; close out the log; turn off the tape recorder; turn off the machines, radars, computers and lights.  I spend over 10 minutes performing these duties.  I am not compensated for these post-shift activities."); Santa Declaration ¶ 6 ("I perform the following activities prior to the scheduled start time of my shift:  review any FAA-issued memoranda from the Mandatory Briefing Items and Read and Initial binder; review information concerning the status information area (SIA); and conduct a position relief briefing.  Until approximately late 2007, the position relief briefing was a mandatory five (5) minute briefing; after late 2007 the briefing is a mandatory two (2) minute briefing.  Occasionally I will also conduct pre-briefing for individuals that I am training prior to my scheduled shift start time.  I often spend over 10 minutes performing these duties each day."); K. Peterson Declaration ¶ 5 ("I am required to read and sign for each item contained in the Essential Read Binder prior to assuming operational duties."); K. Peterson Declaration ¶ 6 ("I am also required to become familiar with the current weather and forecasts, notices to airmen, facility equipment status, and flow restrictions prior to assuming an operational position.").  Plaintiffs argue:

> If the employee is responsible for the operational positions once she has signed on to the Cru-X/ART system, she is required to begin performing both the duty familiarization tasks noted by defendant and other necessary pre-shift work prior to, or at least immediately after, they sign on to the Cru-X/ART system.  Accordingly, if an employee signs on fifteen minutes prior to the scheduled shift start time, she must immediately begin performing the duty familiarization tasks.

Pls.' Reply 15.

According to plaintiffs, "[t]he Cru-X/ART system does not prevent plaintiffs from performing these pre-shift and post-shift activities."  Pls.' Mot. 7.  The activities are allegedly performed before or after plaintiffs sign into or out of Cru-X/ART.  <u>Id.</u>; <u>see</u> Bukovskey Declaration ¶ 28 ("I have logged out of Cru-X/ART up to 15 minutes prior to the scheduled end of my shift.  On those occasions when I have done so, I remained at my workplace until the scheduled end of my shift.  It is my understanding that whenever I log out of Cru-X/ART within 15 minutes prior to the scheduled end of my shift, I am required to remain on premises in case my employer needs me to return to a post.  It is my

understanding that I would be subject to discipline for leaving my workplace prior to the scheduled end of my shift, even if I have logged out of the Cru-X/ART system.").

Furthermore, plaintiffs allege that "the Cru-X/ART system allows plaintiffs to log-in prior to their scheduled shift start time, manually change the start time listed on the Cru-X/ART system to reflect the scheduled shift start time – as opposed to the actual log-in time – and perform job duties prior to the scheduled shift start time."  Pls.' Mot. 7 (citing Pls.' Facts ¶¶ 22-27); see Bukovskey Declaration ¶ 24 ("I log into the Cru-X system prior to my scheduled shift start time, however, I alter the start time to indicate the start time of the shift even though I begin working prior to that time.  It is my understanding that my employer expects me to alter the time on the Cru-X system to reflect the start time of my shift because I am expected to perform my pre-shift duties without compensation.  Therefore, the start time indicated on the Cru-X system merely reveals the start time of my shift and not the actual time I commenced work."); D. Peterson Declaration ¶ 22; Savasta Declaration ¶ 9; see also Robicheau Declaration ¶ 9 (stating that "the software does not automatically use [an employee's] actual time as the 'start time' of her work hours.  Instead, the software prompts her to manually enter a 'start time.'  If the actual time of her sign-in precedes her scheduled shift-start time, she may enter her shift-start time as the 'start time' in Cru-X/ART.  The program does not prevent her from inputting a future time, as opposed to the actual time, as the 'start time'").  Plaintiffs allege that the Cru-X/ART system allows them to alter the end time of their shifts as well.  Robicheau Declaration ¶ 13 ("The design of Cru-X does not preclude an operational employee from performing work before or after her scheduled shift without compensation."); Bukovskey Declaration ¶ 27 ("I have performed job duties subsequent to the scheduled end of my shift without receiving compensation for that time. For example, if my shift ends at 3:00 p.m., but I continue to perform my job duties until 3:11 p.m., I log-out of the Cru-X system at 3:11 p.m. and change the time listed on Cru-X to reflect the scheduled end of my shift (i.e., 3:00 p.m.).  It is my understanding that I am not allowed to ask for compensation for those 11 minutes following the scheduled end of my shift because I am expected to work those minutes without compensation."); Santa Declaration ¶ 8.  "Even though the Cru-X system records, via key strokes, the actual time employees sign into and out of the Cru-X system, the Cru-X system is not configured to credit employees with work performed between their first key stroke into and their last key stroke out of the Cru-X system."  Robicheau Declaration ¶ 15.

