# In the United States Court of Federal Claims

No. 07-272 C

(E-Filed: May 4, 2011)

| | |
|---|---|
| MARK G. ABBEY, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Motion for Partial Summary Judgment; Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219 (2006); Motion to Strike Portions of Testimony

Gregory Keith McGillivary, Washington, DC, for plaintiffs.  Sara L. Faulman, Washington, DC, of counsel.

Hillary Adrienne Stern, with whom were Tony West, Assistant Attorney General, Jeanne M. Davidson, Director, and Todd M. Hughes, Deputy Director, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for defendant.  Brett Daee and Michael Doherty, Federal Aviation Administration, Washington, DC, of counsel.

### OPINION AND ORDER

HEWITT, Chief Judge

I.     Background[1]

This is an action concerning overtime pay as provided for by the Fair Labor Standards Act (the FLSA), 29 U.S.C. §§ 201-219 (2006), brought by Mark G. Abbey, et al. (plaintiffs).  Before the court are Defendant's Motion for Summary Judgment (Def.'s Mot.), Defendant's Proposed Findings of Uncontroverted Facts (DFUF I) and defendant's Appendix (Def.'s App.), Docket Number (Dkt. No.) 150, filed November 2, 2010; Plaintiffs' Motion for Partial Summary Judgment (Pls.' Mot.) and Appendix to Plaintiffs' Motion for Partial Summary Judgment (Pls.' App.), Dkt. No. 152, filed November 2, 2010; Plaintiffs' Proposed Findings of Uncontroverted Facts (PFUF I), Dkt. No. 154, filed November 2, 2010; Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Pls.' Resp.), Dkt. No. 165, filed December 15, 2010; Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment (Def.'s Resp.), Defendant's Statement of Genuine Issues (Def.'s Resp. to PFUF I) and Defendant's Additional Proposed Finding of Uncontroverted Facts (DFUF II), Dkt. No. 166, filed December 15, 2010; Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts (Pls.' Resp. to DFUF I), Dkt. No. 167, filed December 15, 2010; Plaintiffs' Supplemental Proposed Findings of Uncontroverted Facts (PFUF II), Dkt. No. 168, filed December 15, 2010; defendant's Supplemental Appendix (Def.'s Supp. App.), Dkt. No. 170, filed December 17, 2010; Plaintiffs' Reply in Support of their Motion for Partial Summary Judgment (Pls.' Reply), Dkt. No. 176, filed January 10, 2011; Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Def.'s Reply), Dkt. No. 178, filed January 10, 2011; Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts (Pls.' Brief), Dkt. No. 183, filed February 7, 2011; and Defendant's Reply to Plaintiffs' Response to the Court's Order of February 2, 2011 (Def.'s Brief), Dkt. No. 184, filed February 14, 2011.

Also before the court are Plaintiffs' Motion to Strike Portions of the Affidavits of James Whitlow and Anthony Capaldi (plaintiffs' Motion to Strike or Pls.' Mot. Strike), Dkt. No. 164, filed December 15, 2010; Defendant's Opposition to Plaintiffs' Motion to Strike Portions of the Declarations of James Whitlow and Anthony Capaldi (Def.'s Resp. Strike), Dkt. No. 173, filed January 3, 2011; and Plaintiffs' Reply to Defendant's

---

[1]Plaintiffs state that "[t]he parties now cross-move for summary judgment with respect to liability and damages . . . in both Abbey and [Abdalla v. United States, No. 09-786 (Fed. Cl.)]." Pls.' Mot. for Partial Summ. J. (Pls.' Mot.) 1, Docket Number (Dkt. No.) 152, at 1-2.  Motion practice in Abdalla v. United States, Case No. 09-786, is stayed until the parties and the court agree to proceed.  See Tr. of Proceedings Held on Mar. 24, 2010 at 17, Abdalla v. United States, No. 09-786 (Fed. Cl. Apr. 20, 2010), Dkt. No. 18.

Opposition to Plaintiffs' Motion to Strike Portions of the Affidavits of James Whitlow and Anthony Capaldi (Pls.' Reply Strike), Dkt. No. 175, filed January 10, 2011.

Plaintiffs are Traffic Management Coordinators and Air Traffic Control Specialists (ATCs) (collectively, Controllers), currently or formerly employed by the Federal Aviation Administration (FAA). Pls.' Mot. 1. Plaintiffs bring four claims pursuant to the FLSA. Id. In Count I, plaintiffs claim that defendant failed "to properly compute the rate at which overtime is paid in violation of the FLSA's requirement that overtime be paid at one and one-half times the regular rate of pay." Id. In Count II, plaintiffs claim that defendant violated the FLSA by compensating plaintiffs with compensatory time or credit hours instead of paying them "overtime compensation for hours worked in excess of 40 hours in a workweek at the rate of one and one-half times the regular rate of pay." Id. (footnote omitted). In Count III, plaintiffs claim that defendant failed to "compensate plaintiffs for pre- and post-shift activities plaintiffs are 'suffered or permitted' to work" in violation of 29 U.S.C. § 203(g) and § 207(a). Id. In Count IV, plaintiffs contend that defendant failed "to compensate plaintiffs for time spent bidding on work schedules off-duty" in violation of 29 U.S.C. § 203(g) and § 207(a). Id. Plaintiffs also claim that they are entitled to recover liquidated damages pursuant to 29 U.S.C. § 216(b). Pls.' Mot. 40-48. Except for factual issues related to Count III, the disputed issues are legal in nature.

For the following reasons: (1) defendant's Motion is GRANTED-IN-PART and DENIED-IN-PART and plaintiffs' Motion is GRANTED-IN-PART and DENIED-IN-PART with respect to Count I; (2) defendant and plaintiffs' Motions are DENIED with respect to Count II; (3) defendant and plaintiffs' Motions are DENIED with respect to Count III; and (4) defendant's Motion is GRANTED and plaintiffs' Motion is DENIED with respect to Count IV.

II.    Legal Standards

    A.    Subject Matter Jurisdiction

Because subject matter jurisdiction is a threshold matter, it must be established before the case can proceed on the merits. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007). Plaintiffs bear the burden of establishing subject matter jurisdiction, and the court may determine whether they have met this burden once they have had an opportunity to be heard on the matter. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (citing Zunamon v. Brown, 418 F.2d 883, 886 (8th Cir. 1969)). If the court determines that it lacks subject matter jurisdiction, it must dismiss the claim. Steel

<u>Co.</u>, 523 U.S. at 94; <u>Matthews v. United States</u>, 72 Fed. Cl. 274, 278 (2006); Rules of the United States Court of Federal Claims (RCFC) 12(h)(3).

Like all federal courts, the United States Court of Federal Claims (CFC) is a court of limited jurisdiction. The jurisdiction of the CFC is set forth in the Tucker Act, 28 U.S.C. § 1491. The Tucker Act provides that the CFC has jurisdiction to hear claims against the United States founded upon "the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Plaintiffs have brought claims under the FLSA, 29 U.S.C. §§ 201-219. The CFC has jurisdiction over claims brought pursuant to the FLSA. <u>Whalen v. United States</u>, 80 Fed. Cl. 685, 687 (2008); <u>see</u> <u>Lion Raisins, Inc. v. United States</u>, 416 F.3d 1356, 1364-65 (Fed. Cir. 2005).

B.    Standard of Review

The parties have cross-moved for summary judgment pursuant to RCFC 56. <u>See</u> Pls.' Mot. 9-10; Def.'s Mot. 1. A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). A fact is material if it might significantly affect the outcome of the suit. <u>Anderson v. Liberty Lobby, Inc.</u> (<u>Liberty Lobby</u>), 477 U.S. 242, 248 (1986). Where the moving party has not disputed any facts contained in the non-movant's pleadings, the court assumes all well-pleaded facts to be true and draws all applicable presumptions and inferences from such facts in favor of the non-moving party. <u>See</u> <u>Univ. of W. Va. v. VanVoorhies</u>, 278 F.3d 1288, 1295 (Fed. Cir. 2002).

Failure by a non-moving party to raise a genuine issue of material fact results in the court's granting summary judgment in favor of the moving party. <u>See</u> RCFC 56(c)(1). "The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." <u>SRI Int'l v. Matsushita Elec. Corp. of Am.</u>, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing <u>Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.</u>, 731 F.2d 831, 836 (Fed. Cir. 1984)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Liberty Lobby</u>, 477 U.S. at 247-48 (emphasis omitted).

When parties cross-move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration." <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

C.       Claims For Overtime Compensation Under the FLSA

To prevail on a FLSA claim for an overtime activity suffered or permitted to be performed, plaintiffs must carry their burden of proof on all of the elements of the particular claim. <u>See</u> <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 686-87 (1946). "First, plaintiffs must establish that each activity for which overtime compensation is sought constitutes 'work.'" <u>Bull v. United States</u>, 68 Fed. Cl. 212, 220 (2005), <u>aff'd</u>, 479 F.3d 1365 (Fed. Cir. 2007). Second, plaintiffs must establish that the hours of work performed are not de minimis, <u>id.</u> (citing <u>Anderson</u>, 328 U.S. at 693; <u>Bobo v. United States</u>, 136 F.3d 1465, 1468 (Fed. Cir. 1998); <u>Adams v. United States</u>, 65 Fed. Cl. 217, 222 (2005)), and that the work performed is "reasonable in relation to the principal activity," <u>id.</u> at 220-21 (citing <u>Anderson</u>, 328 U.S. at 688; <u>Amos v. United States</u>, 13 Cl. Ct. 442, 449 (1987)).

1.       Elements of "Work"

"[A]ctivities performed either before or after the regular work shift, on or off the production line, are compensable . . . if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed . . . ." <u>Steiner v. Mitchell</u>, 350 U.S. 247, 256 (1956). As discussed by the court in <u>Bull</u>:

> The modern understanding of the preliminary and postliminary work that warrants compensation under the FLSA emerged from [<u>Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123</u> (<u>Tennessee Coal</u>), 321 U.S. 590 (1944)] as initially expanded by [<u>Anderson</u>] and ultimately circumscribed by the Portal-to-Portal Act. In [<u>Bobo</u>], the United States Court of Appeals for the Federal Circuit adopted the approach articulated by the United States Court of Appeals for the Second Circuit [in <u>Reich v. N.Y. City Transit Authority</u>, 45 F.3d 646, 650 (2d Cir. 1995)] for defining overtime "work" under the FLSA and for implementing the Supreme Court's "integral and indispensable" standard: "The more the preliminary (or postliminary) activity is undertaken for the employer's benefit, the more indispensable it is to the primary goal of the employee's work, and the less choice the employee has in the matter, the more likely such work will be found to be compensable."

Bull, 68 Fed. Cl. at 222 (quoting Bobo, 136 F.3d at 1467).  "An activity is indispensable to the primary goal of an employee's work if it is 'closely related to the [employee's] principal work activities.'"  Whalen v. United States, 93 Fed. Cl. 579, 599 (2010) (alteration in original) (emphasis omitted) (quoting Bobo, 136 F.3d at 1468).

For plaintiffs to prove that the overtime activities are an integral and indispensable part of the principal activities for which plaintiffs are entitled compensation, see Steiner, 350 U.S. at 256, "plaintiffs must establish that each task (1) was undertaken for the benefit of the employer; (2) was known or reasonably should have been known by the employer to have been performed; and (3) was controlled or required by the employer," Bull, 68 Fed. Cl. at 222; see Tennessee Coal, 321 U.S. at 598 (An activity constitutes compensable "work" if it involves "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." (footnote omitted)).

"For an overtime activity to constitute 'work' under the FLSA, it must be undertaken by the employee for the benefit of the employer."  Bull, 68 Fed. Cl. at 222 (citations omitted); Anderson, 328 U.S. at 693 ("[The activities are] pursued necessarily and primarily for the employer's benefit. . . .  There is nothing in such activities that partakes only of the personal convenience or needs of the employees.  Hence they constitute work . . . ."); see also Bobo, 136 F.3d at 1467-68; Adams, 65 Fed. Cl. at 226–27.  "To benefit the employer, an activity need not be 'productive'–rather, it must be necessary" to the employee's ability to accomplish the principal duties owed to the employer.  Bull, 68 Fed. Cl. at 223 (citation omitted).  "The FLSA, as interpreted by the Office of Personnel Management's [(OPM's)] regulations, requires federal agencies to pay employees for '[a]ll time spent by an employee performing an activity for the benefit of the agency and under the control and direction of the agency.'"  Bobo, 136 F.3d at 1467 (quoting 5 C.F.R. § 551.401(a) (1997)).  "The test is not whether the employer is the sole beneficiary of the activity, but rather whether the employer derives a significant benefit from the activity."  Whalen, 93 Fed. Cl. at 605 (citations omitted).

"It is not enough that the preliminary or postliminary activity for which compensation is sought be undertaken for the employer's benefit."  Bull, 68 Fed. Cl. at 223.  Regulations promulgated by OPM make clear that, for an activity performed by an employee off-duty to constitute compensable work, "the employee's supervisor [must] know[] or ha[ve] reason to believe that the work is being performed and [must] ha[ve] an opportunity to prevent the work from being performed."  5 C.F.R. § 551.104 (2011).  "This actual or constructive knowledge must be attributable to someone with the authority to bind the government."  Bull, 68 Fed. Cl. at 224 (citation omitted).