Plaintiffs' Appendix contains a document titled "Section 2. Responsibilities."  Pls.' App. 76-87.  Subsection 2-2-6 of this document discusses "Sign In/Out and On/Off Procedures."  Pls.' App. 80; see Def.'s Supp. App. 8.  According to this document:

Sign in, using the assigned shift start time, may occur up to 15 minutes before an employee's assigned shift.  Earning of, signing in for, Time

Outside Shift time at the beginning of an assigned shift must receive
approval by the OS/STMC/NTMO/CIC or OMIC prior to earning or
recording it into Cru-X/ART.

Pls.' App. 80 (emphasis added); see Def.'s Supp. App. 8.  Furthermore, "[a]ny Time
Outside Shift at the end of an assigned shift, or leave, must first receive
OS/STMC/NTMO/CIC or OMIC approval prior to earning/using and recording such time
in Cru-X/ART." Pls.' App. 81; see Def.'s Supp. App. 8.  The foregoing supports
plaintiffs' assertions that they were expected to alter their start time in the Cru-X/ART
system and that they were "expected to perform . . . pre-shift [and post-shift] duties
without compensation," Bukovskey Declaration ¶ 24; Savasta Declaration ¶ 9, unless they
received prior approval, see Pls.' App. 80-81.

        According to defendant, "the declarations submitted by plaintiffs in support of
these propositions, fail to establish the facts critical to defeating [its] motion for summary
judgment as to these issues."  Def.'s Reply 4.  Defendant argues that three of the six
plaintiffs who provided declarations "did not allege that they performed uncompensated
pre and post-shift work at all."  Id. at 21 (listing Ms. Adcock, Mr. Krasner, and Mr.
Robicheau).  Although Ms. Adcock's, Mr. Krasner's and Mr. Robicheau's declarations
"did not allege that they performed uncompensated pre and post-shift work," id., they
provide testimony on other issues before the court in this matter, see Adcock Declaration
¶¶ 9-10 (providing testimony that she as not "compensated for bidding performed outside
[her] scheduled hours of work"); Pls.' App. 14-18 (Declaration of Barry Krasner)
(Krasner Declaration) passim (discussing collective bargaining agreements between the
National Air Traffic Controllers Association and the FAA); Robicheau Declaration ¶ 4
(stating that Mr. Robicheau "studied the Cru-X/ART . . . system" and that he had "an
opportunity to learn about [its] capabilities . . . and [its] design"); Robicheau Declaration
¶ 8 (stating that "[t]he Cru-X software cannot be used to prevent non-exempt employees
from working before or after their scheduled shift without compensation"); Robicheau
Declaration ¶ 12 (stating that "the supervisor can see when an employee signs into the
Cru-X on a 'real time' basis"); Robicheau Declaration ¶ 14 (stating that "[w]hen an
employee signs into the Cru-X system prior to her scheduled shift start time, the Cru-X
system records her actual sign in time. . . . [by] record[ing] the date and time of each
individual's key stroke within the Cru-X software" (footnote omitted)); Robicheau
Declaration ¶ 17 (stating that "FAA has used employees' Cru-X key stroke times to
support disciplinary charges or investigations of bargaining unit employees who have
been accused of wrong-doing").  The declarations of other plaintiffs, on the other hand,
do allege the performance of uncompensated pre- and post-shift work.  See Bukovskey
Declaration ¶ 32; Savasta Declaration ¶¶ 7, 12; Santa Declaration ¶¶ 6-7; K. Peterson
Declaration ¶¶ 5-7.