"For an activity to constitute 'work' under the FLSA, it must not only benefit the employer and be actually or constructively known by the employer, but also must be 'controlled or required' by the employer."  Id. (citing Anderson, 328 U.S. at 693); Whalen, 93 Fed. Cl. at 605-06.  OPM requires that employers "exercis[e] appropriate controls to assure that only that work for which it intends to make payment is performed." 5 C.F.R. § 551.402(a).

2.      The Work Must be Actually Compensable

Plaintiffs must also establish that the hours of work performed are not de minimis, Bull, 68 Fed. Cl. at 220 (citing, inter alia, Bobo, 136 F.3d at 1468), and that the work performed is "reasonable in relation to the principal activity," id. (citing Anderson, 328 U.S. at 688; Amos, 13 Cl. Ct. at 449).

"To establish that preliminary or postliminary work is compensable, plaintiffs first must show that the time spent engaged in the activity was not so 'insubstantial and insignificant' as to bar recovery under the 'de minimis doctrine.'"  Id. (quoting Anderson, 328 U.S. at 693).  "The de minimis doctrine limits FLSA liability for overtime activities that consume negligible amounts of time."  Id.  "It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."  Anderson, 328 U.S. at 692.  "The factors that trial courts must examine when assessing whether the work underlying a compensation claim is de minimis" are "'(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work.'"  Bobo, 136 F.3d at 1468 (quoting Lindow v. United States, 738 F.2d 1057, 1063 (9th Cir. 1984)). "OPM limits the application of the de minimis doctrine to periods of 10 minutes or less per day."  Bull, 68 Fed. Cl. at 226 (citing 5 C.F.R. § 551.412(a)(1)).  "When the pleadings and submissions, viewed in the light most favorable to the claimant and analyzed according to these factors, indicate that the claim is for work that is merely de minimis, summary judgment is entirely appropriate."  Bobo, 136 F.3d at 1468.

D.      Calculating Overtime Compensation Under the FLSA

An employee's "regular rate" of pay is the basis on which overtime compensation is computed under the FLSA.  The FLSA requires an employer to pay an employee overtime for hours worked in excess of 40 hours "at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Similarly, 5 C.F.R. § 551.501, which "supplements and interprets FLSA as it applies to federal

employees," <u>Brooks v. Weinberger</u>, 730 F. Supp. 1132, 1133 n.3 (D.D.C. 1989), provides that "[a]n agency shall compensate an employee . . . for all hours of work in excess of 8 in a day or 40 in a workweek at a rate equal to one and one-half times the employee's hourly regular rate of pay . . . ."  5 C.F.R. § 551.501(a).

The District Court for the District of Columbia explained in the <u>Brooks</u> case that "[5 C.F.R. §] 551.512 is a statement of the arithmetic processes to go through to ensure that an employee is paid the one and one-half times regular rate for overtime that the worker is entitled to under [5 C.F.R. § 551.501]" and 29 U.S.C. § 207(a).  <u>Brooks</u>, 730 F. Supp. at 1138.  Section 551.512 provides the method of calculating federally-employed plaintiffs' overtime entitlement.  Section 551.512 utilizes two rates of pay, the "straight time rate" and the "hourly regular rate":

> (a) An employee's overtime entitlement under this subpart includes:
> (1) The straight time rate of pay times all overtime hours worked; plus
> (2) One-half times the employee's hourly regular rate of pay times all overtime hours worked.
> (b) An employee's "straight time rate of pay" is equal to the employee's rate of pay for his or her position (exclusive of any premiums, differentials, or cash awards or bonuses) except for an employee who is authorized annual premium pay under § 550.141 or § 550.151 of this chapter. . . .
> (c) An employee has been paid in compliance with the overtime pay provisions of this subpart only if the employee has received pay at a rate at least equal to the employee's straight time rate of pay for all nonovertime hours of work in the workweek.

5 C.F.R. § 551.512.  Section 551.511(a) explains that "[a]n employee's 'hourly regular rate' is computed by dividing the total remuneration paid to an employee in the workweek by the total number of hours of work in the workweek for which such compensation was paid."  5 C.F.R. § 551.511(a).

The FLSA, 29 U.S.C. § 207(e), provides, in relevant part, that the regular rate of pay includes all remuneration paid to an employee except:

> (1) sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency;
> . . . .

8

(3) Sums paid in recognition of services performed during a given period if . . . both the fact that payment is to be made and the amount of payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly . . . .

In other words, in order for a payment to be excluded from the regular rate under 29 U.S.C. § 207(e)(3), four requirements must be met:  (1) "[t]he employer must retain discretion as to whether the payment will be made;" (2) "[t]he employer must retain discretion as to the amount;" (3) "[t]he employer must retain discretion as to the payment of the bonus until near the end of the period which it covers; and" (4) "[t]he bonus must not be paid pursuant to any prior contract, agreement, or promise."  McLaughlin v. McGee Bros. Co., 681 F. Supp. 1117, 1133 (W.D.N.C. 1988), aff'd sub. nom., Brock v. Wendell's Woodwork, Inc., 867 F.2d 196 (4th Cir. 1989).

In addition, 5 C.F.R. § 551.511(b), which "supplements and interprets" 29 U.S.C. § 207(e) as it applies to FAA employees, see 5 C.F.R. § 551.101(b), excludes bonuses and discretionary payments from "total remuneration," 5 C.F.R. § 551.511(b).  In particular, 5 C.F.R. § 551.511(b) provides that "total remuneration" does not include:

(1) Payments as rewards for service the amount of which is not measured by or dependent on hours of work, production, or efficiency (e.g., a cash award for a suggestion made by an employee and adopted by an agency);
. . . .
(3) Payments made in recognition of services performed during a given period, if both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the agency (i.e., discretionary cash awards or bonuses) . . . .

III.    Discussion

A.    Count I

The FAA's Core Compensation Plan and the applicable collective bargaining agreement[2] establish a compensation system that allows FAA employees to receive a

---

[2]The Collective Bargaining Agreement (CBA) incorporates the Core Compensation Plan by reference, and the Organizational Success Increase (OSI) and Superior Contribution Increase (SCI) are administered in accordance with the CBA and the Core Compensation Plan.  Def.'s

continue...

number of payments in addition to salary in certain circumstances.  See Def.'s App. 102-108 (CBA); Def.'s App. 57-60 (Core Compensation Plan).  Five of these payments are at issue here:  the Retention Incentive (RTI), the Organizational Success Increase (OSI), the Superior Contribution Increase (SCI), Controller Incentive Pay (CIP) and Sunday premium pay.

In Count I, plaintiffs contend that the FAA failed to include in the regular rate of pay RTI, OSI and SCI in violation of the FLSA.  Pls.' Mot. 6.  Plaintiffs also contend that the FAA's method of computing "overtime pay for controllers who receive CIP and Sunday premium pay violates the requirement under [29 U.S.C. § 207(a)] that employees receive one and one-half times their regular rate of pay as compensation for hours worked in excess of 40 hours a week."  Pls.' Brief 1.

    1.    Sunday Premium Pay and Controller Incentive Pay

The FAA's compensation scheme allows FAA employees to receive CIP and Sunday premium pay in certain circumstances.  "CIP is calculated as a percentage, ten percent (10%), of a controller's basic rate of pay.  It is paid to controllers working non-overtime hours at certain facilities that are difficult to fill or have high turnover rates."  Pls.' Brief 1-2; see Def.'s Resp. to PFUF I ¶ 24.  "Sunday premium pay is also a payment that is calculated as a percentage, 25%, of a controller's basic rate of pay for a day's pay if the controller works Sundays as part of his or her 5-day work week."  Pls.' Brief 2; Def.'s Resp. to PFUF I ¶ 15.  "Pursuant to the Collective Bargaining Agreements (CBA[]s) between plaintiffs' union (the National Air Traffic Controllers Association or NATCA) and the FAA in effect during the period covered by plaintiffs' complaint, Sunday premium pay is payable only for non-overtime hours worked on a shift a part of which falls on a Sunday.  Pursuant to the same CBA[]s, CIP is not paid for overtime hours."  Def.'s Mot. 8 (footnote omitted); see Pls.' Brief 2.

Plaintiffs contend that "[t]he method by which the [FAA] computes the overtime pay for controllers who receive CIP and Sunday premium pay violates the requirement under [29 U.S.C. § 207(a)] that employees receive one and one-half times their regular

---

    [2]...continue

App., Dkt. No. 150, at 105 (CBA) ("The OSI is administered in accordance with this Article and the Core Compensation Plan."); Def.'s App. 106 (CBA) ("The SCI is administered in accordance with this Article and the Core Compensation Plan.").  The FAA policy for paying a Retention Incentive (RTI) is established in the FAA's Human Resources Policy Manual (HRPM).  Def.'s App. 109 (Human Resources Policy Manual).

rate of pay as compensation for hours worked in excess of 40 hours a week, as interpreted by the regulations of [OPM] and the U.S. Department of Labor (DOL)."  Pls.' Brief 1.

More specifically, plaintiffs contend that the FAA's calculation of overtime pay violates the FLSA in two ways.  First, plaintiffs contend that "because CIP and Sunday premium pay are paid only for non-overtime hours – indeed, they are increases to the controllers' base salary – the payments should be included in the straight time portion of the time and one-half payment."  Pls.' Brief 3.  Second, plaintiffs contend that the "appropriate divisor for computing the regular rate[3] is to divide these payments, along with the salary, [Cost of Living Allowances (COLA)] and locality pay, by 40 hours."  Id.

Defendant contends that the FAA's method of calculating overtime is in accordance with 5 C.F.R. § 551.512 and § 551.511, the provisions the FAA has adopted as part of its personnel management plan to calculate the overtime entitlement of FAA employees:

> The FAA follows 5 C.F.R. § 551.512 which requires it to first calculate the straight time portion of plaintiffs' overtime pay entitlement, a calculation that does not include Sunday premium pay or CIP.  The FAA then determines plaintiffs' hourly regular rate, pursuant to section 551.511(a), by calculating plaintiffs' total compensation (including Sunday premium pay and CIP), and dividing the total compensation by all hours worked, to determine the half-time portion of plaintiffs' overtime pay entitlement pursuant to section 551.512.

Def.'s Resp. 15; see Def.'s Mot. 8-9.  Plaintiffs do not dispute that the FAA calculates plaintiffs' overtime entitlement in this manner.  See Pls.' Brief 3-4.  "Rather, plaintiffs challenge the FAA's misapplication of [5 C.F.R. § 551.512 and § 551.511(a)]."  Pls.' Brief 4.

Section 551.512 sets forth the method of calculating plaintiffs' overtime entitlement in accordance with the FLSA:

> (a)  An employee's overtime entitlement under this subpart includes:

---

[3]Plaintiffs' argument regarding the proper divisor refers to the regular rate calculation set out at 5 C.F.R. § 551.512(a)(2) and § 551.511(a).  See Pls.' Resp. to the Ct.'s Order of Feb. 2, 2011 (Pls.' Brief), Dkt. No. 183, at 3-7; see also Def.'s Reply to Pls.' Resp. to the Ct.'s Order of Feb. 2, 2011 (Def.'s Brief), Dkt. No. 184, at 5.  The straight time rate of pay is calculated using a 40-hour divisor.  Def.'s Brief 5.

(1) The straight time rate of pay times all overtime hours worked; plus
(2) One-half times the employee's hourly regular rate of pay times all overtime hours worked.
(b) An employee's "straight time rate of pay" is equal to the employee's rate of pay for his or her position (exclusive of any premiums, differentials, or cash awards or bonuses) except for an employee who is authorized annual premium pay under § 550.141 or § 550.151 of this chapter. . . .
(c) An employee has been paid in compliance with the overtime pay provisions of this subpart only if the employee has received pay at a rate at least equal to the employee's straight time rate of pay for all nonovertime hours of work in the workweek.

5 C.F.R. § 551.512.  Section 551.511(a) states that "[a]n employee's 'hourly regular rate' is computed by dividing the total remuneration paid to an employee in the workweek by the total number of hours of work in the workweek for which such compensation was paid."  5 C.F.R. § 551.511(a).

    a.      Straight Time Portion

    Plaintiffs contend that "because CIP and Sunday premium pay are paid only for non-overtime hours – indeed, they are increases to the controllers' base salary – the payments should be included in the straight time portion of the time and one-half payment."  Pls.' Brief 3.  Defendant contends that CIP and Sunday premium pay are premiums and differentials and that the FAA properly excludes them from the straight time portion of plaintiffs' overtime entitlement.  Def.'s Mot. 8.  The issue of whether CIP and Sunday premium pay must be included in the straight time portion of plaintiffs' overtime entitlement is resolved by determining whether CIP and Sunday premium pay are, as defendant contends, excludable as "premiums" or "differentials" under 5 C.F.R. § 551.512(b), Def.'s Mot. 8, or, as plaintiffs contend, includable under 5 C.F.R. § 551.512(b), Pls.' Brief 3.