                                        41

In further support of its argument that plaintiffs did not perform uncompensated pre-shift and/or post-shift work, defendant proffers evidence that plaintiffs never notified their supervisors or FAA management of their performance of alleged pre-shift and post-shift duties, never requested compensation for such work, and never requested that their records be corrected.  See Miller Declaration ¶ 3; Dunne Declaration ¶ 3; Prosperi Declaration ¶ 3; Fuentes Declaration ¶ 3; see also Def.'s Reply 20.  According to Ellen B. Cook, "all overtime for non-exempt employees must be officially ordered and approved by their supervisor in advance."  Def.'s Supp. App. 1-2 (Supplemental Declaration of Ellen B. Cook) (Supp. Cook Declaration) ¶ 5.  Ms. Cook stated:  "If a non-exempt employee performs work before or after her scheduled shift that was not officially ordered and approved in advance, she should notify her supervisor and request compensation . . . ."  Supp. Cook Declaration ¶ 5.  Defendant argues that no plaintiff claims to have "notified [his or her] supervisor and requested compensation in the form of overtime, compensatory time or credit hours" for pre-shift or post-shift work performed prior to the implementation of the Cru-X/ART system.  Def.'s Reply 19-20; see Miller Declaration ¶ 3 ("I do not recall nor does the facility have a record of any grievances filed by Mr. Bukovskey claiming that he was not compensated for work performed either before or after one of his scheduled shifts.  I do not recall nor does the facility have a record of any grievances filed by NATCA claiming that Mr. Bukovskey was not compensated for work performed either before or after one of his scheduled shifts.");  Dunne Declaration ¶ 3; Prosperi Declaration ¶ 3; Fuentes Declaration ¶ 3.  Ms. Cook further stated:  "In accordance with FAA Human Resource Policy Manual . . . 'Employees are required to record time and attendance information each pay period and attest to its accuracy and completeness with either a manual or electronic signature.'"  Supp. Cook Declaration ¶ 6.  Defendant again argues that "no plaintiff . . . claims to have requested the FAA to correct his or her time and attendance records to reflect overtime hours worked."  Def.'s Reply 20; see Miller Declaration ¶ 3; Dunne Declaration ¶ 3; Prosperi Declaration ¶ 3; Fuentes Declaration ¶ 3.  Thomas Cassady[12] stated:

> Employees receive Leave and Earnings [(L&E)]Statements on a biweekly basis that reflect their time worked for the relevant pay period.  If an employee believes she was not paid correctly, e.g.[,] the employee worked overtime during the pay period but the L&E Statement did not reflect that, she could bring the issue to FAA management's attention for resolution.  If the employee was not satisfied by management's response, she could grieve

---

[12]Thomas Cassady is "the Manager of the Field Labor Relations and Customer Service Group, Office of the Assistant Administrator for Human Resource Management (AHR), [FAA], U.S. Department of Transportation (DOT)."  Def.'s App. 8-12 (Declaration of Thomas Cassady) (Cassady Declaration) ¶ 1.

the issue under the grievance procedure contained in the applicable agreement.

Def.'s App. 8-12 (Declaration of Thomas Cassady) (Cassady Declaration) ¶ 13. Defendant asserts: "There is no evidence that any plaintiff, including those who provided declarations for this lawsuit, ever recorded or reported time worked outside their regular shift or brought such work to the attention of FAA management. Def.'s Reply 20; see Miller Declaration ¶ 3; Dunne Declaration ¶ 3; Prosperi Declaration ¶ 3; Fuentes Declaration ¶ 3. Plaintiffs, on the other hand, argue that "[a]n employer . . . has a duty to accurately record the hours its employees work each day." Pls.' Mot. 33; see 29 U.S.C. § 211(c) ("Every employer subject to any provision of this chapter . . . shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, . . . ."). In light of the responsibilities to "make, keep, and preserve such records," imposed by law on employers, the court does not view plaintiffs' alleged failures to notify their supervisors of the alleged pre-shift and post-shift work, or to request compensation for such work, as conclusive evidence that the work was not performed.

Defendant correctly states that plaintiffs have the "burden to establish all of the elements of their prima facie case." Def.'s Reply 23. But with regard to a motion for summary judgment, defendant has the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The parties' testimony is in conflict regarding whether plaintiffs performed pre-shift and post-shift duties. Regardless of whether the FAA intended these duties to be performed during on-duty time, there remains a genuine issue as to whether such duties were in fact performed prior to the start of, or after the end of, plaintiffs' scheduled shifts.