    Section 551.512(b) provides a definition of an employee's straight time rate of pay:

    An employee's "straight time rate of pay" is equal to the employee's rate of pay for his or her position (exclusive of any premiums, differentials, or cash awards or bonuses) except for an employee who is authorized annual premium pay under § 550.141 or § 550.151 of this chapter.  For an employee who is authorized annual premium pay, straight time rate of pay

12

is equal to basic pay plus annual premium pay divided by the hours for
which the basic pay plus annual premium pay are intended.

5 C.F.R. § 551.512(b).  The terms "premium" and "differential" are not defined in 5
C.F.R. § 551 or the Federal Register.  Plaintiffs fail to address whether Sunday premium
pay and CIP are premiums or differentials under 5 C.F.R. § 551.512(b).  Defendant
defines the term premium as "a payment made only for certain hours and not for every
hour that an employee works," Def.'s Reply 3, and the term differential as "an additional
payment attached only to certain hours," Def.'s Brief 2, without citation to any legal
authority or even a dictionary, see Def.'s Mot. 8 ("Both Sunday premium pay and the CIP
differential are true premiums and differentials because they are not earned every hour
(non-overtime and overtime) that an employee works but are only earned during specific
hours of the workweek.").  As far as this court can discern, what constitutes a "premium"
or "differential" under 5 C.F.R. § 551.512(b) has not been the subject of a dispositive
analysis by any court.  In the absence of legal authority on the issue, the court relies on
the ordinary, dictionary meanings of the terms.

The ordinary, dictionary meaning of "premium" is "[a] sum of money or bonus
paid in addition to a regular price, salary, or other amount."  The American Heritage
Dictionary of the English Language (AHD) 1385 (4th ed. 2000).  "Sunday premium pay
is . . . a payment that is calculated as a percentage, 25%, of a controller's basic rate of pay
for a day's pay if the controller works Sundays as part of his or her 5-day work week."
Pls.' Brief 2; Def.'s Resp. to PFUF I ¶ 15.  Because Sunday premium pay is calculated as
a percentage of the controller's salary, it is not a salary, but is rather "[a] sum of
money . . . paid in addition to . . . salary."  AHD 1385.  Accordingly, Sunday premium
pay is a premium and is properly excluded from the straight rate portion of plaintiffs'
overtime entitlement.

The ordinary, dictionary meaning of "differential" is "[a] difference between
comparable things, as in wage rate or in price."  AHD 505.  A "differential rate" is "[a]
difference in wage rate paid for the same work performed under differing conditions."  Id.
"CIP is calculated as a percentage, ten percent (10%), of a controller's basic rate of pay.
It is paid to controllers working non-overtime hours at certain facilities that are difficult
to fill or have high turnover rates."  Pls.' Brief 1-2; see Def.'s Resp. to PFUF I ¶ 24.
Because CIP is paid to controllers working at facilities that are difficult to fill or have
high turnover rates, it is a "difference between comparable" wages "paid for the same
work performed under differing conditions."  AHD 505.  Therefore, CIP is a differential
and is properly excluded from the straight rate portion of plaintiffs' overtime entitlement.
Because CIP is calculated as a percentage of a controller's base rate of pay, it is not a
salary, but is rather "[a] sum of money . . . paid in addition to . . . salary."  AHD 1385.

13

Accordingly, CIP is also a premium and is properly excluded from the straight rate portion of plaintiffs' overtime entitlement.

Because CIP and Sunday premium pay are premiums or differentials and are not explicitly listed as exceptions in 5 C.F.R. § 551.512(b), they are not included in plaintiffs' straight time rate.

Rather than directly addressing defendant's argument that CIP and Sunday premium pay are premiums and differentials, plaintiffs contend that "[b]oth CIP and Sunday premium pay are paid only for non-overtime hours," Pls.' Brief 2, and therefore must be included in the straight time portion of plaintiffs' overtime entitlement, Pls.' Brief 2, 5. Plaintiffs rely primarily on the law surrounding COLAs and Territorial Cost of Living Adjustments (TCOLAs).

Plaintiffs cite to Frank v. McQuigg, 950 F.2d 590 (9th Cir. 1991) for the proposition that the FAA improperly omits CIP and Sunday premium pay from the straight time portion of the overtime entitlement under 5 C.F.R. § 551.512. See Pls.' Brief 4-7. However, the Frank court did not discuss the straight time portion of the overtime entitlement under 5 C.F.R. § 551.512. In Frank, employees of the United States Postal Service (USPS) claimed that the USPS's formula for computing overtime pay violated the FLSA because it allocated the TCOLA over all hours worked in the workweek. 950 F.2d at 591. The United States Court of Appeals for the Ninth Circuit (Ninth Circuit) held that Congress intended that the TCOLA be allocated only to non-overtime hours. See id. at 596-97. Therefore, the USPS had diluted the amount intended as TCOLA and the regular rate by improperly allocating the TCOLA over all hours worked. See id. Defendant argues that "both the math and the logic upon which the [Frank] court relied to reach its conclusion were flawed." Def.'s Brief 6.

The TCOLA at issue in Frank was established by statute. See Frank, 950 F.2d 596-98 (citing 5 U.S.C. § 5941(a) (1988)). Because neither the CIP nor the Sunday premium pay of FAA employees is governed by a statute similar to 5 U.S.C. § 5941, the statute central to the decision in Frank, the Ninth Circuit's analysis in Frank does not provide guidance for the dispute before the court. The FAA employees' entitlement to CIP and Sunday premium pay is established by a Collective Bargaining Agreement (CBA) between the controllers' union and the FAA. Pls.' Brief 1. Plaintiffs do not cite to anything in the CBA that mandates that plaintiffs' overtime entitlement be calculated in the manner that plaintiffs suggest and the court finds nothing in the CBA requiring that overtime compensation be so calculated.

Plaintiffs also suggest that because the FAA includes COLAs in the straight time portion of the overtime entitlement, CIP and Sunday premium pay must be included in the straight time rate. Pls.' Mot. 19-20; Pls.' Resp. 5-7; Pls.' Brief 3 n.1. In 2002 OPM amended its regulations to require that COLAs be included in the straight time portion of the overtime entitlement. 5 C.F.R. § 591.239; 67 Fed. Reg. 22,339, 22,346-47 (May 3, 2002). Defendant contends that "[t]he inclusion of COLAs in the straight rate calculation is not required by the FLSA." Def.'s Mot. 11. Defendant recognizes that "OPM's regulation results in more generous treatment of COLA," Def.'s Mot. 11; however, defendant argues that "OPM's decision to do so does not mandate that other premiums and differentials, including Sunday premium pay or CIP be treated similarly," Def.'s Mot. 11-12. Absent a provision in the CBA or in OPM's regulations mandating that CIP and Sunday premium pay be included in the straight rate, plaintiffs are not entitled to a method of overtime calculation that includes CIP and Sunday premium pay in the straight rate. The FAA properly excluded Sunday premium pay and CIP from the straight rate portion of plaintiffs' overtime entitlement.

b.     Regular Rate Calculation

The parties dispute whether, pursuant to 5 C.F.R. § 551.511(a), an employee's "hourly regular rate" is computed by dividing the total remuneration paid to an employee in the workweek by the total number of hours worked by the employee in the workweek.[4]

---

[4]Plaintiffs' briefing focuses on the government's violation of the FLSA by the FAA's misapplication of OPM regulations. In their response, plaintiffs appear to suggest another method of calculating plaintiffs' overtime entitlement. See Pls.' Opp'n to Def.'s Mot. for Summ. J. (Pls.' Resp.), Dkt. No. 165, at 9-10. Plaintiffs argue that Sunday premium pay and CIP should be added to plaintiffs' salary and divided by 40 hours to calculate the regular rate of pay pursuant to 29 U.S.C. § 207(a). See Pls.' Resp. 9-10. However, in the most recent brief filed by plaintiffs in response to the court's Order of February 2, 2011, Dkt. No. 182, requesting that plaintiffs clarify their arguments regarding the proper method of calculating plaintiffs' overtime entitlement, plaintiffs explain that they do not challenge the validity of the method set forth in 5 C.F.R. § 551.511 and § 551.512 under 29 U.S.C. § 207(a), but their challenge is instead to the validity of FAA's application of the method set forth in 5 C.F.R. § 551.511 and § 551.512 under 29 U.S.C. § 207(a). Pls.' Brief 3-4. Moreover, plaintiffs argue that the method set forth in 5 C.F.R. § 551.511 and § 551.512 is the same as the method in 29 U.S.C. § 207(a). See Pls.' Reply in Supp. of Their Mot. for Partial Summ. J. (Pls.' Reply), Dkt. No. 176, at 7. Because plaintiffs do not argue that 5 C.F.R. § 551.511 and § 551.512 are invalid under 29 U.S.C. § 207, the court confines its discussion of the regular rate calculation to the validity of the FAA's application of 5 C.F.R. § 551.511 and § 551.512, which "supplements and interprets" 29 U.S.C. § 207(a) as it applies to federal employees. See Brooks v. Weinberger, 730 F. Supp. 1132, 1133
continue...

As far as this court can discern, 5 C.F.R. § 551.511(a) has not been the subject of a dispositive analysis by the United States Court of Appeals for the Federal Circuit (Federal Circuit).[5]

Section 551.511(a) provides a definition of an employee's hourly regular rate of pay:

> An employee's "hourly regular rate" is computed by dividing the total remuneration paid to an employee in the workweek by the total number of hours of work in the workweek for which such compensation was paid.

5 C.F.R. § 551.511(a).

Plaintiffs contend that the FAA "improperly reduced the controllers' regular rates of pay by dividing the compensation for Sunday premium pay and [CIP] by all hours worked in a workweek rather than the 40 non-overtime hours a week for which this compensation was paid." Pls.' Mot. 7.  According to plaintiffs, "For each type of payment an employee receives, a determination must be made as to the hours for which the payment is made–i.e., is the payment made for all hours worked in a workweek or is the payment made as part of the employee's weekly compensation intended to compensate the employee for regularly scheduled hours?" Pls.' Resp. 4.  Plaintiffs argue that CIP and Sunday premium pay are intended to compensate the ATCs for non-overtime hours:  40 hours per week. Pls.' Resp. 6-7.  Defendant responds that plaintiffs' assertion that a separate regular rate must be calculated for each type of payment an employee receives "is not supported by any law, rule, or regulation."  Def.'s Reply 2.  Defendant

---

[4]...continue

n.3 (D.D.C. 1989).  In addition, plaintiffs offer no binding legal authority, and as far as the court can discern, there is no binding legal authority for the proposition that Sunday premium pay and CIP should be added to plaintiffs' salary and divided by 40 to calculate the regular rate pursuant to 29 U.S.C. § 207(a).

[5]In Zumerling v. Devine, 769 F.2d 745, 747 (Fed. Cir. 1985), pursuant to Federal Personnel Manual (FPM) Letter 551-5, the Office of Personnel Management (OPM) divided appellants' total remuneration by the total hours worked, 144 hours served in each two-week pay period, to calculate appellants' regular rates of pay.  Appellants argued that OPM's calculation of the regular rate was improper under the FLSA because the FLSA requires that appellants' total remuneration be divided by 80 hours, 40 hours per week for a two-week pay period, to calculate appellants' regular rates of pay.  Id. at 747-48.  The court held that OPM's method of calculating appellants' regular rates of pay was in accordance with the FLSA.  Id. at 749.

argues that the appropriate denominator under 5 C.F.R. § 551.511(a) is the number of hours in the workweek actually worked by the employee.  Def.'s Brief 4.

The court focuses on the following in reaching its decision:  (1) 29 C.F.R. § 778.113, which plaintiffs primarily on, does not apply to FAA employees; (2) 5 C.F.R. § 551, which the FAA uses to calculate plaintiffs' overtime entitlement, does not include a provision similar to 29 C.F.R. § 778.113; (3) the language used in 5 C.F.R.§ 551.511 is sufficiently different from the language used in 29 C.F.R. § 778.113, that the court cannot reach an interpretation of 5 C.F.R.§ 551.511 that would require that the FAA calculate plaintiffs' overtime entitlement in the manner required by 29 C.F.R. § 778.113; and (4) the case law discussing 5 C.F.R. § 551.511 supports the conclusion that the hourly regular rate is computed by dividing the total remuneration paid to an employee in the workweek by the total number of hours worked by the employee in the workweek.[6]

The primary focus of plaintiffs' argument regarding the hourly regular rate is that 5 C.F.R. § 551.511 should be interpreted to provide a method of calculating the hourly regular rate that is the same as the method of calculating the hourly regular rate for salaried workers set forth in 29 C.F.R. § 778.113.  However, 29 C.F.R. § 778.113 is inapplicable to FAA employees.  Section 778.113(a) was promulgated by the Wage and Hour Administrator of the DOL and does not apply to FAA employees.  See 5 C.F.R. § 551.102; see also 29 U.S.C. § 204(f); Billings v. United States, 322 F.3d 1328, 1331 (Fed. Cir. 2003) ("Because OPM administers the Fair Labor Standards Act with respect to employees of the federal government, it is the OPM regulations, rather than the Labor Department regulations, that govern the application of the Fair Labor Standards Act to appellants.")[7]; Zumerling v. Devine, 769 F.2d 745, 749-50 (Fed. Cir. 1985); Am. Fed'n of Gov't Emps., Local 1546 Union, 19 F.L.R.A. 1016, 1022 n.7 (1985).