2.      Whether Plaintiffs Were Suffered Or Permitted to Perform Pre-Shift and Post-Shift Duties For Which They Were Not Compensated

According to defendant, the Cru-X/ART system accurately reflects the time plaintiffs work that is suffered or permitted by the FAA and for which plaintiffs have been compensated. Def.'s Reply 19 ("Because the CRU-X/ART system makes plaintiffs responsible for their own time-keeping, the system reflects all work that the agency has 'suffered or permitted.'"); Def.'s Mot. 21-22 ("Plaintiffs do not allege that they were not properly compensated for all time reflected in the [Cru-X/]ART system. Because the [Cru-X/]ART system reflects all work that the agency has suffered or permitted, plaintiffs have not been deprived of any overtime compensation and their claims should be denied."). Defendant admits that "[i]f an employee chooses to hide the fact that they are performing work by performing it before signing onto the system, the system cannot prevent them from doing that." Def.'s Reply 19. However, defendant argues that "the

43

hidden nature of the work prevent[s] the employer from being 'aware' that the work has been performed." Id.

Defendant asserts that "all of the tasks that plaintiffs claim to have performed during uncompensated pre and post-shift times are tasks that, according to FAA policy, are to be performed while in a paid duty status. Id. at 20-21 (citing Def.'s Supp. App. 28-29). According to defendant, "An employee who performs work prior to the start of her scheduled shift without either changing her shift or requesting permission to do so is acting contrary to FAA policy." Id. at 21 (citing Def.'s Supp. App. 14-15); see Def.'s Supp. App. 3-6 (Supplemental Declaration of Michael Masson) (Masson Declaration) ¶ 10 ("The employee could physically begin working an operational position [prior to their start time] without making an entry in the Cru-X/ART system, but she would be doing so in violation of FAA policy. The Cru-X/ART system, however, would have no record of any work performed in violation of policy."); Def.'s Supp. App. 14-16 (Declaration of Cindy Rooney) (Rooney Declaration) ¶ 3 ("If Plaintiffs are performing job duties prior to signing on to the Cru-X/ART system, they are doing so in violation of FAA policy."); Rooney Declaration ¶ 4 ("Employees are required to sign on to the Cru-X/ART system at the beginning of their scheduled shift and are not supposed to perform any work prior to the beginning of their scheduled shift. An employee may sign on to her shift in the Cru-X/ART system prior to the scheduled start of her shift, but she is neither expected or required to perform any work until the scheduled start of her shift, unless authorized to do so by a manager or supervisor.").

Some of the declarations provided by defendant state that plaintiffs' employers were not aware that plaintiffs were performing pre-shift and post-shift work for which they were not compensated. See Dunne Declaration ¶ 3; Miller Declaration ¶¶ 3-4; Prosperi Declaration ¶ 3; Fuentes Declaration ¶ 3. Mr. Dunne stated:

> I am not aware of and have not observed Mr. Peterson performing work before or after his normal duty hours without compensation. I have not required . . . Mr. Peterson to perform work before or after his normal duty hours without compensation.

Dunne Declaration ¶ 3. Similarly, other declarations submitted by defendant state that plaintiffs were not "required, authorized, or expected" to perform work without compensation before or after his or her scheduled shift, Miller Declaration ¶ 4, and that defendant "neither expects nor requires" such work, Prosperi Declaration ¶¶ 4-5. Mr. Miller stated:

> FAA management at ZJX has never required, authorized, or expected Mr. Bukovskey to perform work prior to the beginning of his scheduled shift or

after the scheduled end of his shift without compensation.  FAA
management at ZJX is not aware of Mr. Bukovskey ever having performed
work before or after his scheduled shift without compensation.

Miller Declaration ¶ 4.  Mr. Prosperi stated:  "FAA management neither expects nor
requires ATCSs, including Mr. Savasta, to perform any tasks prior to the start of [or after
the end of] their scheduled shifts, including following procedures to open [or close] the
control tower."  Prosperi Declaration ¶¶ 4-5.