---

[6]"Workweek" is defined as "a fixed and recurring period of 168 hours–seven consecutive 24-hour periods.  It need not coincide with the calendar week but may begin on any day and at any hour of a day."  5 C.F.R. § 551.104.

[7]OPM was "instructed by the Congress to administer the 1974 Amendments [to the FLSA, see 29 U.S.C. § 203(e)(2),] in a manner consistent with the Department of Labor's administration of FLSA in the private sector," Lanehart v. Horner, 818 F.2d 1574, 1578 (Fed. Cir. 1987); see also Billings v. United States, 322 F.3d 1328, 1331 (Fed. Cir. 2003).  However, this court has previously stated that "[i]t would be inappropriate . . . to elevate [this] statement in the committee report to an ironclad rule barring any inconsistency."  Riggs v. United States, 21 Cl. Ct. 664, 681 (1990).  Plaintiffs have not argued that the Office of Personnel Management's administration of the FLSA is inconsistent with the Department of Labor's administration of the FLSA.

Although "[t]his court has recognized the importance of referring to DOL regulations for guidance,"[8] the DOL regulations are not congruent with 5 C.F.R. § 551.511, which applies to FAA employees.  If OPM had intended that the hourly regular rate for salaried federal workers be calculated in the manner set forth in interpretive bulletin 29 C.F.R. § 778.113, OPM could have included a provision on calculating overtime for salaried federal workers similar to 29 C.F.R. § 778.113 in its regulations, which were enacted after 29 C.F.R. § 778.113 was issued.  See 33 Fed. Reg. 986 (Jan. 26, 1968) (stating that the appropriate divisor used to calculate the regular hourly rate in 29 C.F.R. § 778.113 is "the number of hours which the salary is intended to compensate").

In addition, the language used in 5 C.F.R. § 551.511 is distinguishable from the language used in 29 C.F.R. § 778.113.  Section 551.511(a) provides that "[a]n employee's 'hourly regular rate' is computed by dividing the total remuneration paid to an employee in the workweek by the total number of hours of work in the workweek for which such compensation was paid."  5 C.F.R. § 551.511(a) (emphasis added).  An employee is typically paid compensation for the hours an employee works during the workweek.  Therefore, the court understands the phrase "the total number of hours of work in the workweek for which such compensation was paid" to refer to the hours an employee actually works.

In contrast, 29 C.F.R. § 778.113 provides that a salaried employee's regular hourly rate of pay "is computed by dividing the salary by the number of hours which the salary is intended to compensate."  29 C.F.R. § 778.113(a) (emphasis added).  A treatise on the FLSA provides an example of a calculation of the regular rate pursuant to 29 C.F.R. § 778.113:

---

[8]Pls.' Brief 4 n.3 (citing Astor v. United States, 79 Fed. Cl. 303, 310 (2007); Aamold v. United States, 39 Fed. Cl. 735, 739 n.4 (1997) ("OPM's regulations and interpretations must be consistent with the FLSA itself and with the standards set by DOL for the private sector.  While OPM regulations are controlling and are entitled to great deference, the court also can consider DOL's regulations.")); see Bates v. United States, 60 Fed. Cl. 319, 321 n.3 (2004) ("While caution dictates against simply importing DOL-created standards into the federal sector without any conscious rulemaking at either DOL or OPM, we believe it is appropriate to look to them for persuasive guidance where the OPM regulations are unclear." (internal quotation omitted)); see also Alexander v. United States, 1 Cl. Ct. 653, 657 n.5 (1983) ("Although the Department of Labor's regulations are not controlling in deciding the validity of FPM Letter 551.5, they are persuasive, because Congress intended OPM's administration of the Act to be consistent with the Department of Labor's Administration of the Act." (citation omitted)).

If an employee is hired at a salary of $182.70 and if it is understood that his salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $182.70 divided by 35 hours, or $5.22 an hour . . . .  If an employee is hired at a salary of $220.80 for a 40-hour week his regular rate is $5.52 an hour.

The Fair Labor Standards Act 10-48 (Ellen C. Kearns et al. eds., 2d ed. 2010).  The language used in 5 C.F.R.§ 551.511 is sufficiently different from the language used in 29 C.F.R. § 778.113 that the court cannot reach an interpretation of 5 C.F.R.§ 551.511 that would require that the FAA calculate plaintiffs' overtime entitlement in the manner required by 29 C.F.R. § 778.113.

Moreover, plaintiffs' argument is further weakened by OPM's use of language similar to 29 C.F.R. § 778.113 in a provision dealing with annual premium pay.  Section 551.512(b) states, "For an employee who is authorized annual premium pay, straight time rate of pay is equal to basic pay plus annual premium pay divided by the hours for which the basic pay plus annual premium pay are <u>intended</u>."  5 C.F.R. § 551.512(b) (emphasis added).  The court understands the word "intended" to serve as a shortened version of the phrase "intended to compensate," appearing in 29 C.F.R. § 778.113.  If OPM had wanted the "hourly regular rate" to be computed by dividing the total remuneration paid to an employee in the workweek by the total number of hours that remuneration was "intended to compensate," OPM could and--the court finds it likely-- would have used the phrase "intended" in 5 C.F.R. § 551.511(a) as it did in 5 C.F.R. § 551.512(b) to describe the appropriate number of hours worked to be used in the straight time rate of pay calculation.

In addition, other courts have suggested that 5 C.F.R. § 551.512 provides a method of calculating an employee's overtime entitlement that is in compliance with the FLSA and in contrast with the method that plaintiffs argue is mandated by the FLSA.  In <u>Brooks</u>, 730 F. Supp. at 1140-41, the district court held that "the formula for overtime stated in 5 C.F.R. § 551.512 conforms to overtime requirements under FLSA."  In determining the amount of overtime a law enforcement officer was entitled to, the court stated, "Gabriel's hourly regular rate of pay is computed by dividing his 'total remuneration' for a pay period by the <u>total number of hours worked in the period</u> to earn the total remuneration."  <u>Id.</u> at 1135 (emphasis added) (citing 5 C.F.R. § 551.511).[9]

_____

[9]Although the court's decision in <u>Brooks</u> was in the context of Section 7(k) of the FLSA, 29 U.S.C. § 207(k), which provides an exception to when overtime must begin to be paid under the FLSA for law enforcement officers and firefighters, the court cited to 5 C.F.R. § 551.511, a

continue...

In <u>Alexander v. United States</u>, 1 Cl. Ct. 653, 657-59 (1983), the court determined that Customs Service employees were entitled to overtime compensation at their regular rate plus one-half of their regular rate and that premium pay received for administratively uncontrollable overtime is not excluded from the regular rate of employees in law enforcement activities.  The court discussed Federal Personnel Manual (FPM) Letter 551-5, Instructions for Applying the [FLSA] to Federal Employees Engaged in Fire Protection Activities or Law Enforcement Activities, dated January 15, 1975. <u>Id.</u> at 655-59.  The court noted that "OPM's overtime pay instructions under the Act are now found at 5 C.F.R. §§ 551.501-.541 (1982) and are consistent with FPM Letter 551-5." <u>Id.</u> at 655 n.2.  In its discussion of the proper method for computing the regular rate, the court stated, "The regular rate is determined 'by adding up all includable payments made for all hours of actual work for the week, and then dividing by the <u>total hours of actual work</u>.'" <u>Id.</u> at 656 (emphasis added) (quoting FPM Letter 551-1) (citing 5 C.F.R. § 551.511(a) (1982)).  Although the court relied primarily on FPM Letters 551-1 and -5, the court stated that OPM's regulations are consistent with FPM Letter 551-5 and cited to 5 C.F.R. § 551.511(a). <u>See id.</u>

Plaintiffs rely on <u>Newmark v. Triangle Aluminum Industries, Inc.</u>, 277 F. Supp. 480, 482 (N.D. Ga. 1967) in support of their proposition that "[f]or each type of payment an employee receives, a determination must be made as to the hours for which the payment is made."  Pls.' Resp. 4-5.  In <u>Newmark</u>, 277 F. Supp. at 482, the court interpreted 29 C.F.R. § 778.113, which, as discussed above, provides a method of calculating the hourly regular rate for salaried non-federal workers that is distinct from the method set forth in 5 C.F.R. § 551.511 for federal workers.

Plaintiffs also rely on <u>Frank</u>, 950 F.2d at 590, for the proposition that "the regular rate is calculated by dividing payments by the number of hours they are intended to compensate."  Pls.' Brief 4.  However, as discussed above, <u>Frank</u> is inapplicable to the circumstances of this case.  <u>See</u> <u>supra</u> Part III.A.1.a.

Plaintiffs also rely on the treatment of COLAs for the proposition that the regular rate is calculated by dividing the payment by the number of hours the payment is intended to compensate.  Pls.'s Resp. 5-6, 10-12.  However, the inclusion of COLAs in the straight rate calculation is not required by the FLSA.  <u>See</u> <u>supra</u> Part III.A.1.a.  OPM amended its

_____

[9]...continue

provision generally applicable to most federal employees, when it stated that "Gabriel's hourly regular rate of pay is computed by dividing his 'total remuneration' for a pay period by the total number of hours worked in the period to earn the total remuneration."  <u>See</u> <u>Brooks</u>, 730 F. Supp. at 1135.

regulations to require COLAs be included in the straight time portion of the overtime entitlement.  See 5 C.F.R. § 591.239.  OPM's decision to calculate COLAs in a particular manner does not mandate that other premiums and differentials be calculated in the same manner.[10]

The court is unpersuaded by plaintiffs' argument that 5 C.F.R. § 551.511 provides for the same method of calculating the hourly regular rate as the method set forth in 29 C.F.R. § 778.113.  The language, "the total number of hours of work in the workweek for which such compensation was paid," contained in 5 C.F.R. § 551.511(a) (emphasis added), means the total number of hours actually worked in the workweek by an employee.  In other words, the FAA properly calculates the hourly regular rate portion of plaintiffs' overtime entitlement by dividing the total remuneration paid to an employee in the workweek by the total number of hours worked by the employee in the workweek.

2.      Retention Incentives, the Organizational Success Increase and the Superior Contribution Increase

Under the FAA's compensation scheme employees may be eligible for an Organizational Success Increase (OSI), which recognizes organizational accomplishments, or a Superior Contribution Increase (SCI), which recognizes individual contributions.  PFUF I ¶ 30; Def.'s Resp. to PFUF I ¶ 30.  In addition, "Retention incentives [(RTI)] may be offered to persuade an employee with unique qualifications to stay on when the employee would otherwise be likely to leave."  DFUF I ¶ 24; see Pls.' Mot. 12.  Before 2007, the OSI and SCI payments were included in the plaintiffs' regular rate of pay.  PFUF I ¶ 39; Def.'s Resp. to PFUF I ¶ 39.  Beginning in 2007, if the payment of OSI and SCI caused employees to exceed the maximum pay range for their positions set by the FAA, plaintiffs received OSI and SCI as lump sum payments.  PFUF I ¶ 39; Def.'s Resp. to PFUF I ¶ 39; Def.'s Mot. 18.  OSI and SCI payments made as lump sum payments and the RTI payments were not included in the plaintiffs' regular rates of pay

---

[10]In addition to arguing that the language "the total number of hours of work in the workweek for which such compensation was paid" means the total number of hours of work the payment was intended to compensate, Pls.' Resp. 4-5; Pls.' Brief 3-5, plaintiffs argue, without support, that for each type of payment an employee receives, a separate regular rate must be calculated, see Pls.' Resp. 4-5.  Nothing in the FLSA mandates that an employer calculate separate regular rates of pay for each type of payment an employee receives.  See 29 U.S.C. §§ 201-219 (2006).  In fact, in certain circumstances, the FLSA contemplates the use of a blended rate of pay to calculate the regular rate for employees who receive different rates of pay.  See 29 U.S.C. § 207(g)(2).

for purposes of calculating overtime pay under the FLSA.  PFUF I ¶¶ 29, 40; Def.'s Resp. to PFUF I ¶¶ 29, 40.

Plaintiffs contend that the FAA's failure to include OSI, SCI and RTI in plaintiffs' regular rates of pay violates 29 U.S.C. § 207(e).  Pls.' Mot. 6.  Defendant contends that OSI, SCI and RTI are properly excluded from plaintiffs' regular rates of pay pursuant to 29 U.S.C. § 207(e)(1) and § 207(e)(3).[11]  Def.'s Mot. 14.