Plaintiffs, on the other hand, offer evidence that supervisors were informed that
employees were performing work before their shifts.  Santa Declaration ¶ 12
("Approximately four to five times in the last two years I have, in my role as President of
the Washington ARTCC Local of the National Air Traffic Controllers Association,
informed the supervisors that employees, including myself, are performing pre-shift work.
My employer has not made any substantive efforts to prohibit that work from
occurring.").  In plaintiffs' Appendix, plaintiffs presented evidence to support this
allegation.  Bukovsky Declaration ¶ 22 ("I perform the following activities prior to the
scheduled start time of my shift:  check in with supervisor, review any FAA-issued
memoranda, exchange air-traffic control information with the employee I am relieving.  A
supervisor is often present in the room when I perform these activities."); D. Peterson
Declaration ¶ 19 ("A supervisor is often present in the room when I perform [work-
related activities prior to the scheduled start time of a shift]."); Robicheau Declaration ¶
12 ("From the supervisor's computer screen, the supervisor can see when an employee
signs into Cru-X on a 'real time' basis.  For example, if an Air Traffic Controller
("ATC") signs into Cru-X at 6:14 a.m., the supervisor will see that ATC's name appear
on the Cru-X computer screen at 6:14 a.m[.]  Moreover, if an ATC signs into Cru-X at
6:14 a.m. and manually changes her log-in time to reflect 6:30 a.m., her shift start time,
the supervisor will see that ATC's name appear on the Cru-X computer screen at 6:14
a.m. and will also see that she is not being credited with having worked between the hours
of 6:14 a.m. and 6:30 a.m[.]"); Santa Declaration ¶ 9 ("The Cru-X system is located in the
area in which I perform my work.  My supervisor works approximately six to ten feet
behind the Cru-X system.  The Mandatory Briefing Items and Read and Initial binder is
located on my supervisor's desk.  My supervisor is aware that I am performing work prior
to my scheduled shift start time."); K. Peterson Declaration ¶ 4; Pls.' App. 121-22
(Declaration of Vivian Lumbard) (Lumbard Declaration) ¶ 4.

Furthermore, the documentary evidence reflects ambiguity concerning whether
certain activities are to be performed within or outside of the employee's scheduled shift.
Pls.' App. 35 (FAA document listing "Opening Procedures" to be performed prior to
plaintiffs' shifts and "Closing Procedures" to be performed "prior to leaving the
facility"); Pls.' App. 39 (stating pre-duty familiarization requirement that "[a]ll Roanoke

Tower personnel shall, prior to assuming operational duties, review the Hot Board and Read and Initial (R&I), current weather, runway configuration, equipment condition/configuration and NOTAM information"); Pls.' App. 40 (FAA document stating that plaintiffs may sign in up to 15 minutes before their shift starts and may sign out up to 15 minutes after their shift ends); Pls.' App. 66 (FAA "Hot Binder" cover for "operational/critical info that must be read and initialed prior to <u>start</u> of shift").

Defendant points out that Mr. Savasta "does not allege that the FAA was aware he was" performing work before and/or after his scheduled shift. Def.'s Reply 22. Mr. Savasta's Declaration, however, does provide testimony regarding the types of pre-shift and post-shift activities he performs, Savasta Declaration ¶¶ 7, 12, and his alteration of his start time in the Cru-X system because of his "understanding that [his] employer expects [him] to alter the time . . . because [he is] expected to perform [his] pre-shift duties without compensation," Savasta Declaration ¶ 9. Additionally, plaintiffs provided multiple declarations that did in fact "allege that the FAA was aware" plaintiffs were performing pre and post-shift work for which they were not compensated. <u>See</u> Santa Declaration ¶¶ 9, 12; Bukovskey Declaration ¶ 22; D. Peterson Declaration ¶ 19; Robicheau Declaration ¶ 12; K. Peterson Declaration ¶ 4; Lumbard Declaration ¶ 4. Plaintiffs also provided documentary evidence suggesting that the FAA was aware plaintiffs were performing pre-shift and post-shift duties. <u>See</u> Pls.' App. 35, 39, 40, 66.

Defendant further contends that "the mere fact that an employer requires an employee to do something is not proof that the employee does it or that the employer is aware of the employee doing it outside of her scheduled shift." Def.'s Reply 22. Of course, the court might agree in many circumstances that "the mere fact that an employer requires an employee to do something" is not <u>conclusive</u> proof that the employee does it or that the employer is aware of the employee doing it outside of her scheduled shift." But the court believes that the fact that "an employer requires an employee to do something" is probative and may even be highly probative, in some circumstances, "that the employee does it." As to the question of awareness, a professed lack of awareness is far from dispositive of the issue. "An agency is responsible for exercising appropriate controls to assure that only that work for which it intends to make payment is performed," 5 C.F.R. § 551.402(a); <u>see</u> 29 C.F.R. § 785.13 ("The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.").