"The burden is on the employer to establish that the remuneration in question falls under an exemption."  Madison v. Res. for Human Dev., Inc., 233 F.3d 175, 187 (3d Cir. 2000).  "[I]t is employer upon whom the burden rests in demonstrating that certain payments it has made should not be included in determining its employees' 'regular rate.'"  Herman v. Anderson Floor Co., 11 F. Supp. 2d 1038, 1042 (E.D. Wis. 1998) (citing Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 209 (1966)).

 a. The Discretionary Payment Exclusion

Section 207(e) of title 29 of the United States Code provides, in relevant part, that the regular rate of pay includes all remuneration paid to an employee except:

> (3) Sums paid in recognition of services performed during a given period if . . . both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly . . . .

29 U.S.C. § 207(e)(3).

Accordingly, in order for a payment to be excluded from the regular rate under 29 U.S.C. § 207(e)(3), four requirements must be met:  (1) "[t]he employer must retain discretion as to whether the payment will be made;" (2) "[t]he employer must retain

---

[11]The Conference Report to the public law that originally established the exemptions from the regular rate now found at 29 U.S.C. § 207(e) explains that each exclusion "is intended to provide a separate, carefully defined exclusion from 'regular rate.'  Accordingly, a payment excluded under any one subdivision would not be deemed part of the 'regular rate' by reason of the fact that such payment may not be excluded by the language of any other subdivision."  H.R. Rep. No. 81-1453, at 19 (1949) (Conf. Rep.).  In other words, defendant does not have to prove it fits within both § 207(e)(1) and § 207(e)(3) to properly exclude OSI, SCI and RTI from the regular rate.

discretion as to the amount;" (3) "[t]he employer must retain discretion as to the payment of the bonus until near the end of the period which it covers; and" (4) "[t]he bonus must not be paid pursuant to any prior contract, agreement, or promise." McLaughlin, 681 F. Supp. at 1133.

Similarly, 5 C.F.R. § 551.511(b), "which supplements and interprets FLSA as it applies to federal employees," see Brooks, 730 F. Supp. at 1133 n.3, excludes bonuses and discretionary payments from "total remuneration." In particular, 5 C.F.R. § 551.511(b) provides, in relevant part, that "total remuneration" includes all remuneration paid to an employee except:

> (3) Payments made in recognition of services performed during a given period, if both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the agency (i.e., discretionary cash awards or bonuses) . . . .

5 C.F.R. § 551.511(b)(3).

Neither 29 U.S.C. § 207(e)(3) nor 5 C.F.R. § 551.511(b)(3) has been the subject of analysis by the Federal Circuit.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). The interpretation of a contract is a question of law for the court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 997 (Fed. Cir. 1995) ("The interpretation of a contract or a deed, like a patent, is ultimately a question of law."); Yaist v. United States, 17 Cl. Ct. 246, 253 (1989) ("[T]he interpretation of a written instrument is a question of law, which is to be determined by the court." (citations omitted)). The texts of the relevant contract provisions and policy documents--that is, the CBA, the Human Resources Policy Manual (HRPM) and the Core Compensation Plan--are not in dispute.

  i.  OSI

Relying on the declaration of Andrew J. LeBovidge, an ATC and President of NATCA, and the text of the CBA, plaintiffs argue that the FAA did not retain discretion to determine whether to award OSI payments to plaintiffs or to determine the amount of the OSI payments awarded to plaintiffs. PFUF I ¶ 35 (citing Pls.' App. 754-55 (LeBovidge Decl.)).

Relying also on the text of the CBA, defendant argues that the FAA retains discretion to determine whether to award OSI payments to plaintiffs and to determine the amount of the OSI payments awarded to plaintiffs:

> [T]he OSI is based upon the organization's success in meeting the goals contained in the Core Compensation Plan which are:  safety, security, system efficiency, customer satisfaction, financial responsibility, and people. . . . [A]n OSI payout (of any amount) is not required under any circumstances but is a discretionary decision upon the part of the FAA Administrator.

Def.'s Resp. to PFUF I ¶ 35.  Defendant contends that "[u]nder Article 108, Section 8 of the [CBA], both the decision to grant an OSI as well as the amount of the OSI are entirely within the discretion of the FAA Administrator based upon his judgment of the success [of] the agency in meeting organizational goals."  DFUF I ¶ 20.

Section 8.a of Article 108 of the CBA provides that the FAA determines whether to grant the entire available OSI pool or a portion of the OSI pool:

> a.  After the end of the performance year, the Administrator assesses the performance of the Agency against the organizational goals and makes a final OSI determination.  Based on the assessment, <u>the Administrator will determine whether to grant the entire available OSI pool for total success or a portion of the pool for partial success as the final OSI</u>.

Def.'s App. 105 (CBA) (emphasis added).

Similarly, the Core Compensation Plan provides that "[t]here are currently six organizational goals:  Safety, Security, System Efficiency, Customer Satisfaction, Financial Responsibility, and People."  Def.'s App. 59 (Core Compensation Plan). Pursuant to the Core Compensation Plan, "After the end of the performance year, the Administrator assesses the performance of the agency against the organizational goals and makes a final OSI determination.  Based on the assessment, <u>the Administrator will determine whether to grant the entire available OSI pool for success or a portion of the pool for partial success as the final OSI</u>."  Def.'s App. 58 (Core Compensation Plan) (emphasis added).

Defendant states that the CBA and the Core Compensation Plan support its contention that "the decision as to whether to grant the OSI . . . and the amounts of the OSI . . . are entirely within the discretion of the FAA administrator or other agency

managers." Def.'s Mot. 19. Accordingly, defendant contends that the OSI is "properly excluded from the FLSA regular rate calculation." Def.'s Mot. 19. The court disagrees.

As an initial matter, "the decision as to whether to grant the OSI" is not, as defendant contends, "entirely within the discretion of [the FAA]." Def.'s Mot. 19. The Core Compensation Plan and the CBA state that "the Administrator will determine whether to grant the entire available OSI pool for total success or a portion of the pool for partial success as the final OSI." Def.'s App. 58 (Core Compensation Plan) (emphasis added); Def.'s App. 105 (CBA). In addition, the Core Compensation Plan provides that all employees will receive an OSI:[12]

> Approximately 20% will get the OSI plus an SCI-1 of 1.8% of base salary
> Approximately 45% will get the OSI plus an SCI-2 of 0.6% of base salary
> Approximately 35% will get the OSI with no SCI

Def.'s App. 58 (Core Compensation Plan) (emphasis added). In fact, "[t]he [ATCs] have received OSI payments ranging between 2.7% of base pay and 3.9% of base pay in every year since 2004." PFUF I ¶ 36; see Def.'s Resp. to PFUF I ¶ 36.

There is strong persuasive authority to support plaintiff's contention that the OSI payments are properly includable in the "regular rate" of pay. In Featsent v. City of

---

[12]The Collective Bargaining agreement (CBA) provides that the some employees are ineligible for the Organizational Success Increase and the Superior Contribution Increase. Def.'s App. 105-07 (CBA). In particular, the ineligible employees are those who:

(1)     have less than 90 days in a pay status with the FAA in the performance year.

(2)     were on an Opportunity to Demonstrate Performance (ODP) at the end of the performance year.

(3)     were unsuccessful in completing an ODP during the performance year.

(4)     received an unsuccessful performance rating.

(5)     received a suspension, reduction in grade or pay for conduct or performance, or issued a removal decision letter during the performance year.

(6)     were decertified as a result of a performance deficiency during the performance year.

Def.'s App. 105-107 (CBA).

<u>Youngstown</u>, 859 F. Supp. 1134, 1136 (N.D. Ohio 1993), <u>aff'd in part, rev'd in part</u>, 70 F.3d 900 (6th Cir. 1995), the court found that:

> [A]ny bonus which is the result of collective bargaining is a non-discretionary bonus, and must, as a matter of law, be included in the "regular rate" of pay upon which . . . overtime is calculated.

<u>Featsent</u>, 859 F. Supp. at 1136 (footnote omitted).  Similarly, a DOL interpretive bulletin, 29 C.F.R. § 778.211, provides that "any bonus which is promised to employees upon hiring or which is the result of collective bargaining would not be excluded from the regular rate."  29 C.F.R. § 778.211(c).

Because the OSI and the process the FAA uses to determine the amount of the OSI are contained in the CBA, defendant cannot establish that the OSI was not paid "pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly," as required by 29 U.S.C. § 207(e)(3) and 5 C.F.R. § 551.511(b)(3).  <u>See Featsent</u>, 859 F. Supp. at 1136; <u>see also</u> 29 C.F.R. § 778.211.  In addition, because the Core Compensation Plan provides that all employees will receive an OSI and all ATCs have in fact received an OSI every year since 2004, defendant cannot establish that defendant retained discretion as to whether to award an OSI, as required by 29 U.S.C. § 207(e)(3) and 5 C.F.R. § 551.511(b)(3).  <u>See McLaughlin</u>, 681 F. Supp. at 1133 (To be excluded from the regular rate, "[t]he employer must retain discretion as to whether the payment will be made[.]").  Accordingly, defendant cannot exclude the OSI from the regular rate pursuant to 29 U.S.C. § 207(e)(3) or 5 C.F.R. § 551.511(b)(3).  Because interpretation of the provisions of the CBA and Core Compensation Plan is a matter of law, and because payments required by collective bargaining cannot be excluded from the regular rate, plaintiff is entitled to summary judgment that OSI must be included in the regular rate.  <u>See</u> RCFC 56(c)(1) ("A motion for summary judgment should be granted if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.").

    ii.    SCI

Mr. LeBovidge's declaration in support of plaintiffs states that the FAA did not retain discretion to determine whether to award SCI payments to plaintiffs or to determine the amount of the SCI payments awarded to plaintiffs:

> FAA employees also received additional annual pay adjustments called Superior Contribution Increases, or SCI payouts, based on criteria such as collaboration, customer service, and impact on organizational success.

>These are payments for an employee's superior work.  These are guaranteed
>if employees meet certain target goals and were paid out under a quota
>system in which some employees who met these target goals received the
>maximum amount, another group is paid the middle amount, and the
>remaining employees did not receive anything.

Pls.' App. 756 (LeBovidge Decl.).

Defendant argues that "[p]ursuant to Article 108, Section 9 of the [CBA], both the
decision to grant an SCI as well as the amount of an SCI are entirely within the discretion
of the FAA.  After the end of the performance year, FAA management assesses the
performance of each employee and makes a final SCI determination."  DFUF I ¶ 22
(citations omitted).

Section 9 of Article 108 of the CBA provides that the SCI will be based on
individual performance and awarded in accordance with Agency directives:

>a.  The Agency will identify which employees will receive an SCI using the
>criteria in the Agency's Core Compensation Plan.  The process for
>evaluating employees will include an opportunity for employees to provide
>input.

>b.  After the end of the performance year, management will assess the
>performance of each employee and make a final SCI determination.  Based
>on the assessment, the SCI will be awarded in accordance with Agency
>directives.

Def.'s App. 106 (CBA) (emphasis added).

The Core Compensation Plan relied on by defendant provides the following
Agency directives:

>Managers will use a streamlined assessment process to identify recipients
>for each annual pay increase level.  There are three possible annual pay
>increase levels:

>Approximately 20% will get the OSI plus an SCI-1 of 1.8% of base salary
>Approximately 45% will get the OSI plus an SCI-2 of 0.6% of base salary
>Approximately 35% will get the OSI with no SCI

Def.'s App. 58 (Core Compensation Plan) (emphasis added).  In addition, the Core Compensation Plan states that "SCI decisions will be made at the lowest practical levels, so that to the greatest extent possible, decision-makers will be personally familiar with the employee contributions.  The criteria against which employees will be rated are collaboration, customer service, and impact on organizational success."  Def.'s App. 58 (Core Compensation Plan).

Based on the CBA and the Core Compensation Plan, defendant contends that "the decision as to whether to grant the . . . SCI and the amounts of the . . . SCI are entirely within the discretion of the FAA administrator or other agency managers."  Def.'s Mot. 19.  Accordingly, defendant contends that SCI is "properly excluded from the FLSA regular rate calculation."  Def.'s Mot. 19.

The SCI and the process the FAA uses to determine the amount of the SCI are contained in the CBA and Core Compensation Plan.  <u>See</u> Def.'s App. 106 (CBA); <u>see also</u> Def.'s App. 57-58 (Core Compensation Plan).

In addition, the Core Compensation Plan provides that employees will receive an SCI or 1.8% of base salary, an SCI of 0.6% of base salary or no SCI:

> Approximately 20% will get the OSI plus an <u>SCI-1 of 1.8% of base salary</u>
> Approximately 45% will get the OSI plus an <u>SCI-2 of 0.6% of base salary</u>
> Approximately 35% will get the OSI with <u>no SCI</u>

Def.'s App. 58 (Core Compensation Plan) (emphasis added).  In other words, if the FAA decides to grant an SCI, it can choose between only an SCI of 1.8% of base salary or an SCI of 0.6% of base salary.  <u>See</u> Def.'s App. 58 (Core Compensation Plan).  The FAA cannot, for example, pay an SCI of 3.0% of base salary.