Addressing the Bukovskey and Peterson Declarations, defendant argues that "these allegations fall short of actually demonstrating that plaintiffs' supervisors or FAA management was aware that they were performing work outside their shift and for which they were not being compensated." Def.'s Reply 22. "One may be present in a room without being aware of everything that is transpiring in that room. Indeed, Messrs.

46

Peterson's and Bukovsk[e]y's supervisors, Messrs. Dunn[e] and Miller, ha[ve] furnished declarations in which each states that he was unaware of his employee performing uncompensated work." Def.'s Reply 22-23 (citing Def.'s Supp. App. 17-20, 21-24). However, the conflicts between the testimony of Mr. Peterson and Mr. Bukovskey, on the one hand, and the testimony of Mr. Dunne and Mr. Miller, on the other, highlight, rather than resolve, the factual disputes that still remain in this case.

The parties have provided conflicting declarations and documentary evidence regarding whether, if plaintiffs performed pre-shift and post-shift duties, such work was suffered or permitted by the FAA. Genuine issues of material fact remain to be resolved concerning this element of plaintiffs' case. Therefore, summary judgment is inappropriate with respect to Count III.

    C.    Count IV

Count IV of plaintiffs' Complaint alleges that defendant has not compensated plaintiffs for time spent bidding on schedules and vacation leave while off-duty. Compl. ¶ 12. Defendant seeks summary judgment with respect to Count IV on the grounds that "time spent by plaintiffs bidding on vacation and work schedules amounts to no more than five or ten minutes a year" and is "de minimis." Def.'s Mot. 13. In order to prevail on its Motion, defendant must demonstrate "the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. In particular, defendant must demonstrate that there is an absence of evidence to support plaintiffs' claim that plaintiffs are entitled to overtime pay. See id. at 325. The question of whether plaintiffs are entitled to overtime pay under Count IV turns on whether defendant failed "to compensate plaintiffs . . . for time spent off-duty bidding on work schedules in violation of sections 203(g) and 207(a) of the FLSA." Pls.' Mot. 2. Therefore, the facts concerning whether plaintiffs spent time off-duty bidding on work schedules that was not de minimis are material facts. In order to prevail on its Motion for summary judgment, defendant must demonstrate that there is no "genuine issue of material fact," see Celotex, 477 U.S. at 323, as to whether time spent by plaintiffs bidding on vacation and work schedules while off-duty is de minimis. See Def.'s Mot. 13. As discussed above, supra Part I.C, "[t]he factors that trial courts must examine when assessing whether the work underlying a compensation claim is de minimis" are "'(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work,'" Bobo, 136 F.3d at 1468 (quoting Lindow v. United States, 738 F.2d 1057, 1063 (9th Cir. 1984)); see supra Part I.C. In its determination of whether defendant has carried its burden under RCFC 56, the court must draw all factual inferences in favor of plaintiffs as the non-moving parties. See Matsushita, 475 U.S. at 587. For the following reasons, the court concludes that defendant has not met its burden under RCFC 56.

47

According to defendant, each air traffic facility of the FAA "has the discretion to develop its own policies regarding the establishment of work and leave schedules, including procedures for employees bidding on the schedules. Def.'s Mot. 10. Although both parties agree that a system for bidding on schedules and vacation leave is in place, see Def.'s Mot. 10-11; Pls.' Mot. 7, the parameters of the process remain unclear. Defendant argues that the time spent bidding on work and vacation schedules while off-duty amounts to "no more than five to ten minutes once or twice a year . . . [and] is considered de minimis under the FLSA." Def.'s Mot. 22. "The mere fact that [plaintiffs] may have been provided with a three hour window in which to bid does not establish that [plaintiffs] spent three hours bidding, nor does it constitute evidence that disputes [defendant's] contention that the actual bidding time consumes less than ten minutes." Def.'s Reply 26. Defendant admits, however, that the bidding process could take up to an hour each year. Cassady Declaration ¶ 8 ("The total time that an individual employee spends annually bidding the BWS [(basic work schedule)] and vacation leave schedule combined is approximately five (5) to ten (10) minutes, regardless of whether he or she is at work or not. In no circumstances should any employee spend more than one (1) hour per year bidding the BWS and vacation leave schedule, regardless of whether he or she is at work or not."). Defendant further argues that even if plaintiffs spent 70-95 minutes bidding each year while off duty, it would only amount to "between one and two minutes per week." Def.'s Reply 25.