Because the SCI and the process the FAA uses to determine the amount of the SCI is contained in the CBA, defendant cannot establish that the SCI was not paid "pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly," as required by 29 U.S.C. § 207(e)(3) and 5 C.F.R. § 551.511(b)(3). <u>See</u> <u>Featsent</u>, 859 F. Supp. at 1136 ("[A]ny bonus which is the result of collective bargaining is a non-discretionary bonus, and must, as a matter of law, be included in the 'regular rate' of pay upon which . . . overtime is calculated." (footnote omitted)); <u>see also</u> 29 C.F.R. § 778.211(c) ("[A]ny bonus which is promised to employees upon hiring or which is the result of collective bargaining would not be excluded from the regular rate . . . .").  Additionally, because the FAA can only choose between an SCI of 1.8% of base salary and an SCI of 0.6% of base salary, <u>see</u> Def.'s App. 58 (Core Compensation

Plan), defendant cannot establish that defendant retained discretion as to the amount of the SCI, as required by 29 U.S.C. § 207(e)(3) and 5 C.F.R. § 551.511(b)(3), see McLaughlin, 681 F. Supp. at 1133. Accordingly, defendant cannot exclude the SCI from the regular rate pursuant to 29 U.S.C. § 207(e)(3) or 5 C.F.R. § 551.511(b)(3). Because interpretation of the provisions of the CBA and Core Compensation Plan is a matter of law, and because payments required by collective bargaining cannot be excluded from the regular rate, plaintiff is entitled to summary judgment that SCI must be included in the regular rate. See RCFC 56(c)(1) ("A motion for summary judgment should be granted if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.").

      iii.    RTI

      Plaintiffs argue that the FAA did not retain discretion to determine whether to award RTI payments to plaintiffs because the FAA promised to pay RTI to plaintiffs:

> [T]he RTI is "promised" to the employee if the employee continues his or her employment with the FAA. The specific purpose of the RTI is evident in its title--it is a "Retention Incentive" designed to convince the employee to continue working at the FAA. . . . [I]t is paid by the FAA as part of the employee's compensation resulting from him or her continuing at the FAA and not as some gratuitous bonus provided because the FAA has money leftover in its budget.

Pls.' Mot. 16-17 (citation omitted).

      Defendant argues that "[t]he decision as to whether to offer a retention incentive . . . is purely discretionary upon the part of the FAA," DFUF I ¶ 25, and "even if the agency decides to offer an incentive the amount of the incentive is purely discretionary, although FAA policy sets an upper limit upon the amount that can be offered," Def.'s Mot. 22.

      Neither the CBA nor the Core Compensation Plan--on which defendant relies with respect to its characterization of OSI and SCI payments--discuss the RTI. Defendant submitted a portion of the FAA's Human Resources Policy Manual (HRPM) describing the RTI. See Def.'s App. 109 (Human Resources Policy Manual). The HRPM "establishes FAA policy for paying a retention incentive." Def.'s App. 110 (Human Resources Policy Manual).

The HRPM provides that in order for an employee to receive an RTI, the employee and the FAA must enter into a service agreement:

> Before receiving a retention incentive, an employee must agree in writing to complete a specified period of employment with FAA. The service period begins on the first day of a pay period and ends on the last day of a pay period.

Def.'s App. 111 (Human Resources Policy Manual) (emphasis added).

The HRPM further provides that if the FAA terminates the service agreement, the employee is entitled to some or all of the RTI:

> The FAA may terminate a retention incentive service agreement based on the management needs of the agency. In this situation the employee is entitled to retain any retention incentive payment attributable to completed service and receive any portion of a retention incentive payment owed for completed service.

Def.'s App. 111 (Human Resources Policy Manual) (emphasis added). Accordingly, once the service agreement has been entered into, the FAA must pay the agreed upon RTI to the employee for the portion of service completed by the employee. See Def.'s App. 111 (Human Resources Policy Manual). The FAA cannot enter into a service agreement, allow an employee to complete a portion of service, and refuse to pay any RTI. See Def.'s App. 111 (Human Resources Policy Manual).

Because the HPRM provides that "[b]efore receiving a retention incentive, an employee must agree in writing to complete a specified period of employment with FAA," Def.'s App. 111 (Human Resources Policy Manual) (emphasis added), defendant cannot establish that the RTI was not paid "pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly," as required by 29 U.S.C. § 207(e)(3) and 5 C.F.R. § 551.511(b)(3), see 29 C.F.R. § 778.211(c) ("[B]onuses contingent upon the employee's continuing in employment until the time the payment is to be made" must be included in the regular rate.); see also Featsent, 859 F. Supp. at 1136. In addition, because the FAA cannot refuse to pay any RTI once it has entered into a service agreement with an employee, the FAA does not retain discretion as to the payment of the bonus "until near the end of the period which it covers," as required by 29 U.S.C. § 207(e)(3) and 5 C.F.R. § 551.511(b)(3). See McLaughlin, 681 F. Supp. at 1133; 29 U.S.C. § 207(e)(3). Accordingly, defendant cannot exclude the RTI from the regular rate pursuant to 29 U.S.C. § 207(e)(3) or 5 C.F.R. § 551.511(b)(3). Because the

interpretation of the HRPM is a matter of law, and because payments required by agreement cannot be excluded from the regular rate, plaintiff is entitled to summary judgment that RTI must be included in the regular rate.  See RCFC 56(c)(1) ("A motion for summary judgment should be granted if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.").

       b.      The Gift Exclusion

The court now considers whether any of OSI, SCI or RTI payments are excludable from the regular rate of pay as gifts under 29 U.S.C. § 207(e)(1).

Section 207(e) provides, in relevant part, that the regular rate of pay includes all remuneration paid to an employee except:

> (1) sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency . . . .

29 U.S.C. § 207(e)(1).

Similarly, 5 C.F.R. § 551.511(b), "which supplements and interprets the FLSA as it applies to federal employees," see Brooks, 730 F. Supp. at 1133 n.3, excludes bonuses and discretionary payments from "total remuneration."  In particular, 5 C.F.R. § 551.511(b) provides, in relevant part, that "total remuneration" includes all remuneration paid to an employee except:

> (1) Payments as rewards for service the amount of which is not measured by or dependent on hours of work, production, or efficiency (e.g., a cash award for a suggestion made by an employee and adopted by an agency) . . . .

5 C.F.R. § 551.511(b)(1).

Defendant contends that OSI is properly excluded from the regular rate as a gift pursuant to 29 U.S.C. § 207(e)(1) and 5 C.F.R. § 551.511(b)(1) because

> [t]he organizational goals upon which the decision whether to grant the OSI is based are not tied to hours of work, productivity, or efficiency.  They are based upon organizational categories such as:  safety, security, system efficiency, customer satisfaction, financial responsibility, and people.

Def.'s Resp. 8 (citing Def.'s App. 58 (Core Compensation Plan)).

Defendant further contends that "SCI's are granted based upon the performance of each individual air traffic controller."  Def.'s Resp. 10 (citations omitted).  "The performance standards that are the basis for the decisions of whether to grant the SCI and how much to grant are not tied to hours of work, productivity, or efficiency. . . .  [A] controller can only increase his chances of getting an SCI by doing his job well."  Def.'s Resp. 11.  Therefore, defendant contends, SCI is properly excluded from the regular rate pursuant to 29 U.S.C. § 207(e)(1) and 5 C.F.R. § 551.511(b)(1).  Def.'s Resp. 5.

Additionally, defendant argues that RTI is properly excluded from the regular rate pursuant to 29 U.S.C. § 207(e)(1) and 5 C.F.R. § 551.511(b)(1) because RTI is "not measured by or dependent upon hours of work, production, or efficiency."  Def.'s Mot. 22.

Plaintiffs contend that the regulation relied on by defendant, 5 C.F.R. § 551.511(b)(1), applies "only to payments made as rewards to employees for one-time occurrences (i.e., employee suggestions).  Rather than rewards for one-time occurrences, payments for OSI and SCI are made as a result of the controllers performing their underlying jobs well during the entire year."  Pls.' Reply 3.  Plaintiffs also contend that "RTI is not a gift but a mandatory payment, made by agreement, which must be included in the regular rate of pay."  Pls.' Reply 6 (footnote omitted).

Section 207(e)(1) defines the term "gift" in the phrase, "Sums paid as gifts."  29 U.S.C. § 207(e)(1).  Defendant argues that any payment that is not measured by or dependent on production, efficiency or hours worked is a "gift" that can be excluded from the regular rate pursuant to 29 U.S.C. § 207(e)(1) and 5 C.F.R. § 551.511(b)(1).  See Def.'s Resp. 5 ("[OSI, SCI and RTI] comprise discretionary cash rewards that are not tied to hours of work, productivity, or efficiency.").  However, defendant overlooks the text immediately preceding the portion of the text ("the amounts of which are not measured by or dependent on hours worked, production, or efficiency," 29 U.S.C. § 207(e)(1)) on which it relies.  The portion of the text defendant overlooks states that the "regular rate" does not include "payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency."  29 U.S.C. § 207(e)(1) (emphasis added).  It is not enough that the amount of a payment is "not measured by or dependent on hours worked, production, or efficiency."  See 29 U.S.C. § 207(e)(1).  To be excluded from the regular rate pursuant to 29 U.S.C. § 207(e)(1), the payment must also be a payment:  (1) "in the nature of gifts made at Christmas time or on other special occasions" and (2) "as a reward for service."  29 U.S.C. § 207(e)(1).  This interpretation

32

is consistent with the Conference Report to the public law that originally established the exemptions from the regular rate now found at 29 U.S.C. § 207(e) (Conference Report). The Conference Report provides that gifts and payments in the nature of gifts made on special occasions can be excluded from the regular rate pursuant to 29 U.S.C. § 207(e)(1):

> The conference agreement adopts the language of the House provisions excluding from the "regular rate" . . . bona fide gifts and payments in the nature of gifts made at Christmas time or on other special occasions under specified conditions . . . .

H.R. Rep. No. 81-1453, at 19 (1949) (Conf. Rep.); see Haber v. Americana Corp., 378 F.2d 854, 856 (9th Cir. 1967) (describing 29 U.S.C. § 207(e)(1) as excluding "gifts made on special occasions the amounts of which are not dependent upon hours worked, production or efficiency").  The Conference Report does not state that any payment that is "not measured by or dependent on hours worked, production, or efficiency" can be excluded from the regular rate.  If Congress intended any payment "not measured by or dependent on hours worked, production, or efficiency" to be considered a gift, Congress could have inserted a semicolon between the phrases "payments in the nature of gifts made at Christmas time or on other special occasions" and "as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency" in the text of 29 U.S.C. § 207(e)(1).

Also overlooked by defendant, the amount of the RTI is dependent on the hours worked by the employee:

> [A] retention incentive may not exceed 25 percent of the employee's annual rate of basic pay (including locality pay) in effect at the beginning of the service year, multiplied by the number of years (or fractions of a year) in the service period (not to exceed 4 years).

Def.'s App. 110 (Human Resources Policy Manual) (emphasis added).  Because the amount of the RTI is based on the number of years in the service period established by the service agreement, defendant cannot establish that the amount of the RTI is "not measured by or dependent on hours worked," as required by 29 U.S.C. § 207(e)(1). Additionally, the RTI was not awarded "at Christmas time or on other special occasions," 29 U.S.C. § 207(e)(1), but pursuant to service agreements, see Def.'s App. 111 (Human Resources Policy Manual).  Because interpretation of the HRPM is a matter of law, and because the RTI was dependent on hours worked and was not awarded "at Christmas time or on other special occasions," defendant cannot exclude RTI from plaintiffs' regular rates of pay as a "gift" pursuant to 29 U.S.C. § 207(e)(1) and 5 C.F.R. § 551.511(b)(1)

and plaintiffs are entitled to summary judgment on this issue.  <u>See</u> RCFC 56(c)(1) ("A
motion for summary judgment should be granted if . . . there is no genuine issue as to any
material fact and . . . the movant is entitled to judgment as a matter of law.").

Similarly, the amount of the OSI is dependent on organizational goals, including
"System Efficiency":

> There are currently six organizational goals:  Safety, Security, <u>System
> Efficiency</u>, Customer Satisfaction, Financial Responsibility, and
> People. . . .  After the end of the performance year, <u>the Administrator
> assesses the performance of the agency against the organizational goals and
> makes a final OSI determination</u>.

Def.'s App. 58-59 (Core Compensation Plan) (emphasis added).  Because the
Administrator assesses the performance of the agency against organizational goals,
including "system efficiency," to make a final OSI determination, defendant cannot
establish that the amount of the OSI is "not measured by or dependent on . . . efficiency,"
as required by 29 U.S.C. § 207(e)(1).  Moreover, the OSI was not awarded "at Christmas
time or on other special occasions," but pursuant to the CBA.  <u>See</u> Def.'s App. 105
(CBA).  Because interpretation of the CBA and Core Compensation Plan is a matter of
law, and because the OSI was dependent on efficiency and was not awarded "at
Christmas time or on other special occasions," defendant cannot exclude OSI from
plaintiffs' regular rates of pay as a "gift" pursuant to 29 U.S.C. § 207(e)(1) and 5 C.F.R. §
551.511(b)(1), and plaintiffs are entitled to summary judgment on this issue.  <u>See</u> RCFC
56(c)(1) ("A motion for summary judgment should be granted if . . . there is no genuine
issue as to any material fact and . . . the movant is entitled to judgment as a matter of
law.").