Defendant also argues that because the windows of opportunity for bidding vary and may fall inside or outside of plaintiffs' work shifts, plaintiffs' bidding time "is irregularly performed." Id. Additionally, "plaintiffs are free to select for themselves when, within the window of opportunity, they will choose to make their bid." Id. According to defendant, it would be administratively difficult for the FAA to record plaintiffs' bidding time because the FAA's bidding schedules do not list the details of plaintiffs' bidding, such as duration and time. Id. at 24.

Contrary to plaintiffs' implicit assertion, the bidding schedules included [in] the appendix to their brief do not record the duration of time plaintiffs spend bidding, nor is there anything in the declarations submitted by plaintiffs that suggests the schedules do provide such evidence. In fact, the schedules do no such thing.

The time periods contained in the bidding schedules are only windows of opportunity that a plaintiff may utilize to make a bid. The schedules do not indicate whether a particular plaintiff has taken advantage of this opportunity or, if he or she has taken advantage, how long he or she has spent bidding.

Id. (citations omitted).

Furthermore, defendant offers evidence that plaintiffs were not required to spend time off-duty bidding.  See Fuentes Declaration ¶¶ 3-4; Dunne Declaration ¶ 6; Prosperi Declaration ¶ 7.  According to Mr. Fuentes, supervisor to Ms. Adcock, he does "not recall nor does the facility have any record of M[s]. Adcock ever claiming that she was not compensated for . . . time spent bidding work schedule or vacation leave while off duty." Fuentes Declaration ¶ 3.  Mr. Fuentes stated:

> There was no requirement for or expectation that Ms. Adcock or any other ATCS at MIA to bid while off duty.  The FAA and NATCA provided for a proxy system to allow employees to submit [their] bids ahead of time if they were going to be out of the facility when their bidding time occurred.

Id. at ¶ 4.  According to Mr. Dunne, supervisor to Donald Peterson at IAH/I90, Dunne Declaration ¶ 2, "FAA management . . . did not authorize or approve Mr. Peterson spending time outside of his regular duty hours bidding his own work schedules and vacation leave or assisting other employees with bidding," id. at ¶ 6.  According to Mr. Prosperi, supervisor to Mr. Savasta at MMU, Prosperi Declaration ¶ 2, "All bidding by ATCSs is conducted on duty time," id. at ¶ 7.

Plaintiffs, however, assert that "[o]n this record, plaintiffs have foreclosed the possibility of a de minimis defense, or at the very least, established a genuine dispute of fact as to whether plaintiffs['] uncompensated work duties are de minimis."  Pls.' Mot. 38.  Plaintiffs argue:  "Because defendant's own estimates of the amount of time spent bidding are inconsistent, they establish a dispute of fact such that a finding of summary judgment is not warranted."  Pls.' Reply 17-18.  Plaintiffs allege that the bidding time "exceeds 10 minutes per occasion" and that "bidding activities are performed on a regular basis."  Pls.' Mot. 8.  "[P]laintiffs submitted evidence that they are scheduled to spend 30 minutes to 3 hours bidding on a given day, and as much as 40-50 hours engaged in the bidding process over one year period."  Pls.' Mot. 37-38 n.26 (citing Pls.' Facts ¶ 31 (citing Adcock Declaration ¶¶ 8-9; Pls.' App. 36-38 (bidding schedules))).  Donald A. Peterson, a Traffic Management Coordinator at the FAA, signed a declaration which stated the time he spent participating in the bidding process from 2005 to 2007.  D. Peterson Declaration ¶¶ 1-2, 14-16.  Mr. Peterson stated that he "spent approximately 40-50 hours engaged in the bidding process, 2 hours of which were spent bidding for [his] own schedule, while outside [his] scheduled hours of work" in the years 2005, 2006, and 2007.  D. Peterson Declaration ¶ 14 (footnote omitted); see D. Peterson Declaration ¶¶ 15-16.  Ms. Adcock asserts that the bidding process can take from one hour and 45 minutes to two hours and 15 minutes.  See Supp. Adcock Declaration ¶¶ 4-6.  Plaintiffs also offer evidence that they were required to spend time off-duty bidding.  See Supp.