The Core Compensation Plan also states that the SCI will be determined by
evaluating, among other things, an employee's impact on organizational success:

> SCI decisions will be made at the lowest practical levels, so that to the
> greatest extent possible, decision-makers will be personally familiar with
> the employee contributions.  <u>The criteria against which employees will be
> rated are collaboration, customer service, and impact on organizational
> success.</u>

Def.'s App. 58 (Core Compensation Plan) (emphasis added).  Because organizational
success is measured by or dependent on "system efficiency" and the amount of the SCI is
determined by evaluating an individual's impact on organizational success, defendant

cannot establish that the amount of the SCI is "not measured by or dependent on . . . efficiency," as required by 29 U.S.C. § 207(e)(1).  In addition, the SCI was not awarded "at Christmas time or on other special occasions," but pursuant to the CBA.  See Def.'s App. 106 (CBA).  Because interpretation of the CBA and Core Compensation Plan is a matter of law, and because the SCI was dependent on efficiency and was not awarded "at Christmas time or on other special occasions," defendant cannot exclude SCI from plaintiffs' regular rates of pay as a "gift" pursuant to 29 U.S.C. § 207(e)(1) and 5 C.F.R. § 551.511(b)(1), and plaintiffs are entitled to summary judgment on this issue.  See RCFC 56(c)(1) ("A motion for summary judgment should be granted if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.").

B.    Count II

The court will address the issue of damages with respect to Count II at trial.  Because the court is not addressing the issue of damages with respect to Count II at this time, plaintiffs' Motion to Strike Mr. Whitlow's declaration is MOOT.

C.    Count III

In Count III, plaintiffs argue that defendant failed to "compensate plaintiffs for pre- and post-shift activities plaintiffs are 'suffered or permitted' to work" in violation of 29 U.S.C. § 203(g) and § 207(a).  Pls.' Mot. 1.  Defendant contends, "Plaintiffs' motion for summary judgment as to count III should also be denied because the issue of whether plaintiffs at the Dutchess County Air Traffic Control Facility spend more than a de minimis amount of time performing pre- and post-shift duties is a disputed issue of material fact."  Def.'s Resp. 3 (emphasis omitted).

Plaintiffs offer the deposition testimony of plaintiff FAA ATCs Daniel Grieco and Robert Fisher to support their claims regarding the amount of time plaintiffs spent performing pre-shift and post-shift activities.  See PFUF I ¶ 118.

1.    Pre-Shift Activities

Based on the deposition testimony of Mr. Grieco and Mr. Fisher, plaintiffs assert that "[p]rior to the watch schedule changes effective September 15, 2008, the ATCs who worked the 3 p.m. to 11 p.m. watch schedule were required to engage in a number of activities before their shift began at 3:00 p.m. which are called pre-duty familiarization. . . .  These activities take a minimum of 15-20 minutes each day."  PFUF I ¶ 118.  According to plaintiffs, these activities include among other tasks, familiarizing

themselves with weather conditions and any special information pertinent to that day's flights:

> reviewing a Read & Initial binder including reviewing any materials included in the binder; reviewing the IDS-4 (identifying runways and flight approaches in use that day); checking the weather visually and on an ATIS machine; reviewing the daily log, which reflects significant matters happening that day in the tower, including any equipment malfunctions or unique occurrences; and checking the Notice to Airmen, which contains pertinent information that pilots must know before landing at that airport.

Pls.' Mot. 25-26 (footnote and citation omitted); see also Pls.' App. 10, 22, 29 (Cahill Dep.); Pls.' App. 369-72 (Fisher Dep.); Pls.' App. 411-12, 440, 442-43 (Grieco Dep.); Pls.' App. 599-656 (Dutchess Tower Standard Operating Procedures, Apr. 15, 2007); Pls.' App. 726-29 (Esau Decl.); Pls.' App. 732-41 (FAA Order).  In addition, plaintiffs assert that the incoming[13] ATC must complete the following tasks after the above activities are completed:

> 1) review the status information area; 2) observe position equipment, operational situation, and the work environment; 3) listen to voice communications and observe other operational actions; 4) observe current and pending aircraft and vehicular traffic and correlate with flight and other movement information; and 5) indicate to the specialist being relieved that the position has been previewed and that the verbal briefing may begin.

Pls.' Mot. 26; see Pls.' App. 732-741 (FAA Order).  After the above tasks are completed, plaintiffs state that a position briefing must occur:  "[A] verbal briefing is given by the outgoing controller to the oncoming controller with information about abnormal or unusual items of special interest, the day's air traffic and any other information necessary for operational responsibility."  Pls.' Mot. 26; see Pls.' App. 732-41 (FAA Order).  "The FAA then requires a mandatory minimum of 2 minutes of shared observation of the air traffic in which both the outgoing and the oncoming controller are on position."  Pls.' Mot. 26 (footnote omitted); see Pls.' App. 732-41 (FAA Order).

Defendant contends that Mr. Grieco's and Mr. Fisher's allegations are contradicted by the declarations of Anthony Capaldi, a former FAA manager, and John Cahill, an FAA manager, offered by defendant.  Def.'s Resp. 39.  Mr. Capaldi and Mr. Cahill claim that

---

[13]An "incoming ATC" refers to an Air Traffic Controller (ATC) who is receiving position responsibilities from another ATC.  See Pls.' App. 733 (FAA Order).

pre-duty activities, including pre-duty familiarization and position relief briefing, take approximately four minutes to perform.  Def.'s Resp. 40; Def.'s App. 239 (Cahill Decl.) ("Considering the pre-duty familiarization and the position relief briefing together, controllers generally complete these tasks within 3-4 minutes."); Def.'s App. 226 (Capaldi Decl.) ("Based on my observations and experience at Dutchess Tower, it was extremely rare that it took a controller longer than four minutes total to complete these pre-duty familiarization and position briefing tasks.").

2.      Post-Shift Activities

Based on the deposition testimony of Mr. Grieco and Mr. Fisher, plaintiffs assert that the controller-in-charge "is responsible for closing the air traffic tower, and must perform certain activities that take on average 11 minutes . . . without compensation after his or her shift in order to close the tower."  Pls.' Mot. 25.  In particular, before closing the tower, the controller-in-charge must review the daily log, count daily air traffic, coordinate broadcast frequencies, contact the New York tower and bundle flight strips:

> The work activities necessary to close the tower . . . [i]nvolve confirming the work schedules of all controllers who worked that day and entering information on their behalf in the time keeping system; reviewing the daily log and making final entries for the day on runway closings, approaches, weather, unusual occurrences, and similar matters; counting the air traffic for the day; changing the weather setting from the hourly broadcast made by the controllers during the day to the automated weather report; setting the light control panel to set the lights for the runway approach system for night and turning the runway lights off; setting the thunderstorm panel; coordinating the broadcast frequencies; changing the recorded announcement pilots hear to make a recorded announcement with information such as announcing that the tower is closed and the common frequency pilots can now use, the approach to use, and informing the pilots that they can check with the New York tower; contacting the New York tower to let them know the tower is closed; bundling all of the flight strips, counting them, and recording this information in the daily log; lowering the contrast on all computer and radar screens and turning off all of lights on all equipment in the tower; setting the tower alarm and temperature; walking downstairs and turning off the facility alarm; and turning off the tape that records all information on air traffic control.

Pls.' Mot. 27-28 (citation omitted).  According to plaintiffs, these post-shift activities "take between 10-15 minutes, and, on average 11 minutes."  Pls.' Mot. 28 (citation omitted).

Defendant contends that Mr. Grieco's and Mr. Fisher's allegations are contradicted by the declarations of Mr. Capaldi and Mr. Cahill and the videotape demonstration of Mr. Capaldi performing the tower closure procedures prepared by Mr. Capaldi and Mr. Cahill. Def.'s Resp. 40-41; Def.'s App. 228, 234-36 (Capaldi Decl.); Def.'s App. 239 (Cahill Decl.).  Mr. Capaldi and Mr. Cahill claim that post-shift activities take no more than two minutes after concluding air traffic services to perform.  Def.'s Resp. 41; Def.'s App. 239 (Cahill Decl.) ("With respect to the duties particular to closing the tower, the entire tower closing process takes less than ten minutes.  Even then, almost all of the duties are performed just prior to closing while on duty.  The tasks that must be performed after concluding air traffic services take no more than 1-2 minutes."); Def.'s App. 228 (Capaldi Decl.) ("There is no need for me to address Mr. Fisher's testimony regarding the closing procedures, etc.  The videotape speaks for itself."); Def.'s App. 235-36 (Capaldi Decl.) ("The resulting videotape demonstrates that I completed the entire tower closing tasks in approximately 10 minutes, that I performed nearly all of the tasks before the tower officially closed (i.e. before the end of my shift), and that those final tasks that could not be performed until the tower closed took at most one minute.  I performed these final tasks before the tower's official closing time (i.e. while I was still on duty) as I often did, and as was permitted by Dutchess Tower policy.  If some CPCs performed these final tasks and/or additional tasks after their shift concluded, they never made me aware of it."); Def.'s App. 234 (Capaldi Decl.) ("With respect to closing the tower off the clock, in my 27 years as a CPC and FLM at Dutchess Tower, I never witnessed or heard that CPCs were working beyond their shift to perform closing procedures.").

"To establish that preliminary or postliminary work is compensable, plaintiffs first must show that the time spent engaged in the activity was not so 'insubstantial and insignificant' as to bar recovery under the 'de minimis doctrine.'"  Bull, 68 Fed. Cl. at 225 (quoting Anderson, 328 U.S. at 693).  "The de minimis doctrine limits FLSA liability for overtime activities that consume negligible amounts of time."  Id.  "OPM limits the application of the de minimis doctrine to periods of 10 minutes or less per day."  Id. at 226 (citing 5 C.F.R. § 551.412(a)(1)).

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1).  The parties' testimony is in conflict regarding the amount of time plaintiffs spent performing pre-shift and post-shift activities.  Because plaintiffs' deposition testimony is that pre-shift activities take between 15-20 minutes and post-shift

activities take between 10-15 minutes and defendant's declarations assert that pre-shift activities take no more than 4 minutes and post-shift activities take no more than 2 minutes, there remains a genuine issue of material fact as to whether plaintiffs spent more than a de minimis amount of time performing pre-shift and post-shift activities.

3.      Liquidated Damages and the Three-Year Statute of Limitations

Because the court has determined that there remains a genuine issue as to whether plaintiffs spent more than a de minimis amount of time performing pre-shift and post-shift activities, it is unnecessary for the court to determine whether or not plaintiffs are entitled to liquidated damages or a three-year statute of limitations in connection with plaintiffs' pre- and post-shift activities claims at this time.

4.      Motion to Strike

Plaintiffs contend that defendant violated the sham affidavit doctrine and Rule 30(b)(6) in its filings in support of its motion for summary judgment on Count III.  Under the sham affidavit doctrine, a party "'cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity.'"  Grand Acadian, Inc. v. United States, 87 Fed. Cl. 193, 206 (2009) (quoting Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992).

Defendant produced John Cahill as a designated Rule 30(b)(6) witness.  Pls.' Mot. Strike 4.  Mr. Cahill testified during deposition about the pre-duty familiarization process that ATCs must complete.  Pls.' Mot. Strike 4-5.  According to plaintiffs, "pre-duty familiarization" includes reviewing the Read and Initial (R&I) binder:

> reviewing a Read & Initial binder including reviewing any materials included in the binder; reviewing the IDS-4 (identifying runways and flight approaches in use that day); checking the weather visually and on an ATIS machine; reviewing the daily log, which reflects significant matters happening that day in the tower, including any equipment malfunctions or unique occurrences; and checking the Notice to Airmen, which contains pertinent information that pilots must know before landing at that airport.

Pls.' Mot. 25-26 (footnote and citation omitted).  Mr. Cahill also testified that pre-duty familiarization should occur prior to assuming a position:

> Q:     And so before–if somebody was coming on duty, and they were
>        going to assume a position, . . . they would need to do this pre-duty
>        familiarization before they got on that position?
> A:     They should, yes.

Pls.' Mot. Strike 5 (alteration in original) (emphasis omitted) (citation omitted).  Mr.
Cahill stated that ATCs should complete the pre-duty familiarization process prior to
assuming a position.

Defendant submitted a declaration from Anthony Capaldi, a subordinate of Mr.
Cahill, with its motion for summary judgment.  Pls.' Mot. Strike 5.  Plaintiffs contend that
portions of Mr. Capaldi's declaration "directly conflict with Mr. Cahill's Rule 30(b)(6)
testimony."  Pls.' Mot. Strike 5.  In particular, plaintiffs point to the following declaration
testimony by Mr. Capaldi that explains the process of reviewing the R&I binder and that
ATCs should review the R&I binder at the start of their shift:

> Read and Initial items are annotated with "Read Immediately", "Read by
> (date)", or "Read prior to taking position".  When an R&I item is brought to
> the tower, even if it is marked "read immediately", people are obviously not
> expected to stop what they are doing, ignore airplanes, and read the item.  It
> is acceptable to read it at some point during the course of the shift.  The
> same expectation exists at the start of one's shift.  The individual must
> review the R&I binder, be aware of the new item, read it at that point, or
> read it during the course of the shift.  Only items marked "read prior to
> taking position" must be read prior to taking a position.  Only two or three
> times a year, has there been an item marked "Read prior to taking position".
> Most times there is nothing new in the binder.  Controllers open the binder,
> see that they have initialed the last item, and then close it.  Even when there
> are new items, CPCs are free to review the binder after they are on duty, but
> when they are not on position.  In other words, between the generous breaks
> built into Dutchess' staffing, and the sheer lack of aircraft traffic, CPCs
> have ample time to review the R&I Binder <u>after</u> their duty shift has
> commenced.