Adcock Declaration ¶ 2.  Ms. Adcock alleges that "the proxy may not be acted upon" because her "supervisors have stated that they will not be responsible for submitting any bids that are left with them."  Id.  Plaintiffs also assert that "it is administratively feasible for defendants to record such time . . . because FAA's bidding schedules list the date, time and duration of plaintiffs' bidding."  Pls.' Mot. 8 (citing Pls.' Facts ¶¶ 30-31 (citing Bukovskey Declaration ¶¶ 11-15; Adcock Declaration ¶¶ 6-9; Pls.' App. 5-6, 36-38 (bidding schedules); D. Peterson Declaration ¶ 11-12)).  Plaintiffs contend that defendant "points to no facts showing that it is administratively difficult to record plaintiffs' performance of bidding duties."  Pls.' Mot. 37 (emphasis omitted).

Defendant itself has presented conflicting statements regarding the amount of time plaintiffs spend participating in the bidding process while off duty.  See Def.'s Mot. 22 (stating that plaintiffs spend "no more than five to ten minutes once or twice a year" participating in the bidding process); Cassady Declaration ¶ 8 (discussing a possible range of 5-10 minutes to one hour).  Plaintiffs, on the other hand, have provided evidence that plaintiffs may spend more than two hours participating in the bidding process while off-duty.  See D. Peterson Declaration ¶ 14; Supp. Adcock Declaration ¶¶ 4-6.  As with defendant's evidence, plaintiffs evidence also contains discrepancies regarding the time spent bidding while off-duty.  See Bukovskey Declaration ¶¶ 16-20.  Mr. Bukovskey first declares:  "In 2004 [and 2005], I spent approximately 70-95 minutes [each year] bidding while off duty."  Bukovskey Declaration ¶¶ 16-17.  Mr. Bukovskey also states, however, that "[p]rior to 2006, bidding was performed during scheduled hours of work."  Bukovskey Declaration ¶ 20.  Mr. Bukovskey then states that "[i]n 2006, I spent approximately 70-95 minutes bidding while off duty."  Bukovskey Declaration ¶ 18.  According to Mr. Bukovskey he "was not compensated for this time."  Bukovskey Declaration ¶¶16-18.

Based on the conflicting evidence of both parties, the court finds that genuine issues remain as to the material facts concerning the amount of time plaintiffs spent bidding on work and vacation schedules while off-duty, and as to the practical administrative difficulty of recording such additional time.  Therefore, summary judgment is not appropriate at this time with respect to Count IV.[13]

_____

[13]In defendant's Reply, defendant raises for the first time the argument that plaintiffs' bidding time "does not constitute 'work' at all for purposes of the FLSA."  Def.'s Reply 26.  According to defendant, plaintiffs' bidding time does not constitute work because "bidding on work and vacation schedules is not part of plaintiffs' actual job duties, . . . [and because it is not] time spent necessarily or primarily for the benefit of the FAA."  Id.  Instead, "the bidding procedure is an accommodation made by the FAA on behalf of plaintiffs."  Id. at 26-27 (noting that if plaintiffs are unable to participate in the bidding process they may use a proxy or just

(continued...)

III.    Conclusion

For the foregoing reasons, defendant's motion to dismiss, treated as a motion for summary judgment as to Count II, is DENIED; plaintiffs' motion for summary judgment as to Count II is GRANTED; and defendant's motion for summary judgment with respect to both Counts III and IV is DENIED.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge

---

[13](...continued)
accept a work and leave schedule without the opportunity to state their preferences).  Plaintiffs' argue, however, that the bidding process is "for the benefit of and under the control of the FAA." Pls.' Reply 18-19 ("The bidding benefits FAA management as it decreases the time and effort needed to unilaterally establish the schedules and respond to subsequent requests for non-vacation leave for all employees.  It helps maintain a more productive and satisfied work force, which helps retain the workforce.").  Because this issue was not fully addressed in briefing, the court does not address its merits.  See Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief-they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").