Def.'s App. 227 (Capaldi Decl.) (emphasis in original); <u>see</u> Pls.' Mot. Strike 5-6.  In his
declaration, Mr. Capaldi explained that ATCs should review the R&I binder at the start of
their shift.  Def.'s App. 227-28 (Capaldi Decl.).  Mr. Capaldi also stated, "As a result,
CPCs can use the time when they are on duty but not on position to read the items in the
R&I binder."  Def.'s App. 228 (Capaldi Decl.).

Plaintiffs contend that the above portions of the affidavit testimony of Mr. Capaldi are inconsistent with Mr. Cahill's testimony that pre-duty familiarization should occur before an ATC assumes a position.  Pls.' Mot. Strike 8-9; see Pls.' App. 22 (Cahill Dep.) ("Q:  And so before–if somebody was coming on duty, and they were going to assume a position, . . . they would need to do this pre-duty familiarization before they got on that position?  A:  They should, yes.").  Therefore, plaintiffs contend, defendant should be precluded from introducing those inconsistent portions of the declaration of Mr. Capaldi in its motion for summary judgment.  Pls.' Mot. Strike 8-9.

Plaintiffs do not acknowledge that at least one statement of Mr. Capaldi could be viewed as harmonizing the views of Mr. Cahill and Mr. Capaldi with respect to the preparation necessary to begin duty, in particular, that Mr. Capaldi stated that "[p]re-duty familiarization is what a controller must accomplish in order to have a general idea of what is going on prior to taking a position."  Def.'s App. 226 (Capaldi Decl.) (emphasis added).  Mr. Capaldi's declaration could be read to indicate that in order to complete the pre-duty familiarization process, an ATC must review the R&I binder prior to taking position, but that the review of the R&I binder does not require that an ATC read every item in the R&I binder.  See Def.'s App. 226-27 (Capaldi Decl.).  Mr. Capaldi did not state that pre-duty familiarization can be accomplished after taking position.  The portions of the declaration testimony of Mr. Capaldi cited to by plaintiffs can be harmonized with the testimony of Mr. Cahill:  Mr. Cahill and Mr. Capaldi both stated that pre-duty familiarization should occur prior to taking position.

Even if the court were to strike the portions of Mr. Capaldi's declaration that plaintiffs claim are inconsistent with Mr. Cahill's deposition testimony, there still would be a genuine issue of material fact with respect to Count III because the deposition testimony of Mr. Grieco and Mr. Fisher produced by plaintiffs is that pre-shift activities take between 15-20 minutes and post-shift activities take between 10-15 minutes, and in the declaration of Mr. Cahill produced by defendant, Mr. Cahill asserts that pre-shift activities take no more than 4 minutes and post-shift activities take no more than 2 minutes.  Therefore, a genuine issue of material fact remains as to whether plaintiffs spent more than a de minimis amount of time performing pre-shift and post-shift activities.

D.     Count IV

Plaintiffs contend that time spent bidding on their work schedules and vacation leave while off-duty constitutes "work" under the FLSA and that the FAA violated the FLSA by failing to compensate plaintiffs for such work.  Pls.' Mot. 30.  Defendant contends that bidding on work schedules and vacation leave "does not constitute work pursuant to the FLSA because it is an activity that primarily benefits plaintiffs rather than

41

the FAA." Def.'s Mot. 39.  The compensability of off-duty bidding for work schedules and vacation leave appears to be an issue of first impression in the United States Court of Federal Claims, and the court has not found a decision in another jurisdiction addressing the issue.

The process used by FAA employees to select their work schedules and vacation leave schedules is known as "bidding the basic watch schedule (BWS)."  Def.'s App. 327 (Cassady Decl.).  "The FAA does not require any [ATCs] to bid the BWS or vacation leave schedule.  Bidding is completely voluntarily with the employee."  Def.'s App. 328 (Cassady Decl.); see Pls.' Resp. to DFUF I ¶ 80.  Some controllers bid for work schedules and vacation leave schedules while off-duty.  PFUF I ¶ 168; Def.'s Resp. to PFUF I ¶ 168.  "If a plaintiff is unable to participate in bidding either during her shift or by proxy, she would be assigned a work schedule by her supervisor and permitted to submit requests for non-vacation leave during the leave year."  DFUF I ¶ 80; Pls.' Resp. to DFUF I ¶ 80.

In order to prove that overtime activities are "an integral and indispensable part of the principal activities" for which plaintiffs are entitled to compensation, Steiner, 350 U.S. at 256, "plaintiffs must establish that each task (1) was undertaken for the benefit of the employer; (2) was known or reasonably should have been known by the employer to have been performed; and (3) was controlled or required by the employer," Bull, 68 Fed. Cl. at 222.

Plaintiffs contend that the bidding process is beneficial to the FAA for a number of reasons.  In particular, plaintiffs argue that the bidding process allows the FAA to create work schedules in advance and estimate staffing needs:

> The bidding process is beneficial to the FAA as it permits the FAA to set the employees' work and vacation schedules in advance for the entire year. The FAA can plan annual staffing levels and determine whether there will be a need for overtime, which factors into the FAA's annual overtime budget.  In addition, the FAA knows the approximate number of people who will be off on any given day, which assists the FAA in scheduling special events at the airport.  Advance scheduling makes the supervisors' jobs easier as they are not fielding last minute leave requests nor spending as much time on purely administrative tasks such as scheduling the employees' vacation time or work schedules.

Pls.' Mot. 32 (citation omitted); see Pls.' Resp. 43, 45-46.  Plaintiffs further contend that "[p]ermitting controllers to use their earned leave helps the FAA maintain a happier, more

42

productive work force, something the FAA wants to foster." Pls.' Mot. 32; Pls.' Resp. 45-46.

Defendant contends that bidding is an accommodation made by the FAA to FAA employees and that the FAA does not benefit from bidding:

> Contrary to plaintiffs' claims, bidding is not work. It is simply a process for requesting one's preferred work and vacation schedule no different analytically than filling out a leave slip. . . . In support of their claim that bidding comprises work, plaintiffs assert that bidding is for the benefit of the FAA. However, there is no evidence whatsoever that bidding benefits the agency. . . . [T]he bidding procedure is an accommodation made by the FAA to its employees to allow them the benefit of requesting leave and work schedules in order of seniority and having advance knowledge of whether they will be able to take time off on the dates they prefer.

Def.'s Resp. 45.

If an employee is engaging in the principal activity for which she is employed, whether on or off the clock, the activity is beneficial to the employer. It becomes more difficult for the court to determine whether an activity is beneficial to the employer when the activity is not the "principal activity" for which the employee is employed. In situations where the activity the employee is engaging in is not the principal activity for which the employee is employed, the court applies a sliding scale test: the more the activity benefits the employer, the more likely the activity is compensable work under the FLSA. See Bobo, 136 F.3d at 1467 (citing Reich, 45 F.3d at 650). In other words, "The test is not whether the employer is the sole beneficiary of the activity, but rather whether the employer derives a significant benefit from the activity." Whalen, 93 Fed. Cl. at 605-06 (citations and internal quotation marks omitted). Here, the "principal activity" of each plaintiff is to control air traffic. Plaintiffs are not controlling air traffic while they are bidding off-duty.

An activity may still be compensable under the FLSA if the activity is necessary to the employee's ability to accomplish their principal duty. Bull, 68 Fed. Cl. at 223. However, bidding for work schedules and vacation leave is not necessary to plaintiffs' ability to accomplish their principal duty of controlling air traffic. There is no evidence that failing to bid while off-duty would result in plaintiffs' inability to control air traffic. See Whalen, 93 Fed. Cl. at 605 (finding that time spent on medical-waiver examinations benefited the FAA and emphasizing that "[t]he activities of plaintiffs--seeking and obtaining medi[c]al waivers--are necessary in the sense that plaintiffs would be unable to

continue working . . . without them"). If plaintiffs do not bid off-duty, by proxy or when they return to work, plaintiffs are simply assigned a work schedule by their supervisor and permitted to submit requests for non-vacation leave during the leave year. DFUF I ¶ 80; Pls.' Resp. to DFUF I ¶ 80. Any benefit the FAA receives from a happier work force is too speculative to result in bidding being considered compensable work under the FLSA. Plaintiffs' argument that the FAA benefits from the ability to set schedules in advance is similarly unpersuasive. Absent the 2006 CBA, the FAA is not required to use the bidding process. The FAA could assign work schedules and vacation leave without any input from employees.

There is uncontested evidence that the opportunity to bid for work schedules and vacation leave is viewed as a benefit by the employees. See SRI Int'l, 775 F.2d at 1116 ("The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." (citations omitted)). When plaintiff Mr. Baker was asked, "Do you like the fact that you have the opportunity [to] be able to bid for permanent days off," Mr. Baker responded, "Yes. . . . It builds in more regularity in – during the year." Def.'s App. 343 (Baker Dep.). When plaintiff Mr. Campo was asked, "do you like the fact that you have the opportunity to be able to request time off. . . . [a]nd. . . why?" Mr. Campo responded, "Yes. . . . It's nice to get the days off for the vacation time that you're looking for." Def.'s App. 351 (Campo Dep.). When plaintiff Mr. Morris was asked about bidding for days off, Mr. Morris stated, "It helps for the employees. Happy employee. I got the two weeks to go to Branson, Missouri, or Orlando, or on occasion, stay at home. You are grinding every day on this job and, you know, hey, in three days I'm going to be the toes in the sand, drink in the hand. Okay?" Def.'s App. 366 (Morris Dep.). Mr. Cassady, a former FAA ATC, stated that bidding off duty "is a luxury item. This is not an assignment of work, so if you choose to participate in the bidding process, then you can either give a proxy to somebody, tell your supervisor what your top three choices are or have somebody call you at home when it's your turn, or you can call in when it's your turn or you could sit silent. As far as the agency is concerned, we don't care." Def.'s App. 376 (Cassady Dep.). James Durham Slate, one of defendant's Rule 30(b)(6) witnesses, stated that off-duty bidding for work schedules and vacation leave was "requested by the union for the employee benefit," Def.'s App. 379 (Slate Dep.), and "[i]t's not for management," Def.'s App. 381 (Slate Dep.). Plaintiffs present no evidence suggesting that the FAA realized a direct and significant benefit from plaintiffs' off-duty bidding.

Plaintiffs also argue that bidding is compensable work under the FLSA because the FAA allows employees to bid while on-duty. Pls.' Mot. 31-32; Pls.' Resp. 43-44. The court is unpersuaded by plaintiffs' argument. The fact that an employee is allowed to do a particular activity at work does not require the conclusion that the activity is

compensable work under the FLSA.  As defendant points out, "Most employers allow their employees to perform a number of personal tasks, i.e.[,] coffee breaks, filling out leave slips, using the restroom, etc. without deducting the time taken from their work time as long as the privilege is not abused."  Def.'s Resp. 46.  Defendant explains that plaintiffs were occasionally permitted to have extended breaks to make personal phone calls, see Def.'s Resp. 46-47; Pls.' App. 307 (Baker Dep.); Pls.' App. 322-23, 325 (Campo Dep.), and it does not follow that making personal phone calls is compensable work under the FLSA, see Def.'s Resp. 47.  The fact that the FAA allows employees to bid on-duty does not support the conclusion that the FAA derives a significant benefit from off-duty bidding.  Off-duty bidding is acknowledged by the testimony of the employees to be to their benefit.  The evidence is undisputed that off-duty bidding was sought in collective bargaining.  Accordingly, defendant is entitled to summary judgment on this issue.  See RCFC 56(c)(1) ("A motion for summary judgment should be granted if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.").

Because the court has determined that off-duty bidding is not undertaken for the benefit of the FAA, it is unnecessary for the court to determine whether off-duty bidding was known or reasonably should have been known by the FAA to have been performed and controlled or required by the FAA.

IV.    Conclusion

Based on the foregoing:  (1) defendant's Motion is GRANTED-IN-PART and DENIED-IN-PART and plaintiffs' Motion is GRANTED-IN-PART and DENIED-IN-PART with respect to Count I; (2) defendant's and plaintiffs' Motions are DENIED with respect to Count II; (3) defendant's and plaintiffs' Motions are DENIED with respect to Count III; and (4) defendant's Motion is GRANTED and plaintiffs' Motion is DENIED with respect to Count IV.

The court will address liability and damages with respect to Count III and damages with respect to Counts I and II at trial.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge